UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

TRAVELERS PROPERTY & CASUALTY
INSURANCE COMPANY,

Plaintiff,

v.

TRITON MARINE CONSTRUCTION
CORP., R. JOHN ARMSTRONG, PATRICIA
B. ARMSTRONG, LEOLA E. DALY, M.
JEAN SEARLE, WILLIAM F. SEARLE,
WENDELL E. WEBBER, JANICE K.
WEBBER, SANDRA F. PRESTRIDGE, A.
BURTON PRESTRIDGE, EDWARD A.
WARDELL, CAROLYN S. WARDELL,
JERRY W. MCDONALD, MARY J.
MCDONALD, AND THE ESTATE OF
EUGENE F. DALY,

Defendants.

CIVIL ACTION NO. 302CV1500SRU

MEMORANDUM OF LAW IN SUPPORT OF
TRAVELERS PROPERTY & CASUALTY INSURANCE COMPANY'S
MOTION FOR SUMMARY JUDGMENT

I.    INTRODUCTION

Pursuant to Fed. R. Civ. P. Rule 56, the plaintiff, Travelers Property & Casualty

Insurance Company, as Administrator for Reliance Insurance Company[1] (hereinafter collectively

referred to as "Travelers"), submits this Memorandum of Law in support of its Motion for

Summary Judgment against the defendants, Triton Marine Construction Corp. ("Triton"), R.

John Armstrong, Patricia B. Armstrong, Leola E. Daly, N. Jean Searle, William F. Searle,

Wendell E. Webber, Janice K. Webber, Sandra F. Prestridge, A. Burton Prestridge, Edward A.

---

[1] On or about May 2000, Travelers purchased certain assets and liabilities relating to the surety and fidelity lines of Reliance Group Holdings, Inc., including the potential rights and obligations arising from surety bonds issued by Reliance Insurance Company, such as the Bond and Indemnity Agreement which are the subject of this lawsuit. (Monteiro Aff., ¶4). Travelers is Administrator for Reliance Insurance Company ("Reliance"). Unless otherwise specified, Reliance will be referred to herein as "Travelers." (Monteiro Aff., ¶4; Exhs. 26 and 28).

1

Wardell, Carolyn S. Wardell, Jerry W. McDonald, Mary J. McDonald and the Estate of Eugene

F. Daly (hereinafter collectively referred to as "Defendants" or "Indemnitors").

The material facts in this case can be simply stated:

1. The Indemnitors signed an unambiguous and comprehensive agreement of indemnity promising to indemnify Travelers for any and all loss and expense Travelers incurred as a result of issuing surety bonds on behalf of its principal, Triton;

2. Travelers, in good faith, incurred significant expenses as a direct and proximate result of the issuance of a surety bond on behalf of its principal, Triton;

3. The Indemnitors have failed and/or refused to reimburse Travelers for its expenses in violation of the specific terms and conditions of the indemnity agreement.

The relevant law can also be simply stated:

1. A surety such as Travelers is entitled to indemnification for payments made in good faith to discharge its principal's obligations; and

2. Indemnity agreements, such as the one at issue in this case, are valid and enforceable, and are intended to provide comprehensive protection to the surety for losses sustained in fulfilling its obligations on bonds, including reimbursement of all legal and consultant fees.

There are no genuine issues as to any material fact regarding Travelers' entitlement to

indemnification for its losses and expenses incurred in fulfilling its obligations as surety and,

therefore, Travelers is entitled to summary judgment on its indemnification claim and on all

counts asserted in Triton's Counterclaim.

## II.    UNDISPUTED FACTS[2]

On September 12, 1994, the Defendants executed a written agreement of indemnity ("the Indemnity Agreement") in favor of Travelers in which each Defendant specifically agreed to indemnify and hold harmless Travelers from and against any and all loss, including attorney and consultant fees and expenses, that Travelers might incur by reason of having issued bonds on behalf of Triton, as principal, including any attorneys' fees and expenses incurred by Travelers in enforcing the terms of the Indemnity Agreement.

On or about May 9, 1997, Triton entered into contract with United States of America, Army Corps of Engineers (hereinafter referred to as "Corps" or "Government"), for the construction of the Abiquiu Dam Emergency Gate Bypass System ("the Project"). In reliance on the Indemnity Agreement, Travelers issued a performance bond, as surety, naming the Army Corps of Engineers, as obligee, and Triton, as principal, with respect to the Project.

On or about February 18, 2000, the Government issued a Termination for Default of the Contract and demanded that Travelers, as surety, complete the Contract pursuant to the Bond. The Corps terminated Triton because emergency gates were not properly aligned and did not comply with the contract specifications which resulted in a tremendous quantity of water leaking along the sides of each gate (in the range of 3000 gallons per minute). The Corps claimed that the gate leakage was caused by Triton's failure to align the gates within the tolerances specified in the Contract. Triton, on the other hand, disputed the termination and took the position that the rework of the emergency gates was compensable and an extra to Triton.

Travelers and the Corps subsequently entered into Takeover Agreement whereby Travelers agreed to undertake the completion of the Project. In order to reduce its indemnity

---

[2] This section provides a summary of the undisputed facts upon which Travelers relies in support of its Motion for Summary Judgment. The specific evidence upon which Travelers relies, along with citations to pertinent discovery materials, is set forth in Travelers Property & Casualty Insurance Company's Local Rule 56(a)1 Statement of Material Facts, which Travelers incorporates herein by reference.

obligation and contain costs, Triton agreed to serve as the completion contractor and pay for the costs to perform the remedial work at the Project. Travelers, through the efforts of its principal, Triton, effectuated a completion of the Project. Triton subsequently assembled a compilation of its costs to perform the rework of the gates and requested that Travelers submit the costs to the Corps on Triton's behalf. Triton represented these costs to be $2,129,022.00 ("Triton's Rework Claim").

On or about August 30, 2001, Travelers submitted Triton's Rework Claim on behalf of Triton to the Corps. On or about September 10, 2001, the Corps advised Travelers that Triton's Rework Claim was not properly certified and could not be considered as a claim. On or about November 15, 2001, Travelers sent a revised letter to the Corps addressing the issue raised by the Corps concerning the certification for Triton's Rework Claim. Travelers also submitted new certification language that was provided by Triton. At no time was Travelers, by submitting the costs, subscribing to Triton's position that the gate leakage was caused by a design defect.

On or about December 18, 2001, the Corps' Contracting Officer, Theresa Armijo, denied Triton's Rework Claim (hereinafter "the Contracting Officer's Decision") stating that because proper installation of the emergency gates, including the gate frames, was the responsibility of Triton, the costs submitted for the subject claim were not attributable to the Government. According to the Contracting Officer's Decision, written notice of an intent to appeal to the Armed Services Board of Contract Appeals ("ASBCA") had to be furnished to the ASBCA with ninety (90) days of receipt of the Contracting Officer's Decision, or an action had to be brought directly in the United States Court of Claims within twelve (12) months of receipt of the Contracting Officer's Decision.

On or about January 18, 2002, Travelers notified Triton of the Contracting Officer's Decision relative to the Rework Claim. At the same time, Travelers indicated to Triton that

4

Travelers was seeking reimbursement of its incurred losses and expenses. Travelers also informed Triton that, as of January 18, 2002, Travelers had incurred $164,078.60 in consulting and attorney fees and expenses. Travelers requested that Triton contact it regarding reimbursement pursuant to Triton's indemnity obligations.

Despite the fact that Triton had already commenced a lawsuit against the Corps to pursue Triton's Rework Claim, and despite the fact that Triton had recovered $2.4 million on two rework insurance policies for the costs in Triton's Rework Claim, Triton requested that Travelers pursue Triton's Rework Claim by appealing the Contracting Officer's Decision or lending Travelers' name to such an appeal. Despite the fact that Triton was simultaneously pursuing the Corps in a separate proceeding for the rework costs, it was Triton's position that Triton either needed Travelers to appeal the decision itself or permit Triton to pursue an appeal in Travelers' name.

Travelers, in good faith, conducted an investigation and evaluation of Triton's request to appeal the Contracting Officer's Decision. Travelers ultimately decided that it would not appeal the Decision or lend its name to an appeal because it was Travelers' position, based on the opinions of its experts, that the rework was necessitated by poor workmanship, faulty installation and/or poor manufacture of gates and frames, and that rework was not necessitated by a defective design, which was the position Triton was demanding that Travelers assert. Additionally, despite the fact that Travelers' continued to express its position that it would review any information and documentation to support Triton's position, Travelers never received any new documentation that would have altered the position of its experts. Moreover, Travelers receipt of a Grand Jury Subpoena in connection with a criminal investigation of Triton, which Travelers understood to encompass Triton's Rework Claim, further underscored Travelers decision that it should not be a party to the appeal. Throughout this time period, Triton never provided Travelers with any

5

expert reports demonstrating that the gate leakage was due to a design defect, as opposed to faulty workmanship by Triton. Ultimately, Travelers came to the conclusion that the litigation Travelers was asked to put its name to involved allegations that were contrary to what Travelers believed to be true and, therefore, it was not in Travelers' best interest to go forward.

Travelers has sustained damages and losses, including consultant and attorney fees and other expenses, and anticipates sustaining additional losses and expenses as a result of having issued the Bond on behalf of Triton. Despite Travelers' repeated demands to the Indemnitors that the Indemnitors reimburse Travelers in accordance with their obligations under the Indemnity Agreement, the Indemnitors refused to comply. As of September 28, 2004, Travelers has sustained losses in the form of attorney, consultant, and other miscellaneous fees and expenses in excess of $263,058.75, by reason of having issued the Bond and in enforcing the this action, all of which is recoverable under the specific terms of the Indemnity Agreement.

## III.    SUMMARY JUDGMENT STANDARD.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. Rule 56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material facts." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

While the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Knight v. U.S. Fire Ins. Co.,

804 F.2d 9, 12 (2d Cir.1986). The non-moving party may defeat the summary judgment motion

by producing sufficient specific facts to establish that there is a genuine issue of material fact for

trial. Celotex Corp. v Catrett, 477 U.S. 317, 322 (1986). Finally, "'mere conclusory allegations

or denials'" in legal memoranda or oral argument are not evidence and cannot by themselves

create a genuine issue of material fact where none would otherwise exist. Quinn v. Syracuse

Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir.1980), quoting SEC v. Research

Automation Corp., 585 F.2d 31, 33 (2d Cir.1978).

Summary judgment is a favored mechanism for resolving an indemnification action by a

surety against its principal. See, e.g., PSE Consulting, Inc. v. Frank Mercedes & Sons, Inc., 267

Conn. 279, n.18 (2004); Frontier Ins. Co. v. International Inc., 124 F. Supp. 2d 1211 (N.D. Ala.

2000) (indemnification action resolved on summary judgment); United States Fidelity and

Guaranty Company v. Feibus, 15 F. Supp. 2d 579, 585 (M.D. Pa. 1998) (same); United States v.

International Fidelity Insurance Co., 999 F. Supp. 1420 (D. Kan. 1998) (same); Transamerica

Insurance Co. v. HVAC Contractors, Inc., 857 F. Supp. 969 (N.D. Ga. 1994) (same); Hartford

Accident & Indemnity Co. v. Mills Roofing & Sheet Metal, Inc., 418 N.E.2d 645 (Mass. App.

1981) (same).

## IV.     TRAVELERS IS ENTITLED TO SUMMARY JUDGMENT ON ITS INDEMNIFICATION AS A MATTER OF LAW.

It is well settled that a surety is entitled to indemnification for payments made to

discharge its principal's obligations. See Pearlman v. Reliance Ins. Co., 371 U.S. 132, 137

(1962); Admiral Drywall, Inc. v. Cullen, 56 F.3d 4, 5 (1st Cir. 1995). Courts routinely hold that

a surety seeking indemnification based on a written indemnity agreement is entitled to judgment

as a matter of law where (1) the defendants signed the indemnity agreement, (2) the surety

incurred losses, and (3) the defendants have refused to indemnify the surety. See Gundle Lining

Constr. Corp. v. Adams County Asphalt, Inc., 85 F.3d 201 (5th Cir. 1996) (upholding summary

judgment in favor of surety against indemnitors); <u>Continental Casualty Company v. American Security Corp.</u>, 443 F.2d 649 (D.C. Cir. 1970) (same); <u>Feibus</u>, 15 F. Supp. 2d 579 (same); <u>Frontier</u>, 124 F. Supp. 2d 1211 (same); <u>General Acc. Ins. Co. of America v. Merritt-Meridian Constr. Corp.</u>, 975 F. Supp. 511 (S.D.N.Y. 1997) (same); <u>General Ins. Co. of America v. Eastern Consolidated Utilities, Inc.</u>, 1995 WL 428685 (E.D. Pa. 1995) (same); <u>H.V.A.C. Contractors</u>, 857 F. Supp. 969 (same); <u>Employers Ins. of Wausau v. Able Green, Inc.</u>, 749 F. Supp. 1100, 1103 (S.D. Fla. 1990) (same); <u>Fireman's Fund Ins. Co. v. Nizdil</u>, 709 F. Supp. 975, 977 (D. Or. 1989) (same); <u>Buckeye Union Ins. Co. v. Boggs</u>, 109 F.R.D. 420, 423-24 (S.D. W.Va. 1986) (same); <u>Millis Roofing</u>, 418 N.E.2d 645 (same).

Indemnity agreements, like the one executed by the Defendants, have repeatedly been declared to be valid and enforceable obligations. <u>See</u> <u>Mercedes</u>, 267 Conn. at 291-92; <u>Fidelity and Deposit Company v. Bristol Steel and Iron Works</u>, 722 F.2d 1160, 1163 (4th Cir. 1983); <u>Commercial Insurance Company v. Pacific Peru Construction Corp.</u>, 558 F.2d 948 (9th Cir. 1977); <u>Engbrock v. Federal Insurance Co.</u>, 370 F.2d 784, 786 (5th Cir. 1967), and cases cited <u>infra</u>.

The Indemnity Agreement provides that the Defendants:

> agree to protect, indemnify and hold harmless [Travelers] and its attorney-in-fact against any and all Loss that may in any way arise out of the exercise of the assignments contained in this agreement and the powers herein granted, specifically waiving any claim which any Indemnitor has or might hereinafter have against [Travelers] or its attorneys-in-fact on account of anything done in enforcing the terms of this Agreement or the Bonds.
>
> [and]
>
> agree to indemnify, and keep indemnified, and hold and save harmless RELIANCE against all LOSS. The duty of INDEMNITORS to indemnify RELIANCE is a continuing duty, separate from the duty to exonerate, and survives any payments made in exoneration of RELIANCE. Amounts due RELIANCE shall be payable upon demand.

(See Travelers' Local Rule 56(a)1 Statement of Material Facts (hereinafter, "Travelers' Stmnt."),

¶¶3,4).

It is undisputed that the Defendants signed the Indemnity Agreement. (Travelers' Stmnt.,

¶2). Travelers has incurred losses in the form of consultants' and attorneys' fees and expenses in

investigating and fulfilling its obligations under the Bond and enforcing the terms of the

Indemnity Agreement in this action. (Travelers' Stmnt., ¶70).

As of September 28, 2004, Travelers has incurred attorney, consultant, and other

miscellaneous fees and expenses in excess of $263,058.75 as a direct and proximate result of

having issued the Bond on behalf of Triton. (Traveler' Stmnt., ¶¶73, 74).[3] Travelers has made

repeated demands upon the Defendants that they reimburse Travelers for all of its incurred

consultants' and attorneys' fees and expenses and, to date, the Defendants have failed and/or

refused to comply in violation of the express terms of the Indemnity Agreement. (Travelers'

Stmnt., ¶¶39, 43, 45, 51 and 75)

There is no genuine issue as to any material fact and, therefore, Travelers is entitled to

summary judgment on its indemnification as a matter of law.

## V.    TRAVELERS IS ENTITLED TO SUMMARY JUDGMENT ON TRITON'S COUNTERCLAIM.[4]

Travelers is also entitled to summary judgment on all counts of Triton's Counterclaim,

the thrust of which is that Triton was damaged by Travelers' decision to not appeal the

Contracting Officer's Decision or lend its name to such an appeal. As set forth below, Triton

---

[3]Pursuant to Paragraph 28 of the Indemnity Agreement, "an itemized statement of Loss sworn to by an officer of authorized representative of [Travelers] or voucher(s) or other evidence of such Loss shall be prima facie evidence of the fact and extent of the liability of the Indemnitors to [Travelers] in any claim or suit and in and all matters arising between Indemnitors and [Travelers]. (Exh. 27, ¶28)

[4]In its Counterclaim, Triton asserts claims for breach of contract (Counts I, II and III), breach of duty of good faith and fair dealing (Count IV), Uniform Commercial Code (Count V), breach of fiduciary duty (Count VI), misrepresentation (Count VII), negligence (Count VIII), and violation of the Connecticut Unfair Trade Practices Act (Count IX).

cannot prove essential elements of its claims and, therefore, Travelers is entitled to summary judgment on Triton's Counterclaim.

**A.    Travelers Is Entitled To Summary Judgment On All Counts Of Triton's Counterclaim Because Triton Cannot Establish That Travelers Acted In Bad Faith.**

To bar enforcement of an indemnity agreement, an indemnitor must demonstrate that the surety acted in bad faith. <u>Mercedes</u>, 267 Conn. at 300-305; <u>Bristol Steel</u>, 722 F.2d at 1163; <u>Pacific-Penn</u>, 558 F.2d at 953; <u>Engbrock</u>, 370 F.2d at 786; <u>Frontier</u>, 124 F. Supp. 2d at 1213; <u>Feibus</u>, 15 F. Supp. 2d at 585-88; <u>IBEW v. United Pacific Ins. Co.</u>, 697 F. Supp. 378 (D. Idaho 1988). The "bad faith" standard in this context requires proof of *intentional misconduct* and *improper motive* on the part of the surety. <u>Mercedes</u>, 267 Conn. at 304-5; <u>Buckman v. Peoples Express</u>, 205 Conn. 166, 171 (1987); <u>American States Ins. Co. v. Glover</u>, 960 F.2d 149 (6th Cir. 1992); <u>Frontier</u>, 124 F. Supp. at 1214-16; <u>Feibus</u>, 15 F. Supp. 2d at 585-87; <u>Able Green</u>, 749 F. Supp. at 11024; <u>Farmer's Union</u>, 675 F. Supp. at 1538-39.

Lack of diligence, negligence or gross negligence, however, is not the equivalent of "bad faith." <u>Id.</u>; <u>Mercedes</u>, 267 Conn. at 304-5, 308-9. Moreover, a surety's decision to accommodate its own financial interests does not constitute bad faith. <u>Mercedes</u>, 267 Conn. at 300-5; <u>Bristol Steel</u>, 722 F.2d at 1165; <u>Feibus</u>, 15 F. Supp. 2d at 585-86. Similarly, an allegation that a surety failed to mitigate damages in administering claims does not rise to the level of bad faith and therefore does not state a defense to a surety's claim for indemnification. <u>American States Insurance Co. v. Glover</u>, 960 F.2d 149 (6th Cir. 1992); <u>Feibus</u>, 15 F. Supp. 2d at 587.

There are no facts to support an alleged claim that Travelers acted in bad faith or with dishonest purpose by not appealing or lending its name to an appeal of the Contracting Officer's Decision. To the contrary, when one considers the multiple factors that led to the decision – that Travelers' consultants believed the Rework Claim to be without merit because the gates leaked

10

as a result of Triton's faulty workmanship and not because of a design defect, that Triton

repeatedly refused to provide Travelers with expert reports or other information to support its

position, that Triton refused to reimburse Travelers for its incurred expenses pursuant to the

Indemnity Agreement, and that Travelers understood that a criminal investigation was pending

concerning Triton's Rework Claim – the only conclusion that one can reach is that Travelers'

decision was not only imminently reasonable, but also correct.[5] See In re McNeil, 22 B.R. 408,

415-416 (Bkrtcy. Tenn. 1982) (no bad faith on part of surety in declining to pursue affirmative

claims of its principal against third parties).

Under the well established precedent in Connecticut and elsewhere, the failure of Triton

to establish such dishonest purpose compels entry of summary judgment in favor of Travelers on

Triton's Counterclaim as a matter of law.

**B.    Travelers Is Entitled To Summary Judgment On All Counts Of Triton's Counterclaim Because Travelers Had No Duty Or Obligation To Pursue Triton's Rework Claim.**

There is no provision in the Indemnity Agreement – the operative agreement between

Travelers and Triton – that obligated Travelers to pursue or sponsor an appeal of the Rework

Claim. Courts have addressed the issue and have held that a surety is not obligated to pursue its

principal's affirmative claims. See Four Seasons Environmental, Inc. v. Westfield Cos., 638

N.E.2d 91 (Ohio App. 1 Dist. 1994) (surety not obligated to pursue principal's affirmative claims

where nothing in the indemnity contract required such action on the part of the surety). In fact,

the Second Circuit has held that a surety may actually step in and settle the claims over the

objections of its principal. See, e.g., Hutton Construction Company v. County of Rockland, 52

F.3d 1191 (2d Cir. 1995).

---

[5] Considering the requirements and implications of Fed. R. Civ. P. Rule 11, Triton's position, that Travelers was required to appeal the Contracting Officer's Decision or lend its name to an appeal that Travelers' believed had no good faith basis, is blatantly untenable.

Hutton involved a dispute between a principal and its surety over their respective rights to settle a lawsuit with the owner of a project, and to retain the proceeds of that settlement. The District Court in Hutton painstakingly examined the respective rights of principal and surety, and described the difficult position a surety is placed in when a balking principal, which has "nothing to lose," seeks to gamble with the surety's money. As the District Court put it: "Having thus resisted settlement, Hutton approached the trial with only upside potential: if it recovered, it might keep some portion of the recovery; if it lost, it would ignore the verdict and the Suret[y] . . . . Thus Hutton proposed to play this high stakes game with the proverbial O.P.M. [Other People's Money] in this case, the Sureties." Id. The District Court concluded, and the Second Circuit affirmed, that the surety in Hutton had a clear right to settle the litigation notwithstanding the objection of its principal, and to keep the settlement proceeds pursuant to the principal's obligation to indemnify its surety. See also Walsh v. Seaboard Surety Company, 94 F. Supp. 2d 205 (D. Conn. 2000) (summary judgment granted to surety on claim by indemnitors that surety acted in bad faith by settling and denying principal right to enforce claim against an obligee).

Like in Hutton, not only was Travelers under no duty to appeal the Rework Claim, under the Assignment, Attorney-In-Fact, and Right to Settle provisions of the Indemnity Agreement (see Travelers' Stmnt., ¶¶6, 7 and 8), Travelers had the right at all times to settle Triton's Rework Claim had it chosen to do so. While Triton may wish it to be so, there simply is no corresponding duty which obligated Travelers to assume the risk and burden of an appeal of Triton's Rework Claim.

Triton can point to no duty, whether contractual or otherwise, that obligated Travelers to pursue an appeal of the Contracting Officer's Decision. As a result, Travelers is entitled to summary judgment on all counts of Triton's Counterclaim.

12

**C.**   **Triton Had An Independent Right To Pursue The Rework Claim And Did So In Its Action Against The Government.**

Irrespective of the issue of whether Travelers had the contractual right to settle or dispose of Triton's claim, the fact remains that case law holds that Triton was free to pursue the Rework Claim directly against the Corps, independent of the involvement of Travelers. Recognizing this right, Triton in fact did assert such a claim against the Corps in the Triton/Corps Lawsuit. (Travelers' Stmnt., ¶¶62-69). In other words, Triton did not need the "sponsorship" of Travelers to pursue Triton's Rework Claim.

Indeed, the United States Court of Claims has addressed this precise issue and held that an equitable adjustment to the contractor following a wrongful termination by the Government included not only costs the contractor itself incurred before the termination, but also excess costs of the surety in completing the contract. William Green Constr. Co. v. United States, 477 F.2d 930, 938 (Ct. Cl. 1973) ("the equitable adjustment called for by the contract is flexible enough to cover [excess completion costs], to the extent the contractor has incurred such costs as a result of the wrongful termination"). Moreover, in D.E.W., Inc. and D.E. Wurzbach, 1998 WL 212744, ASBCA No. 49735, 98-2 BCA 29, 738 (1998), the Armed Services Board of Contract Appeals held that a defaulted contractor could prosecute an appeal under the Contract Disputes Act where the contractor was liable to its surety for costs and expenses incurred following the default pursuant to a written agreement of indemnity.

Similarly, in Wolfe Constr. Co., 1988 WL 100976, ENG BCA No. 5309, 88-3 BCA ¶21,122 (1988), the Corps of Engineers Board of Contract Appeals held that a terminated contractor who was obligated to its surety under an indemnity agreement was permitted to pursue excess completion costs against the Government as part of its recovery under the "Termination for Convenience" clause. In Wolfe, the Board found that allowing surety expenses "accords with common sense, fairness, and a reasonable interpretation and application of the scheme and clause

13

governing termination for convenience of a construction contract following its conversion from a termination for default." Id. Significantly, in Wolfe, the Board noted that the principal need not actually have paid the surety in order to have incurred a "cost" under an indemnity agreement. Id.; see also Jeffrey B. Peterson & Assoc. v. Dayton Metropolitan Housing Auth., 2000 WL 1006562, *16 (Ohio App. 2 Dist. 2000). The Board, in Wolfe, stated:

> It is well established that in actions for breach of contract which arise out of an improper default termination, the Government will be liable to the surety for reasonably-incurred costs of completion. J.D. Hedin Construction Co. v. United States, 456 F.2d 1315, 1320-1327 (Ct. Cl. 1972); Dale Construction Co. v. United States, 168 Ct. Cl. 692, 733 (1964) (the Government is liable for damages which are the direct and foreseeable result of its breach of the plaintiff's contract); G.L. Christian and Associates v. United States, 312 F.2d 418, 423, (Ct. Cl. 1963) (object in determining damages for breach of contract is to put injured party in as good a position peculiarly as it would have been if contract had been completely performed). In addition, in an action for breach damages where the contractor has entered into an indemnity agreement with the surety, *the contractor can recover from the Government the amount of the surety's excess completion costs,* irrespective of whether the surety had a formal takeover agreement with the Government. Carchia v. United States, 485 F.2d 622 (Ct. Cl. 1973).

Wolfe Constr. Co., 1988 WL 100976 (emphasis added) ("It is necessary to include these costs, which are a direct and foreseeable result of the improper termination, in order to put Appellant in as good a position as it would have been had the contracts been completely performed").

Recognizing this right, Triton commenced the Triton/Corps Lawsuit and amended its original Complaint to "recover the costs expended in connection with the gate leakage remediation work." (Travelers' Stmnt., ¶64-66). In Count II ("Compensation for Amounts Expended Remediating the Gate Leakage Problem") of the Amended Complaint, Triton specifically alleged and admitted that that "the costs incurred remediating the gate leakage problem as hereinabove alleged are compensable, and are recoverable in this action." (Travelers' Stmnt., ¶65). Triton further admitted that "the incurred costs directly related to or

14

caused by the Corps' administration of this Project and its requirement for remediation rework on the emergency gates are compensable under and for breach of Contract . . . ." (Travelers' Stmnt., ¶65). Triton specifically sought a judgment in the Triton/Corps Lawsuit for "2.8 million dollars . . . to compensate for the direct and indirect costs associated with the gate leakage remediation effort . . . ." (Travelers' Stmnt., ¶66). Further demonstrating the viability of Triton's direct claim against the Corps for the Rework Claim, Triton waived its right to recover from the Corps any costs that Triton may have incurred as a result of the post-termination rework pursuant to the Entry of Judgment in the Triton/Corps Lawsuit. (Travelers' Stmnt., ¶69).

Because Triton had an independent right to bring an action directly against the Corps for the Rework Claim, and did so in the Triton/Corps Lawsuit, Triton's claim that Travelers foreclosed Triton's right to pursue the Corps for these costs is completely without any factual or legal merit.

D.    **Travelers Is Entitled To Summary Judgment For The Independent Reason That Triton Has Recouped Its Alleged Rework Costs Under Its Rework Insurance Policies And, Therefore, Triton Has Suffered No Damages.**

Through its Counterclaim, Triton brazenly seeks a double recovery as a result of its having failed to properly install the emergency gates. Indeed, Triton has already recovered the costs to perform the rework of the emergency gates from its rework insurers. (Travelers' Stmnt., ¶¶23, 33). Triton received a total of $2.4 million from the rework insurers – ostensibly because Triton took the position that the costs were not due to a design defect which would not have been covered under the policies -- for the costs it incurred to perform the rework of the emergency gates. (Travelers' Stmnt., ¶33). The claim that Triton asked Travelers to pass up through the Corps was $2,129,022. (Travelers' Stmnt., ¶33). The simple fact is that Triton has already recovered the very costs that it seeks to obtain from Travelers in this action and, as a result, Triton cannot establish that it suffered any damages as a result of Travelers not "sponsoring" an

15

appeal of Triton's Rework Claim. Accordingly, Travelers is entitled to summary judgment on all counts of Triton's Counterclaim.

**E.    Travelers Is Entitled To Summary Judgment On Triton's Counts For Breach Of Contract (Counts I, II and III).**

Travelers is entitled to summary judgment on Counts I, II and III of the Counterclaim for the independent reason that Triton cannot establish that Travelers breached any portion of the Indemnity Agreement, which is the operative agreement between the parties. Chem-Tek, Inc. v. General Motors Corp., 816 F. Supp. 123, 131 (D. Conn.1993) (to prevail on a claim for breach of contract a party must establish the existence of a contract, a breach of the contract, and damages).[6] There is no provision of the Indemnity Agreement that obligates Travelers to pursue Triton's Rework Claim. Triton cannot establish that it is a third party beneficiary of the Takeover Agreement, or even if it was, that such fact somehow obligated Travelers to pursue Triton's Rework Claim. Moreover, Triton cannot establish that the Indemnity Agreement was modified to impose such an obligation. Indeed, the Indemnity Agreement provides that it "may not be changed or modified orally. No change or modification to this Agreement shall be effective unless specifically agreed to in writing and executed by [Travelers]." (Exh. 27, ¶36).

Additionally, Triton cannot prevail on its breach of contract counts for the fundamental reason that Triton breached the Indemnity Agreement by not reimbursing Travelers for its incurred expenses *upon demand*, as required by Paragraph 11 of the Indemnity Agreement. (Travelers' Stmnt., ¶¶4, 39, 43, 45, 51 and 75). Thus, Triton cannot recover for any alleged subsequent breach by Travelers for not "sponsoring" the Rework Claim. Ravitch v. Stollman Poultry Fams, Inc., 165 Conn. 135, 149, 328 A.2d 711, 719 (1973) (it is well established that a party cannot recover on a contract unless he has fully performed his obligations under the contract).

Based on the foregoing, Travelers is entitled to summary judgment on Counts I, II and III of the Counterclaim for the independent reason that Triton cannot establish that Travelers breached the Indemnity Agreement.

### F.    Traveler Is Entitled To Summary Judgment On Triton's Count For Breach Duty Of Good Faith And Fair Dealing (Count IV).

Travelers is entitled to summary judgment on Count IV of the Counterclaim for the independent reason that Triton cannot establish that Travelers engaged in conduct that deprived Triton of the benefits of the Indemnity Agreement and that Travelers acted in bad faith.

An action for breach of the covenant of good faith and fair dealing requires proof of three essential elements:  (1) that the plaintiff and the defendant were parties to a contract under which the plaintiff reasonably expected to receive certain benefits; (2) that the defendant engaged in conduct that injured the plaintiff's right to receive some or all of those benefits; and (3) that when committing the acts by which it injured the plaintiff's right to receive benefits he reasonably expected to receive under the contract, the defendant was acting in bad faith.  Franco v. Yale University, 238 F. Supp. 2d 449, 255 (D. Conn. 2002) (citations omitted).

As a preliminary matter, considering that the purpose and intent of the Indemnity Agreement is to protect the interests of Travelers, it is not clear what benefits Triton expected to receive under the Indemnity Agreement.  Such an analysis is not necessary, however, because Triton cannot establish that Travelers' engaged in conduct that deprived Triton of the benefits of the Indemnity Agreement and, as discussed in Section V.A. above, Triton cannot establish that Travelers acted in bad faith.  Accordingly, Travelers is entitled to summary judgment on Count IV of the Counterclaim.

---

[6] Triton likewise cannot establish that it suffered damages. See, Section V.D., infra.

**G.    Travelers Is Entitled To Summary Judgment On Count V Of The Counterclaim (Uniform Commercial Code).**

Travelers is entitled to summary judgment on Count V of the Counterclaim for the independent reason that the Uniform Commercial Code ("UCC") has no application to the Indemnity Agreement. Triton claims that the UCC's "standard of commercial reasonableness" governs Travelers alleged duty to preserve and resolve Triton's Rework Claim. It argues that the UCC commercial reasonableness standard should apply because of the provision in the Indemnity Agreement which permits Travelers to file the Indemnity Agreement as a UCC financing statement. This argument is without merit because it is the good faith standard that applies to a surety's settlement of a principal's affirmative claim, and the UCC has no application in this case. See General Ins. Co. of Amer. v. Mezzacappa Bros., Inc., 2003 WL 22244964 (E.D.N.Y. 2003) (granting summary judgment to surety and holding that the "good faith" standard applied to surety's settlement of principal's affirmative claims and not the UCC standard of commercial reasonableness).

Noting that Courts consistently apply the good faith standard to the surety's settling of its principal's affirmative claims – and that the UCC has no role to play, the Court, in Mezzacappa, stated that "[t]here is no pragmatic distinction between the evaluation of a surety's settlement of claims against its [principal] and the settlement by the surety of its [principal's] affirmative claims." Id.; see, e.g., Compania de Remorque Y Salvamento, S.A. v. Esperance, Inc., 187 F.2d 114 (2d Cir.1951) (evaluating settlement of contractors counterclaims by the good faith standard); North American Speciality Insur. Co. v. Montco Const. Co., Inc., 2003 U .S. Dist. LEXIS 9995 at *22 (W.D.N.Y.2003) (absent showing of bad faith, surety had the right to settle contractor's pending litigation against the owner); General Accident Insur. Co. v. Merritt-Meridian Construction Corp., 975 F. Supp. 511, 519 (S.D.N.Y.1997) (in the absence of bad faith,

surety "had the right to settle not only claims against [the contractor], but [the contractor's] affirmative claims against the owner as well"). The Court further noted that

> it is established law that the UCC does not displace the surety's equitable subrogation rights -- that is, the surety's right to stand in the shoes of its insured once the surety has performed its obligations under a bond. See, e.g., National Shawmut Bank of Boston v. New Amsterdam Casualty Co., 411 F.2d 843 (1st Cir. 1969) (holding that UCC Article 9 does not affect a surety's right to equitable subrogation); Amwest Surety Insur. Co. v. United States, 870 F. Supp. 432, 434 (D. Conn.1994) (rejecting attempt to apply the UCC to the surety's equitable subrogation claim, after noting that "[t]here is no reference in the UCC to sureties," and that a "surety claim is [not] derived from ... the ordinary financing contemplated by UCC Article 9").

Id. Finally, the Court stated that, like the position asserted by Triton, "the argument that the provision in the indemnification agreement allowing [the surety] to file the agreement as a financing statement under the UCC should be taken to mean that the parties intended the UCC to govern their entire agreement, is specious." Id. (stating that "[t]he purpose of a financing statement under the UCC is merely to alert prospective third party lenders that a conflicting security agreement may exist").

Other Courts which have considered the issue in other contexts have concluded that the UCC has no application to the surety's indemnity agreement. See, e.g., National Shawmut Bank of Boston v. New Amsterdam Casualty Co., 411 F.2d 843 (1st Cir. 1969) (UCC does not apply to surety's right to unpaid progress payments); Transamerica Insurance Company v. Barnett Bank of Marion County, N.A., 140 So.2d 113 (Fla. 1989) (surety's assignment right to accounts receivable conditions upon principals default was not a security interest under the UCC); In re Alcon Demolition, Inc., 204 B.R.440 (Bankr. D.N. J. 1997); Alaska State Bank v. General Insurance Company of America, 579 P.2d 1362 (Alaska 1978); Canter v. Schlager, 267 N.E.2d 492 (Mass. 1971). In re J. B. Gleason Co., 452 F.2d 1219 (8th Cir. 1971), the court held that, although contract retainage represents and "account" within a meaning of the UCC, the surety's

assignments rights under an indemnity agreement did not create a security interest and the type

intended to come within the preview of Article 9.  Indeed, the Court observed,

> A surety ship undertaking is not a true financing arrangement or
> security interest as those conceptual phrases are ordinarily and
> commonly used. There is no financing in the usual sense but
> rather a type of insurance running to the owner that insurers the
> contractors performance in case of default. No funds are advanced
> at the time of the surety ship contract.

Id. at 1223-1224.

Based on the forgoing, Travelers is entitled to summary judgment on Count V of the

Counterclaim because the UCC standard of commercial reasonableness has no application to the

Indemnity Agreement.[7]

### H.    Traveler Is Entitled To Summary Judgment On Triton's Count For Breach Of Fiduciary Duty (Count VI).

Courts, including the Second Circuit, have specifically held that a surety does not owe a

fiduciary duty to its principal.  National Union Fire Ins. Co. of Pittsburgh v. Woodhead, 917 F.2d

752, 757 (1990) ("a surety does not owe a fiduciary duty to its principal"); National Union Fire

Ins. Co. of Pittsburgh v. Turtur, 892 F.2d 199, 207 (1989) (same), citing United States Fidelity &

Guaranty Company v. Cassel Brothers, Inc., 22 B.R. 408, 413 (E.D. Tenn. 1982) (no fiduciary

relationship existed between contractor and surety which furnished performance bond to

contractor); see also National Union Fire Ins. Co. of Pittsburgh v. Oleckna, 1988 WL 131306

(S.D.N.Y. 1988) (surety is not fiduciary to principal); Insurance Co. of N. Am v. Morris, 981

---

[7]Even if this Court were to find that Travelers decision not to pursue an appeal Triton's Rework Claim is subject to
the UCC's "commercial reasonableness" standard, Travelers easily meets this standard because, prior to its decision
to not pursue an appeal of the Contracting Officer's Decision, Travelers investigated the merits of the claim and
thoughtfully considered the potential costs and risks of litigating a claim its experts felt had no merit, and for which
Travelers understood there to be a pending criminal investigation. (Travelers' Stmnt., ¶¶41-61). Moreover, and
despite specific requests, Triton failed to provide evidence to support its position that the rework costs were incurred
as a result of a design defect. (Travelers' Stmnt., ¶52, 54). Because recovery through litigation is speculative in
nature, the decision of Travelers to not pursue the appeal, following a careful consideration of the potential benefits
and risks of such an appeal, is not grounds to question the commercial reasonableness of its decision. Finally, it was
not unreasonable for Travelers to not pursue the appeal considering Triton possessed this right itself at all times and,
in fact, did pursue the claim against the Corps in the Triton/Corps Lawsuit.

S.W.2d 667, 674 (Tex. 1998) ("The relationship between a surety and a principal, however, is not generally one of a fiduciary nature"); National Fire Ins. Co. of Pittsburgh v. Califinvest, 1992 WL 35017 (S.D.N.Y.1992) ("A surety does not have a fiduciary relationship with its principal"); Latimer v. Hall Fin. Group, Inc., 1990 WL 133225 (N.D. Ill. 1990) (same); Northwestern Nat'l Ins. Co. v. Barney, 1988 WL 215411 (N.D. Ohio 1988) (same). These decisions are consistent with the principle that there is no fiduciary duty where a relationship is merely commercial or contractual in nature. Metal Finishing Technologies, Inc. v. Fuss and O'Neil, Inc., 4 Conn. L. Rptr. 493 (1991).[8]

The relationship between Travelers and Triton is that of surety and principal. The relationship is contractual and commercial. No fiduciary duty exists between the parties and, therefore, Travelers is entitled to summary judgment on Count VI of the Counterclaim.

## I.    Travelers Is Entitled To Summary Judgment On Triton's Count For Misrepresentation (Count VII).

Travelers is entitled to summary judgment on Count VII of the Counterclaim for the independent reason that Triton cannot establish that Travelers promised to pursue or lend its name to an appeal of Triton's Rework Claim. As a preliminary matter, it is not entirely clear from the Counterclaim which theory of misrepresentation Triton is proceeding under (i.e. fraudulent, negligent, etc.). Nonetheless, Triton cannot point to a misstatement on the part of Travelers. See Citino v. Redevelopment Agency of City of Hartford, 721 A.2d 1197 (Conn. App. 1998) ("The basic element of a claim for misrepresentation, however, is whether there was a misstatement"). Neither can Triton establish that it justifiably relied upon any alleged

---

[8]Consistent with this analysis, most courts have held that in general, a surety has no duty to disclose information to its principals. Morris, 981 S.W.2d at 675; In re U.S. Grant Hotel Association, Ltd. Securities Litigation, 740 F. Supp. 1460, 1465 (S.D. Cal. 1990); National Union Fire Ins. Co. v. DeLoach, 708 F. Supp. 1371 (S.D.N.Y. 1989); In re McNeil, 22 Bankr. 408 (E.D. Tenn. 1982). Moreover, it would be particularly inappropriate to infer a fiduciary relationship between a surety and its principal because sureties occupy a vulnerable nexus as between the principal and the obligee -- what one commentator has described as "the classic dilemma" of sureties. See John W. Hinchley, Surety's Performance over Protest of Principal: Considerations and Risks, 22 Tort & Ins. L.J. 133 (1986).

misstatement. Id. ("Without a misrepresentation, there can be no justifiable reliance"). Indeed, any such reliance on Triton would have been unreasonable given Triton's ability to pursue the Rework Claim directly against the Corps -- which it admittedly did.

Simply stated, there is no evidence to support the allegation that Travelers represented to Triton that Travelers would pursue an appeal or lend its name to an appeal against the Corps in pursuit the Rework Claim on Triton's behalf. Moreover, Triton's allegation that Triton undertook the rework based on an alleged misstatement belies all fact and logic. There can be no other logical conclusion but that Triton undertook to perform the rework of the gates, not because of an alleged misstatement by Travelers, but because Triton wanted to mitigate its damages and serve its own interests by completing Project pursuant to its indemnity obligations to Travelers. (Travelers' Stmnt., ¶¶20, 21). Accordingly, Travelers is entitled to summary judgment on Count VII of the Counterclaim.

**J.     Traveler Is Entitled To Summary Judgment On Triton's Count For Negligence (Count VIII).**

There can be no actionable negligence unless there exists a cognizable duty of care. RK Constructors, Inc. v. Fusco Corp., 231 Conn. 381, 384-385, 650 A.2d 153 (1994); Frankovitch v. Burton, 185 Conn. 14, 20, 440 A.2d 254 (1981). Whether a duty of care exists is a question of law to be decided by the court. Shore v. Stonington, 187 Conn. 147, 151, 444 A.2d 1379 (1982). Here, Travelers did not undertake or owe a duty of care to Triton. T.P.K. Const. Corp. v. Southern American Ins. Co., 752 F. Supp. 105 (S.D.N.Y. 1990) (finding no independent duty holding surety to standard of conduct higher than that envisioned by parties' general indemnity agreement and, therefore, alleged breach of agreement did not give rise to a negligence claim against surety).

Travelers abrogated no duty with respect to its refusal to pursue the Rework Claim for Triton. It had no such obligation. Even if Triton could establish that Travelers owed a duty, and

22

that Travelers breached that duty, negligence is not a defense to an indemnity action.  The rights

granted to Travelers vis-a-vis its principal, Triton, and other indemnitors under the Indemnity

Agreement are purely contractual and do not transform into duties running from the surety to any

third-party, including its principal, Triton.  See, e.g., Transamerica Premier Ins. Co. v. K & S

Const., 850 F. Supp. 930 (D. Colo. 1994) (surety had the right under the indemnity agreement,

but no duty, to finance the principal); Four Seasons Environmental v. Westfield Cos., 638 N.E.2d

91 (Ohio App. 3d 1994) (surety's right under the indemnity agreement to settle a claim against

the bond was not a duty).

Accordingly, Travelers is entitled to summary judgment on Count VIII of the

Counterclaim.

### K.    Traveler Is Entitled To Summary Judgment On Triton's Count For Violation Of The Connecticut Unfair Trade Practices Act (Count IX).

The Connecticut Unfair Trade Practices Act ("CUTPA") provides that "[n]o person shall

engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct

of any trade or commerce."  C.G.S. §42-110b(a).  In the context of insurance practices, it is well

settled that a CUTPA claim must be based on a violation of the Connecticut Unfair Insurance

Practices Act ("CUIPA").  Mead v. Burns, 199 Conn. 651, 509 A.2d 11 (1986).  In Mead, the

Connecticut Supreme Court construed the relationship between CUIPA and CUTPA and ruled

that both CUIPA and CUTPA causes of action require the allegation of a "general business

practice" entailing more than one act of misconduct.[9]  Id. at 659, 664.  Under the guidelines set

forth in Mead, a plaintiff must allege that the defendant has committed the alleged wrongful acts

with such frequency as to indicate a general business practice in order to successfully assert

CUIPA and CUTPA violations.  See Quimby v. Kimberly Clark Corporation, 28 Conn. App 660,

---

[9]    The Court observed that a CUTPA claim based on the public policy embodied in CUIPA must be consistent with the regulatory principles established therein, and that CUIPA reflects the legislative determination

613 A.2d 838 (1992). Thus, a cause of action cannot rest on the allegation of a solitary unfair practice.

Moreover, CUTPA protects against "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." C.G.S. §42-110b(a); Boulevard Associates v. Sovereign Hotels, 72 F.3d 1029, 1038 (2d Cir. 1995) (agreeing with vast majority of Connecticut courts that a breach of contract is not sufficient to form the basis for a CUTPA claim). Actions undertaken pursuant to CUTPA must demonstrate some nexus with the public interest because CUTPA was not intended to be a remedy for the redress of entirely private wrongs. See Ivey Barnum & O'Mara v. Indian Harbor Properties, Inc., 190 Conn. 528 (1983). As such, in the absence of "substantial aggravating circumstances" or "deceptive practices" accompanying the alleged breach, a mere contract claim, standing alone, is an insufficient basis for a CUTPA claim. City of Bridgeport v. Aerialscope, Inc., 12 F. Supp. 2d 275, 278 (D. Conn. 2000). This is particularly true when CUTPA allegations "simply incorporate by reference [a] breach of contract claim and do not set forth how or in what respect the defendant's activities are either immoral, unethical, unscrupulous or offensive to public policy." Boulevard, 72 F.3d at 1038. As set forth above, this is precisely the situation presented here, as Triton's CUTPA claims simply incorporates by reference the prior counts, followed by conclusory language that merely parrots the language of the statute. (See Triton's Counterclaim, Count IX, ¶¶1-72).

Triton's claim against Travelers is based solely on the isolated allegation that Travelers did not pursue the Rework Claim. Triton fails to support this position with any material facts underlying the CUTPA allegations. As the sole basis for its claims against Travelers, Triton alleges in exceptionally broad strokes that Travelers failed to preserve the Rework Claim.

that isolated instances of unfair insurance settlement practices are not so violative of public policy as to warrant

24

Notably, Triton fails to even allege that Travelers has acted similarly with respect to other bond principals, or that Travelers' actions constitute a general business practice. Triton's claim does not meet the standard enunciated in <u>Mead</u>, and is legally insufficient to state a cause of action under CUTPA. Accordingly, Travelers is entitled to summary judgment on Count IX of the Counterclaim.

## VI.   <u>CONCLUSION</u>

For the foregoing reasons, Travelers respectfully requests that this Honorable Court grant its Motion for Summary Judgment in its entirety, and for such other and further relief that this Court deems just and proper

Respectfully submitted,

TRAVELERS PROPERTY & CASUALTY
INSURANCE COMPANY,

By its attorney,

Bradford R. Carver, (ct12846)
Cetrulo & Capone LLP
Two Seaport Lane, 10th Floor
Boston, MA 02210
Phone: (617) 217-5500
Fax: (617) 217-5200

Local Rule 2(c) Counsel:
James E. Mack, Esq.
St. Paul Travelers
One Tower Square, 4PB
Hartford, CT 06183

statutory intervention. <u>Id.</u>; <u>see also</u> <u>Lees v. Middlesex Ins. Co.</u>, 229 Conn. 842, 850-51, 643 A.2d 1282 (1994).

## CERTIFICATE OF SERVICE

I, Bradford R. Carver, BBO #565396, hereby certify that on this 29th day of September

2004, I caused a true and accurate copy of the above to be served via first class mail, postage

prepaid, on the following counsel of record:

John J. O'Brien, Jr., Esq.
Peck & O'Brien, PC
433 Silas Deane Highway, Second Floor
Wethersfield, CT 06109

Dale R. Martin, Esq.
Barokas, Martin, Ahlers & Tomlinson
1422 Bellevue Avenue
Seattle, Washington 98122

Bradford R. Carver, (ct12846)

26