## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| TRAVELERS PROPERTY & CASUALTY INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>TRITON MARINE CONSTRUCTION CORP., R. JOHN ARMSTRONG, PATRICIA B. ARMSTRONG, LEOLA E. DALY, M. JEAN SEARLE, WILLIAM F. SEARLE, WENDELL E. WEBBER, JANICE K. WEBBER, SANDRA F. PRESTRIDGE, A. BURTON PRESTRIDGE, EDWARD A. WARDELL, CAROLYN S. WARDELL, JERRY W. MCDONALD, MARY J. MCDONALD, AND THE ESTATE OF EUGENE F. DALY,<br><br>Defendants. | CIVIL ACTION NO. 302CV1500SRU |

### TRAVELERS PROPERTY & CASUALTY INSURANCE COMPANY'S
### LOCAL RULE 56(a)1 STATEMENT OF MATERIAL FACTS

The plaintiff, Travelers Property & Casualty Insurance Company ("Travelers"), pursuant to Local Rule 56(a)1 (D. Conn.), hereby identifies the following material facts of record as to which there is no genuine issue to be tried.[1]

1.      At all times relevant to this action, Travelers has been in the business of, among other things, issuing performance and payment surety bonds to various contractors to secure their performance on various construction projects. (See Affidavit of Sherrie L. Monteiro, submitted herewith (hereinafter "Monteiro Aff."), ¶2).

---

[1] The deposition transcripts and exhibits referenced in this Statement of Material Facts are attached to the Affidavit of Bradford R. Carver, submitted herewith.

1

2.      On September 12, 1994, Triton Marine Construction Corporation ("Triton"), R. John Armstrong, Patricia B. Armstrong, Leola E. Daly, N. Jean Searle, William F. Searle, Wendell E. Webber, Janice K. Webber, Sandra F. Prestridge, A. Burton Prestridge, Edward A. Wardell, Carolyn S. Wardell, Jerry W. McDonald, Mary J. McDonald and the Estate of Eugene F. Daly (hereinafter collectively referred to as "Defendants" or "Indemnitors") executed an Underwriting and Continuing Indemnity Agreement in favor of Reliance Insurance Company ("Indemnity Agreement").[2]  (Monteiro Aff., ¶3; Defendants' Answer, ¶20; Monteiro Depo. p. 241; Exh. 27).

3.      Pursuant to the terms and conditions of the Indemnity Agreement (¶17), each Indemnitor:

> specifically agrees to protect, indemnify and hold harmless
> Reliance and its attorney-in-fact against any and all Loss that may
> in any way arise out of the exercise of the assignments contained in
> this agreement and the powers herein granted, specifically waiving
> any claim which any Indemnitor has or might hereinafter have
> against Reliance or its attorneys-in-fact on account of anything
> done in enforcing the terms of this Agreement or the Bonds.

(Monteiro Aff., ¶10; Exh. 27)

4.      Pursuant to the terms and conditions of the Indemnity Agreement (¶11), the Indemnitors:

> agree to indemnify, and keep indemnified, and hold and save
> harmless RELIANCE against all LOSS.  The duty of
> INDEMNITORS to indemnify RELIANCE is a continuing duty,
> separate from the duty to exonerate, and survives any payments
> made in exoneration of RELIANCE.  Amounts due RELIANCE
> shall be payable upon demand.

(Monteiro Aff., ¶11; Exh. 27).

---

[2]On or about May 2000, Travelers purchased certain assets and liabilities relating to the surety and fidelity lines of Reliance Group Holdings, Inc., including the potential rights and obligations arising from surety bonds issued by Reliance Insurance Company, such as the Bond and Indemnity Agreement which are the subject of this lawsuit.

5.    The Indemnity Agreement (Page 4) defines Loss as:

(a)    All damages, costs, attorney fees and liabilities (including all expenses accrued in connection therewith) which RELIANCE may sustain or incur by reason of executing or procuring the execution of the BOND(s), or any other BOND(s) which may be already or hereafter executed on behalf of PRINCIPAL, or renewal or continuation thereof; or which may be sustained or incurred by reason of making any investigation on account thereof, prosecuting or defending any action in connection therewith, obtaining a release, recovering or attempting to recover any salvage in connection therewith or enforcing by litigation or otherwise any of the provisions of this Agreement, including, but not limited to:

(1)    money judgments, amounts paid in settlement or compromise, the full amount of attorney and other professional fees incurred or paid by RELIANCE, court costs and fees, and interest at the maximum legal rate allowable on all sums due it from the date of RELIANCE's demand for said sums, whether or not interest has been awarded by a court; and

(2)    any LOSS which RELIANCE may sustain or incur in connection with the CONTRACT(s) or BOND(s), whether that LOSS results from the activity of the PRINCIPAL individually or as part of a joint venture, partnership or other entity which has been or may be formed; and

(3)    any LOSS which RELIANCE may sustain or incur as a result of any actions taken by RELIANCE upon information provided by any INDEMNITOR.

(4)    Legal and consulting fees and related expenses incurred in connection with any application or submission by PRINCIPAL for a proposal, bid or other BOND, whether or not RELIANCE decides to issue said BOND.

(Monteiro Aff., ¶12; Exh. 27).

---

(Monteiro Aff., ¶4). Travelers is Administrator for Reliance Insurance Company ("Reliance"). Unless otherwise specified, Reliance will be referred to herein as "Travelers." (Monteiro Aff., ¶4; Exhs. 26 and 28).

6.    Pursuant to the terms and conditions of the Indemnity Agreement (¶15(c)), Triton assigned to Travelers, as collateral security for the full performance of the Indemnity Agreement and the payment of any other indebtedness or liability of Triton to Travelers all rights, actions, causes or action, claims and demands of Triton in, or arising from or out of any contract referenced in any bond issued by Travelers.  (Exh. 27, ¶15(c)).

7.    Pursuant to the terms and conditions of the Indemnity Agreement (¶16), the Indemnitors irrevocably nominated and appointed Travelers true and lawful attorney-in-fact of the Indemnitors, "with full right and authority . . . to sign the names of each of the Indemnitors to any . . . release . . . of any or all property assigned" to Travelers.  (Exh. 27, ¶16).

8.    Pursuant to the terms and conditions of the Indemnity Agreement (¶28), Travelers had the "exclusive right for itself and for Indemnitors to decide and determine whether any claim, demand, suit or judgment on the Bond(s) shall be paid, settled, defended or appealed." (Exh. 27, ¶28).

9.    On or about May 9, 1997, Triton entered into a written contract, Number DACW47-97-C0015 ("Contract") with United States of America, Army Corps of Engineers, (hereinafter referred to as "Corps" or "Government") for the construction of the Abiquiu Dam Emergency Gate Bypass System (hereinafter, "the Project").  (Monteiro Aff., ¶5; Defendants' Answer, ¶22).

10.    As a direct and proximate result of the Indemnitors executing the Indemnity Agreement, and in reliance thereon, in or about May 9, 1997, Travelers issued a Performance Bond, Number B2617793 ("the Bond"), naming the Army Corps of Engineers, as obligee, and Triton, as principal, with respect to the Project.  (Monteiro Aff., ¶6; Defendants' Answer, ¶23).

11.    On or about February 18, 2000, the Government notified Travelers that Triton was in default of the contract and issued a Termination for Default of the Contract and demanded that Travelers, as surety, complete the Contract pursuant to the Bond. (Monteiro Aff., ¶7; Exh. 14).

12.    The Corps stated basis for terminating Triton involved the Corps' position that the gates were not properly aligned and did not comply with the contract specifications which resulted in a tremendous quantity of water leaking along the sides of each gate (in the range of 3000 gallons per minute). The Corps' stated position was that Triton's failure to align the gates within the tolerance as specified in the Contract was a direct cause of the gate leakage. (Exh. 30).

13.    Triton disputed the propriety of the Termination for Default and Triton claimed that the rework of the gates was an extra and compensable to Triton. (Exh. 22).

14.    Triton made Travelers aware at the time of the Termination for Default that Triton would be looking to pursue an affirmative claim against the Corps because of the Termination for Default. (McLoughlin Depo. p. 193). Travelers anticipated that Triton would pursue a claim against the Corps for the costs associated with the rework of the gates. (McLoughlin Depo. p. 257).

15.    As a result of the Termination for Default issued by the Corps, and pursuant to its obligations, as surety, on or about April 20, 2000, Travelers entered into Takeover Agreement with the Corps whereby Travelers agreed to undertake the completion of the Project. (Bossard Depo. p. 45; Monteiro Aff., ¶8; Exh. 15).

5

16.     To reserve whatever claims or rights Triton had against the Corps, the Corps and Travelers included Paragraph 5 of the Takeover Agreement which provided that "the government acknowledges that the propriety of the government's termination has not been decided. Notwithstanding any portion of this agreement the surety reserves all rights available to the surety or the principal, in regards to the propriety of the government's termination, at law or in equity." (Exh. 15). This paragraph was intended to reserve Triton's rights with regard to the propriety of the termination and was not intended to confer any rights upon Triton. (McLoughlin Depo. pp. 254-255).

17.     The Corps and Travelers also included Paragraph 8 into the Takeover Agreement which provided, in pertinent part, that the Agreement was "not intended to interfere with [Triton's] rights and remedies in any dispute with the government." (Exh. 15). This is standard takeover agreement language which is intended to reserve any rights and claims that the parties may have had regarding the Project. (McLoughlin Depo. pp. 256, 260, 283).

18.     Pursuant to the Takeover Agreement, Travelers was acting in its capacity as surety for Triton, and not as a completing contractor. (Exh. 15, ¶2).

19.     To effectuate the completion and remediation of the gate leakage, and pursuant to its obligations, as surety, Travelers engaged a consultant, Arvin Daum, to investigate and ultimately oversee the completion of the Project on behalf of Travelers. (Daum Depo. pp. 58-60; Exhs. 7 and 8).

20.     Travelers understood that Triton agreed to serve as the completion contractor and pay for the costs to perform the remedial work at the Project because that was in accordance with Triton's indemnity obligation, i.e. to make Travelers whole. (McLoughlin Depo. pp. 275-277).

6

21.    Travelers understood that Triton was prepared to incur the rework costs because Triton could contain the rework costs and reduce Triton's indemnity obligation to Travelers. (McLoughlin Depo. pp. 278-279).

22.    At the time of the Termination for Default, Triton's position was that it would seek to recover from the Corps the costs associated with the remediation of the gate leakage. (Bossard Depo. p. 59-60).

23.    Triton also made claims and sought reimbursement from TIG Insurance Company and St. Paul Fire & Marine Insurance Company, two companies who had previously[3] issued rework insurance policies to Triton, to pay for the costs of performing the rework of the emergency gates. (Boyd Depo. p. 284-285; McClung Depo. pp. 76-77).  The purpose of the rework insurance was to pay for the cost of repairing defective work. (Boyd Depo. p. 268).  The rework insurance policies provided by TIG and St. Paul ("the rework insurers") excluded coverage for design defects. (Exhs. 31 and 32).

24.    On or about April 27, 2000, Travelers specifically indicated to Triton that, although Travelers would cooperate with Triton and its insurance carriers on the rework investigation in a fair and reasonable manner, Travelers assumed no responsibility or obligation toward either. (Exh. 25).

25.    In or about December of 2000, Triton received $1.6 million from TIG in settlement of the claim on TIG's rework insurance policy. (Exh. 33; Boyd Depo. pp. 268-269).

---

[3]In or about April 1999, Triton procured an insurance policy for "rework insurance" from TIG Insurance. (Boyd Depo. p. 267; Exh. 31).  In or about April 1999, Triton also procured an insurance policy for "rework insurance" from St. Paul. (Boyd Depo. p. 267; Exh. 32).  These policies are hereinafter collectively referred to as "the rework insurance."

26.     Travelers, through the efforts of its principal, Triton, effectuated a completion of the Project and, ultimately, the Corps indicated to Travelers that Travelers had completed its obligations under the Bond. (Bossard Depo. p. 137). The rework of the emergency gates was completed in or about February 2001. (Bossard Depo. p. 65).

27.     Triton subsequently assembled a compilation of its costs to perform the rework of the gates and requested that Travelers submit the costs to the Corps on Triton's behalf ("Triton's Rework Claim"). (Exh. 9). Triton represented these costs to be $2,129,022.00. (Exh. 9).

28.     Fred Bossard, Travelers' Project Manager, reviewed the components of the costs of Triton's Rework Claim for accuracy. Bossard reviewed the labor to see if it was a reasonable representation of the labor costs incurred by Triton on the rework. Bossard deleted items that he felt were inaccurate. Triton did not include a narrative to substantiate the costs. (Bossard Depo. pp. 21, 67, 74).

29.     Bossard concluded that the costs that were being inserted in Triton's Rework Claim were a fair representation of the labor costs expended by Triton. (Bossard Depo. p. 71).

30.     On or about August 30, 2001, Bossard submitted Triton's Rework Claim on behalf of Triton to the Corps. (Bossard Depo. p. 76; Exh. 10).

31.     The August 30, 2001 submission of Triton's Rework Claim indicated that Traveler's certified that it had reviewed the subject claim, eliminated those costs that were not appropriate, and found that the balance of the costs appeared accurate. (Exh. 10).

32.     On or about September 10, 2001, the Corps advised Travelers that Triton's Rework Claim was not properly certified and could not be considered as a claim. (Exh. 11).

8

33.     In or about October of 2001, Triton received from St. Paul $800,000 in settlement

of the rework claim against St. Paul.  (Exh. 33; Boyd Depo. p. 269).  Thus, from the rework

insurers (TIG and St. Paul), Triton received a total of $2.4 million, whereas the claim that Triton

asked Travelers to pass up through the Corps was $2,129,022.  (Boyd Depo. pp. 269-270; Exh.

9).

34.     On or about November 15, 2001, Travelers sent a revised letter to the Corps at the

request of Triton addressing the issue raised by the Corps concerning the certification for the

Rework Claim.  Travelers also submitted the following certification language:

> I (we) hereby certify that the claim is made in good faith, that the
> supporting date [previously submitted as Enclosure (1) to
> Reference (b)] is accurate and complete to the best of my (our)
> knowledge and belief; that the amount requested accurately reflects
> the contract adjustment for which the contractor believes that the
> Government is liable; and that I am duly authorized to certify the
> claim on behalf of the contractor.

(Exh. 12).  This certification language was provided by Triton.  (Bossard Depo. pp. 111-112).

The certification language referred only to the costs incurred by Triton, and not to any

certification that the costs existed because of a design defect.  (Monteiro Depo. pp. 327-328,

344-345).

35.     Bossard did not judge the merits of Triton's Rework Claim; he only certified the

accuracy of the costs, and allowed the contracting officer to make the final decision as to

whether or not Triton's Rework Claim had merit.  (Bossard Depo. pp. 86).  Travelers was not

sponsoring Triton's Rework Claim.  (Monteiro Depo. p. 110).

36.     On or about December 18, 2001, the Corps' Contracting Officer, Theresa Armijo,

denied Triton's Rework Claim (hereinafter "the Contracting Officer's Decision") stating:

> Subsequent to the termination for default issued to Triton Marine
> Construction Corporation on February 18, 2000, the Government
> and Reliance Insurance Company ("Surety") entered into a

9

takeover agreement, dated April 20, 2000, in which the Surety agreed "to complete the work required by the contract plans and specifications in strict accordance with all contract terms and conditions." The Surety did satisfactorily repair the emergency gates to meet the terms of the original contract and the Government has accepted the repair work performed by the Surety. *The Surety has not submitted any information to prove the cost of the repair work should be the responsibility of the Government.*

(Exh. 13; Bossard Depo. p. 138) (emphasis added).

37.    The Contracting Officer's Decision further stated that:

The investigation work performed jointly by the Government and the Surety at the start of the repair operation established the cause of the gate leakage to be misalignment of the gate frames, as previously installed by Triton Marine Construction Corporation. The key task performed by the Surety and its Contractor was to machine the gate frames so they would mate properly with the gate leafs. Once this task was accomplished, the Surety satisfactorily completed leakage and operational testing of the repaired gates. This clearly demonstrated that the gate leakage problem was due to the misalignment of the gate frames, and the specification leakage requirement could be obtained with the original gate design and proper gate installation. Because proper installation of the emergency gates, including the gate frames, was the responsibility of Triton Marine, the costs submitted for the subject claim are not attributable to the Government.

(Exh. 13; Bossard Depo. p. 138).

38.    According to the Contracting Officer's Decision, written notice of an intent to appeal to the Armed Services Board of Contract Appeals ("ASBCA") had to be furnished to the ASBCA with ninety (90) days of receipt of the Contracting Officer's Decision, or an action had to be brought directly in the United States Court of Claims within twelve (12) months of receipt of the Contracting Officer's Decision. (Exh. 13).

39.    On or about January 18, 2002, Travelers notified Triton of the Contracting Officer's Decision relative to the Rework Claim. At the same time, Travelers indicated to Triton that Travelers was seeking reimbursement of its incurred losses and expenses. Travelers also informed Triton that, as of January 18, 2002, Travelers had paid $164,078.60 in consulting and attorneys' fees and expenses. Travelers requested that Triton contact it regarding reimbursement pursuant to Triton's indemnity obligations. (Exh. 16).

40.    Triton subsequently requested that Travelers appeal the Contracting Officer's Decision and that request was considered by Sherrie L. Monteiro,[4] on behalf of Travelers. (Monteiro Depo. p. 49). Monteiro understood that it was Triton's position that, because of what Triton believed to be contractual privity issues, Triton either needed Travelers to appeal the decision itself or permit Triton to pursue the appeal in Travelers' name. (Monteiro Depo. p. 59).

41.    Monteiro conducted an investigation and evaluated Triton's request of Travelers to appeal the Decision. (Monteiro Depo. p. 60). As part of her evaluation, Monteiro reviewed documentation in the file and relied upon the advice of counsel. (Monteiro Depo. p. 62). Monteiro also sought advice from Fred Bossard in connection with her evaluation. (Monteiro Depo. pp. 64-65).

42.    It was Travelers' position, based on the opinions of its experts, that the rework was necessitated by poor workmanship, faulty installation and/or poor manufacture of gates and frames, and that rework was not necessitated by a defective design. (Bossard Depo. pp. 167-168; Daum Depo. pp. 45-48, 54).

43.    On or about April 4, 2002, Travelers again made demand upon the Defendants for reimbursement of Travelers costs and expenses in the amount of $164,078.60. (Exh. 18);

---

[4]In or about January 2002, Sherrie L. Monteiro, Salvage Manager for Travelers, became involved with the Triton matter on behalf of Travelers. (Monteiro Depo. pp. 21, 38)

44.    As of April 24, 2002, the Defendants had still failed to fulfill their obligation to reimburse Travelers pursuant to the Indemnity Agreement. (Exh. 19).

45.    On or about May 14, 2002, Travelers, through counsel, notified Triton, through its counsel, that Travelers was willing to review whatever documents Triton choose to submit as part of Travelers investigatory process. Travelers made clear, however, its agreement to review the documents should not be construed as an acceptance of Triton's position or modification of Travelers previous demand for reimbursement. Travelers made clear that, under any scenario, Travelers would insist on receiving immediate reimbursement for its incurred expenses. (Exh. 20).

46.    On or about May 15, 2002, Travelers was served with a Grand Jury Subpoena issued by the United States District Court for the District of New Mexico. (Exh. 24; Monteiro Depo. p. 273). The Grand Jury Subpoena requested from Travelers any and all records or documents concerning the Project. (Exh. 24).

47.    On or about May 20, 2002, Triton through its counsel, admitted that Triton had no expert reports for Travelers' consultants to review in connection with their evaluation of the merits of Triton's Rework Claim. (Exh. 21; Monteiro Depo. pp. 143-144).

48.    On July 10, 2002, a representative for the Department of the Army, Criminal Investigation Command, Major Procurement Fraud Unit, met with representatives of Travelers and reviewed Travelers' documents in Hartford, Connecticut. (Exh. 17; Monteiro Depo. pp. 274-275).

49.    Monteiro, who attended the July 10, 2002 meeting on behalf of Travelers, understood the representative from the United States Department of Justice to be an officer conducting a criminal investigation in connection with the Subpoena. (Monteiro Depo. p. 276).

50.    Monteiro understood that the criminal investigation by the Department of Justice involved the claim that Triton had submitted for the rework costs with respect to the repair of the emergency gates. (Monteiro Depo. pp. 378-379; Exh. 17).  Monteiro was informed that the criminal investigation involved the Triton's Rework Claim against the Corps.  (Monteiro Depo. pp. 277-284).  It was an important consideration for Monteiro, on behalf of Travelers, to know that a Grand Jury was conducting a criminal investigation surrounding the very claim that Triton was asking Travelers to appeal.  (Monteiro Depo. pp. 288-290).

51.    On or about July 15, 2002, Travelers again demanded that Triton and the indemnitors reimburse Travelers for its incurred consultants' and attorneys' fees and expenses. (Exh. 17).

52.    While Triton offered to meet with Travelers' consultants to discuss Triton's position as to the merits of Triton's Rework Claim, Monteiro believed that a meeting between Triton and Travelers' experts would have been appropriate only when Triton had first provided sufficient documentation to Travelers that supported Triton's position as to the merits of Triton's Rework Claim.  Despite much communication back and forth between Triton and Travelers, Triton never provided any new documentation or information to Travelers to suggest that Travelers' position on the cause of the gate leakage was inaccurate. (Exh. 29; Monteiro Depo. pp. 140, 142, 369-370; Bossard Depo. p. 158).  If Triton had ever provided sufficient information to support its position as to the cause of the gate leakage, Travelers would have been receptive to a meeting at that point. (Monteiro Depo. pp. 124-125, 356-357).

53.    Monteiro understood that Triton wanted Travelers to pursue allegations against the Corps that were contrary to what Travelers' experts believed to be true regarding the cause of the gate leakage. Specifically, Triton wanted Travelers to take the position that the Contracting Officer's Decision was incorrect insofar as the Corps had concluded that the gate leakage was a result of poor workmanship. Triton wanted Travelers to make the allegation in the appeal that the faulty gates were a result of a design defect. Travelers' experts, however, concluded that it was not a design defect and had conveyed this information to Monteiro.[5] Therefore, Triton was asking Travelers to put its name to an appeal that Travelers did not believe had merit. (Monteiro Depo. pp. 113-114).

54.    Triton never presented Monteiro with any post-rework documentation establishing that Travelers' experts were wrong. Monteiro never received any post-rework reports from Triton to demonstrate the validity of Triton's position. (Monteiro Depo. p. 124). Triton never gave Travelers any information, expert reports or other documentation that would have altered the position that Travelers took regarding the cause of the gate leakage. (Monteiro Depo. pp. 124-125).

55.    If Travelers had received any new information from Triton to support its position, Travelers would have considered it in connection with its decision to appeal the Contracting Officer's Decision; but, Travelers never received anything of that nature from Triton. (Monteiro Depo. pp. 139, 150-151). Travelers was at all times willing to listen, review and consider any contrary position that Triton might have made. (Monteiro Depo. p. 169).

---

[5]Bossard had expressed his opinion to Monteiro that the rework was necessitated by poor workmanship, faulty installation, and/or poor manufacture of gates and frames, and that rework was not necessitated by a defective design. (Bossard Depo. p. 167). Bossard conveyed to Monteiro that both he and Arvin Daum believed that the rework was a result of Triton's failure to comply with the contract specifications and not a result of a faulty design. (Bossard Depo. p. 204). Bossard had conferred with Daum, who confirmed that it was defective work on the part of Triton that caused the gate leakage and not a faulty design. (Bossard Depo. p. 168).

56.    Monteiro ultimately made the decision not to appeal the Contracting Officer's Decision. (Monteiro Depo. p. 170).

57.    The considerations that brought Monteiro to the conclusion not to go forward with the appeal or lend Travelers name to an appeal included the fact that Triton wanted Travelers to assert that the cause of the gate leakage was due to a design defect, which Travelers and its experts did not agree with. Additionally, despite the fact that Travelers' continued to express its position that it would review any information and documentation to support Triton's position, Travelers never received any new documentation that would have altered the position of its experts. Moreover, Travelers receipt of a Grand Jury Subpoena in connection with a criminal investigation of Triton, which Travelers understood to encompass Triton's Rework Claim further underscored Travelers' decision that it should not be a party to the appeal. (Monteiro Depo. pp. 173-174).

58.    Despite her decision, there was no point in time in which Monteiro closed the door and was not willing to look at any documentation provided by Triton. (Monteiro Depo. p 182; Exh. 23).

59.    Monteiro does not have authority to put Travelers' name on litigation that does not have a merit, and Triton's request that Travelers do just that was contrary to Traveler's position with respect to the cause of gate leakage. (Monteiro Depo. pp. 232-233).

60.    Monteiro understood that there was risk involved in lending Travelers' name to a lawsuit that Travelers felt had no merit based on its experts' positions. Monteiro came to the conclusion that the litigation Travelers was asked to put its name to involved allegations that were contrary to what Travelers believed to be true, and therefore, it was not in Travelers' best interest to go forward. (Monteiro Depo. pp. 236-237).

61.     One of the issues that Monteiro considered in making her decision not to appeal the claim was the fact that she had become aware of the criminal investigation. (Monteiro Depo. p. 298). Monteiro had been concerned all along with putting Travelers' name on litigation that alleged something that its experts disagreed with. When she received the Grand Jury subpoena and found out that there was a criminal investigation investigating the rework costs, it suggested to her that there may have been other issues involved with the rework and it made her that much more certain that this was not in Travelers' best interests. In addition, despite the many requests of Travelers, Triton never provided Travelers with sufficient documentation to support its position. (Monteiro Depo. pp. 298-302).

### Triton's Litigation Against The Government

62.     On or about May 3, 2000, Triton commenced a lawsuit against the Government in the United States Court of Federal Claims entitled Triton Marine Construction Corp. v. The United States of America, Civil Action No. 00-261C (Judge Weinstein), regarding the Project (hereinafter, the "Triton/Corps Lawsuit"). (Exh. 34; Boyd Depo. p. 218-219).

63.     Among the relief requested by Triton in the Triton/Corps Lawsuit, was that the Termination for Default be converted to a Termination for Convenience. (Exh. 34, Count II; Boyd Depo. p. 220). Triton also sought to recover from the Government the costs associated with Triton's indemnity obligation to Travelers in connection with the excess leakage remediation work under the Takeover Agreement. (Exh. 34, ¶20d; Boyd Depo. p. 221).

64.     On or about January 10, 2001, which was shortly before Triton completed the rework of the gates, Triton filed an Amended Complaint in the Triton/Corps Lawsuit. (Exh. 35; Boyd Depo. p. 223). Triton specifically alleged in the Amended Complaint that it had become necessary to amend its original Complaint to, among other things, "restate its allegation that the Termination for Default should be set aside and converted to a Termination for Convenience of the Government" and to "recover the costs expended in connection with the gate leakage remediation work." (Exh. 35, ¶8).

65.     Pursuant to Count II of the Amended Complaint ("Compensation for Amounts Expended Remediating the Gate Leakage Problem"), Triton specifically alleged that that "the costs incurred remediating the gate leakage problem as hereinabove alleged are compensable, *and are recoverable in this action.*" (Exh. 35, ¶27 (emphasis added); Boyd Depo. pp. 222-223). Triton further alleged that "the incurred costs directly related to or caused by the Corps' administration of this Project and its requirement for remediation rework on the emergency gates are compensable under and for breach of Contract . . . ." (Exh. 35, ¶28).

66.     Pursuant to the Amended Complaint, Triton requested that "judgment be entered for [Triton] in the amount of $2.8 million dollars . . . to compensate for the direct and indirect costs associated with the gate leakage remediation effort . . . ." (Exh. 35, p. 16).

67.     On or about July 20, 2001, Triton filed a Second Amended Complaint in the Triton/Corps Lawsuit. (Exh. 36; Boyd Depo. p. 235). Although Triton continued to allege that "the termination for default should be set aside and converted to a termination for convenience of the government" and that Triton reserved "its right to submit claim for costs expended in connection with the gate leakage remediation work," Triton omitted Count II ("Compensation for Amounts Expended Remediating the Gate Leakage Problem") of the Amended Complaint. (Exhs 35 and 36; Boyd Depo. pp. 236-237). Aside from anything his lawyer might have told him, Triton's Fed. R. Civ. P. Rule 30(b)(6) witness, David Boyd, does not know why Count II was deleted from the Amended Complaint. (Boyd Depo. p. 232-238).

68.     In or about October 2003, an Entry of Judgment was filed with respect to the Triton/Corps Lawsuit. (Exh. 37). Triton received approximately $1,000,072.00 from the Corps pursuant to the settlement. (Boyd Depo. pp. 242-243).

69.     Pursuant to the Entry of Judgment in the Triton/Corps Lawsuit, Triton waived its right to recover from the Corps any costs that Triton may have incurred as a result of the rework, whether those costs were incurred before or after the termination for default. (Exh. II, ¶37; Boyd Depo. p. 244).

**Travelers' Claim For Indemnification**

70.     As a direct and proximate result of the issuance of the Bond to Triton, Travelers sustained damages and losses, including consultants' and attorneys' fees and other expenses, and anticipates sustaining additional claims, losses and expenses. (Monteiro Aff., ¶9).

71.     Despite demand from Travelers to the Indemnitors that the Indemnitors reimburse and hold Travelers harmless from any claims, losses and expenses incurred and anticipated in connection with the Bond, the Indemnitors have refused to comply. (Monteiro Aff., ¶13)

72.    As a result of the foregoing, the Indemnitors are in default of their obligations under the terms and conditions of the Indemnity Agreement. (Monteiro Aff., ¶14).

73.    As of September 28, 2004, Travelers has sustained losses in the form of attorneys' fees and expenses in the amount of $148,058.75 by reason of having issued the Bond and in enforcing the this action, all of which is recoverable under the specific terms of the Indemnity Agreement.[6] (Monteiro Aff., ¶15).

74.    In addition, Travelers has sustained losses in the form of consultants' fees and other miscellaneous in-house expenses in excess of $115,000.00 by reason of having issued the Bond, all of which is recoverable under the specific terms of the Indemnity Agreement. (Monteiro Aff., ¶16).

75.    To date, the Indemnitors have failed and/or or refused to reimburse Travelers for its incurred loss, costs and expenses, in violation of the express terms of the Indemnity Agreement. (Monteiro Aff., ¶17).

76.    At all times relevant hereto, Travelers has acted in good faith relative to its obligations as surety as a result of claims made on the Bond. Travelers' determinations to make disbursements were made in good faith and under the belief that was necessary or expedient to make such payments or disbursements. (Monteiro Aff., ¶18).

77.    Travelers has complied with all conditions precedent to maintaining this action. (Monteiro Aff., ¶19).

Respectfully submitted,

TRAVELERS PROPERTY & CASUALTY
INSURANCE COMPANY,

By its attorney,

_____
Bradford R. Carver, (ct12846)
Cetrulo & Capone LLP
Two Seaport Lane, 10th Floor
Boston, MA 02210
Phone: (617) 217-5500
Fax: (617) 217-5200


Local Rule 2(c) Counsel:
James E. Mack, Esq.
St. Paul Travelers
One Tower Square, 4PB
Hartford, CT 06183

---

[6]This amount does not include unbilled fees and expenses and Travelers reserves the right to seek reimbursement for the additional fees and expenses that will be incurred in further prosecuting and defending the claims in this action, in accordance with the express terms of the Indemnity Agreement.

## CERTIFICATE OF SERVICE

I, Bradford R. Carver, BBO #565396, hereby certify that on this 29th day of September,

2004, I caused a true and accurate copy of the above to be served via first class mail, postage

prepaid, on the following counsel of record:

John J. O'Brien, Jr., Esq.
Peck & O'Brien, PC
433 Silas Deane Highway, Second Floor
Wethersfield, CT 06109

Dale R. Martin, Esq.
Barokas, Martin, Ahlers & Tomlinson
1422 Bellevue Avenue
Seattle, Washington 98122

Bradford R. Carver, (ct12846)

01037-0007
333096v1