FILED

2005 JAN -5 A 11: 31

U.S. DISTRICT COURT
BRIDGEPORT, CONN

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TRAVELERS PROPERTY & CASUALTY INSURANCE COMPANY | : | CIVIL NO. 3:02-cv-1500 (SRU) |
| Plaintiff | : | |
| | : | |
| V. | : | MEMORANDUM OF LAW IN |
| | : | OPPOSITION TO TRAVELERS |
| TRITON MARINE CONSTRUCTION CORP., ET. AL. | : | PROPERTY & CASUALTY |
| | : | INSURANCE COMPANY'S MOTION |
| Defendant | : | FOR SUMMARY JUDGMENT |

## I. INTRODUCTION.

Pursuant to Federal Rules of Civil Procedure Rule 56 the Defendants, Triton Marine Construction Corp., et. al., submit this Memorandum of Law in Opposition to Travelers' Motion for Summary Judgment. Triton, et. al. submit that there are genuine issues of material fact as to Travelers' recovery on its Indemnity Complaint and as to Triton's Counterclaims which preclude the entry of summary judgment. Triton, et. al. has set forth these genuine issues of fact in its Local Rule 56(a)(2) Statement filed herewith.

## II. FACTUAL BACKGROUND.

**General Background of the Parties' Relationship.**

1.  On September 12, 1994, Triton Marine Construction Corporation ("Triton"), and its several indemnitors named as defendants in this action, entered into an

**ORAL ARGUMENT REQUESTED**

agreement with Reliance Insurance Company ("Reliance") styled "Underwriting and Continuing Indemnity Agreement" (herein "GAI", which is the industry-accepted acronym for such general agreements of indemnity) (Exh. #75).

2. Reliance and Triton worked together in accordance with terms of the GAI over the next several years. Triton applied and paid premiums for performance and payment bonds that were required to be posted on its Public Works projects. Reliance issued the bonds and accepted the premiums (Boyd Aff.).

3. The contract and bonds for Triton's contract to construct the Abiquiu Dam Emergency Gate Bypass System ("the Abiquiu project" or "the Abiquiu contract") on behalf of the United States of America, through the U. S. Army Corps of Engineers ("Corps" or "Government") are both dated May 9, 1997. Triton paid Reliance in full for the bond premiums (Exh. #98; Boyd Aff.).

4. The parties' relationship under the GAI continued through May of 2000. Triton requested and paid premiums for the bonds, and Reliance accepted the premiums and issued the bonds (Boyd Aff.).

5. Without any notice having been given, Triton was advised in mid-2000 that Travelers Property & Casualty Company ("Travelers") had taken over Reliance (Exh. # 71, July 16, 2000). Triton never consented to this takeover. Triton never entered into any written agreement with Travelers. The GAI executed by Triton and its indemnitors with Reliance was not amended in any way to reflect a Travelers interest.

The GAI does not contain a provision by which either party consents to the other's assignment of rights or obligations under that agreement (Boyd Aff.).

7. 6. In a transaction of which Triton has no direct knowledge, Travelers apparently assumed the obligations of Reliance under its Takeover Agreement with the Corps (Exh. #76, May 31, 2000). Travelers thus became the "completing surety". In order to discharge its performance obligations under the Takeover Agreement Reliance had entered into with the Corps (see ¶ 19 and 20 herein), Travelers brought Triton onboard as its completion contractor. (Triton previously had agreed with Reliance to serve as completion contractor.) Despite repeated and diligent efforts, Triton was unable to secure from Travelers a written agreement defining terms of the parties' completing surety-completion contractor relationship (see ¶ 21-29) (Boyd Aff.).

**Triton's Disputes With the Corps on the Abiquiu Project.**

7. Abiquiu Dam is situate on the Rio Chama River in Northwest New Mexico. Downstream irrigation requirements and the fish spawning season limit the periods during which river flow can be interrupted for construction purposes. The Corps established the period from November 1 to the following March 31 of each year as the permissible "construction window" (Boyd Aff.).

8. Under its Abiquiu contract with the Corps, the Government had committed its own forces to install the tunnel blocks and provide electrical power. Triton's own work under the Abiquiu contract was dependent upon timely fulfillment of

3

this work. The Government failed to perform either of these critical tasks, resulting in severe delay to the project. The Corps directed Triton to perform the tunnel block installation and provide electrical power. Triton also was directed to accelerate its own work to recapture the lost time so as to complete the Abiquiu project within the 1998-99 construction window (Boyd Aff.).

9.  The Corps failed to act upon Triton's resulting request for an equitable adjustment to the contract time and amount. By March of 1999, all of the work under Triton's Abiquiu contract, along with all of the work the Corps had directed it to perform, had been substantially completed. At that point, a problem developed that diverted everyone's attention from the other issues that had to be resolved before closeout of the Abiquiu project: water flow significantly in excess of the specified limit was leaking through the newly installed emergency gates (Boyd Aff.).

10. Triton and the Corps disagreed as to the cause of this leakage problem. They also differed as to what measures were needed to correct the problem. The Corps directed that Triton terminate its efforts to stop the leakage, and on March 29, 1999, the Abiquiu project was shut down because of the Corps' insistence that the March 31 end date on the construction window was immovable. Triton still had no response to its pending requests for equitable adjustment to the contract time and amount still had not been answered, and in fact these extra compensation and time extension issues were not resolved until Triton's December 2002 settlement with the Government Triton was paid

4

$850,000 plus interest, and the Corps acknowledged Triton's entitlement to a 28 day time extension (Boyd Aff.).

11.     From the outset, Triton's position on the gate leakage issue was, and it remained, that it had performed the contract work in full compliance with the Corps plans and specifications. It was Triton's position that the leakage was attributable to improper design, exacerbated by field directions the Corps and its designers issued during installation, and by irregular configuration of the existing tunnel liner to which the emergency gates had been attached (the tunnel liner had been inaccurately depicted by the Corps in the construction documents). The Corps disagreed, asserting that the problem resulted from faulty workmanship (Boyd Aff.).

12.     Although Triton and the Corps hotly disputed the cause of, and which party should bear responsibility for, the gate leakage problem, the Corps directed that Triton remediate the leakage (the "rework" or "remediation work"). Since the Corps took the position no more money would be paid under the Abiquiu contract until the leakage problem had been fixed, Triton was in a position where it would have to fund and perform the rework from its own resources (Boyd Aff.).

13.     This posture of the parties on the rework issue never changed. Triton was required to perform the work as a condition of obtaining Corps acceptance of the project. The only way for Triton to recover any money to compensate it for this effort was to complete the remedial work such that the specified leakage tolerance had been met, and then submit and successfully prosecute a claim for recovery of the costs it had thus

5

expended. At all times Triton made it plain that it would, in fact, pursue such a claim (Boyd Aff.).

**The Corps' Termination of Triton's Abiquiu Contract for Default, and the Ensuing Takeover Agreement Entered Into Between the Corps and Reliance.**

14.    In the months following shutdown of the Abiquiu project work, Corps and Triton representatives exchanged engineering assessments and position statements relative to the leakage problem. The Contracting Officer ultimately issued a specific fix directive (Exh. #15, Sept. 21, 1999), following which representatives of the parties met in October 2000 to develop a remediation plan. From Triton's standpoint, this meeting also presented an opportunity to press for resolution of the still-pending claims for equitable adjustment of the contract price and time. It was understood and agreed that when the remediation measures were decided upon, they would be implemented in the November 1, 2000 – March 31, 2001 construction window (Boyd Aff.).

15.    The dialogue between the parties was abruptly ended four months later when, without any notice or cure opportunity, the Corps of Engineers terminated Triton's contract for default (Exh. #16, Feb. 18, 2000). Triton protested, and requested reinstatement of its contract (Exh. #46, March 7, 2000). The Corps nonetheless proceeded to tender the remaining work (the remediation work) to Reliance, the performance bond surety on the Abiquiu project (Exh. #16, supra).

16.    Reliance representatives Terry McLoughlin and Fred Bossard met with Triton representatives on March 1, 2000. Mr. McLoughlin was a lawyer and Reliance's

6

designated Claims Manager (McLoughlin Dep.). Mr. Bossard was an engineer whose job it was to support the Claims Manager regarding non-legal aspects of contract performance (Bossard Dep.). Triton presented its case to these Reliance representatives, urging that the contract had been wrongfully terminated and ought to be reinstated (such that there would be no role for the surety); that Triton stood ready, willing and able to complete the work itself, or as completion contractor to Reliance if the Corps refused to reinstate the Triton contract; and, that Triton intended to pursue a claim to recoup the costs it expended for the rework on the basis that fault and responsibility for the leakage problem resided with the Corps (Boyd Aff.).

17. Mr. Bossard and Mr. McLoughlin met with Corps representatives the following day. They listened to the Corps presentation, visited the site, and thereafter undertook a surety investigation which was to completed by March 30, 2000. On March 7, 2000, Triton transmitted to Reliance the seven (7) written opinions that were supportive of Triton's position relative to cause of the gate leakage problem, along with a copy of the letter Triton had sent to the Contracting Officer rebutting the Corps' asserted grounds for terminating Triton's contract (Exhs. #12, March 7, 2000, and #46, supra).

18. At the end of the 30 day investigation period, Reliance agreed to complete the Abiquiu project rework. Reliance proposed to use Triton as its completion contractor. The Corps resisted, but Reliance insisted that it had the right to choose the completion contractor it would use, and the Corps relented (McLoughlin Dep.).

7

19. Reliance proposed, and with one minor exception the Corps accepted, a written Takeover Agreement. Terms of this agreement included the following:

> 5. The Government acknowledges that the propriety of the Government's termination has not been decided. Notwithstanding any portion of this agreement the surety reserves all rights available to the surety or the principal, in regards to the propriety of the Government's termination, at law or in equity.
>
> * * *
>
> 8. The Government understands that the Surety, by entering into this Agreement does not acknowledge the validity of the Government's termination of Principal's Contract, or acknowledge the validity of the assessment of any additional damages, or the validity of any other action taken by the Government against Principal. This Agreement shall not otherwise waive or release the Government's right to damages, if any, as to Principal, and it is not intended to interfere with Principals' rights and remedies in any dispute with the government.

Mr. McLoughlin testified that the purpose and intent of this clause was to enable Triton to pursue a claim for recovery of its rework costs. (Exh. #18A, April 11, 2000; McLoughlin Dep.)

20. Reliance also proposed in the Takeover Agreement, and the Corps accepted, a provision by which the Corps would release the Reliance performance bond upon completion of the rework (Exh. #18A ¶6a, supra). Since the Corps had made known its intention to pursue a claim for recovering the Government costs incurred in

8

connection with the rework (on the assumption that the Corps position regarding cause of the gate leakage would be sustained), Reliance thus was assured of having its bond exonerated. If Triton ultimately was found to be at fault, the Government would have recourse against Triton, but not against its surety (Boyd Aff.).

**Triton's Unsuccessful Effort to Negotiate a Written Completion Agreement.**

21.   In its role as completion contractor, Triton had serious and legitimate interests to protect. Since Triton no longer had a contract with the Government following the Termination For Default, it necessarily depended upon Reliance in its role as completing surety under a Takeover Agreement, to ensure that those interests were preserved. Chief among Triton's concerns was maintaining the ability to pursue a claim for recovery of the rework costs it was expending (Boyd Aff.).

22.   Triton repeatedly expressed this concern to the Reliance representatives. In response, assurances were given that Reliance would do nothing to prejudice this claim right, and that in its privity relationship with the Government as completing surety, Reliance would preserve and protect Triton's claim rights (Boyd Aff.).

23.   Mr. McLoughlin believed and intended that Triton's right to pursue the rework costs claim had been protected in the Takeover Agreement (McLoughlin Dep.). Triton was looking for more definitive language, but learned that the Takeover Agreement which it believed to be a working draft, in fact already had been finalized between the Corps and Reliance without input from Triton (Exh. #21, April 21, 2000).

9

24. Even before it learned that there was a finalized Takeover Agreement between the Corps and Reliance, Triton had been pressing for an agreement defining the Reliance-Triton relationship for purposes of the completion work. Counsel for Triton raised the subject in calls to Mr. McLoughlin. Triton was not aware that Reliance had been purchased by Travelers, or that Mr. McLoughlin had elected not to stay onboard with the Travelers organization after the deal between these companies was completed (Boyd Aff.).

25. On April 25, 2000, Mr. McLoughlin asked that Triton draft and forward the terms it would like to have included in a completion agreement. Triton's counsel responded with a draft proposed agreement the following week. Provisions ensuring that Triton's rights were preserved and protected were included as part of Triton's proposed agreement (Exh. #21, April 28, 2000):

> WHEREAS, Triton performed work on the Project to a point where the Corps took occupancy of the facility, subject to remediation of leakage from the gates in excess of limits prescribed by the Contract, the cause and responsibility for which was and is disputed;...
>
> 7. ...It is Triton's position that all work performed, and all costs incurred in respect to that performance, are extra to Triton's Contract with the Corps, and accordingly, are compensable to Reliance by the Corps.
>
> 8. ...The parties acknowledge that Triton has the following claims for payment and equitable adjustment pending with the Corps: [There follows an itemization of several claims.] Reliance agrees

>  that it will take reasonable necessary steps to
> preserve, and not to prejudice, these claims; and that
> it will duly reserve with the Corps the right to
> recover all loss, cost, and expense for which
> Reliance intends to assert an indemnity claim
> pursuant to the Indemnity Agreement.

26.  Triton did not receive any response to this letter until the following October. Repeated attempts were made to persuade the surety that a completion agreement was a critical issue for Triton and needed to be dealt with. The following chain of events highlights Triton's effort and the surety's lack of response:

- Calls from Triton to Mr. McLoughlin went unanswered (Boyd Aff.).

- On June 5, 2000, Triton's President wrote to Mr. Bossard inquiring when Mr. McLoughlin was going to respond to the completion agreement proposal. It later was learned that Travelers had taken over Reliance; and that Mr. McLoughlin had turned down employment with Travelers (as had Mr. McLoughlin's immediate superior, and as had the head of the Reliance Claims Department) (Exh. #64; Boyd Aff.).

- At no time was Triton asked whether it consented to the takeover by Travelers, and at no time did it consent or agree that it would be bound unto Travelers as it had been bound unto Reliance by terms of the General Agreement of Indemnity. Travelers never wrote any bonds for Triton (Boyd Aff.).

- On advice that a Mr. Peters had taken surety responsibility for the Abiquiu project file, counsel for Triton made unsuccessful attempts to contact him, and then wrote a letter seeking to conclude a completion agreement. Mr. Peters never responded (Exh. #65, June 19, 2000; Boyd Aff.).

- In July Mr. Bossard presented Triton's President with a one-page document that bore the caption "Completion Agreement" (Exh. #65, June 19, 2000; Boyd Aff.). It dealt with none of the items

11

Triton considered critical to its interests as completion contractor (Boyd Aff.). Travelers' witnesses acknowledge that matters essentially legal in nature, such as a completion agreement, are handled by Claims Managers, who are lawyers. They are not handled by engineers such as Mr. Bossard. Triton's President responded to Mr. Bossard's letter by asking that Travelers' Claims Manager get in touch with Triton's counsel so that a proper completion agreement could be negotiated (Boyd Aff.).

- In August Mr. Bossard advised that Travelers' new Claims Manager on the Triton Abiquiu project file was a Ms. Alicia Brown, who was in Hartford (Exh. #66, Aug. 16, 2000). Mr. Bossard, Mr. McLoughlin, Mr. Peters, and presumably the Triton file all had been in Philadelphia at the office that Reliance had occupied (Boyd Aff.).

- Counsel for Triton immediately contacted Ms. Brown seeking to finalize the proposed completion agreement, which at that point had been pending without response for over three months. Ms. Brown responded that she lacked the file containing the background documentation. Triton counsel responded by transmitting all of the key documents to Ms. Brown, including the proposed agreement of April 28, 2000 (Exh. #68, Aug. 21, 2000).

- Ms. Brown never responded, despite advice from Triton's counsel that the matter of completion agreement was considered to be of some urgency because (i) the November 1 construction window was fast approaching; (ii) the length of time the proposed completion agreement had not been responded to was unnecessarily long; and (iii) because counsel for Triton soon would be out of the country for several weeks (Boyd Aff.; Exh. #69, Sept. 1, 2000).

> …As you are well aware, we cannot provide TIG any details of Triton's status as completion contractor because we have been unable to meet and discuss an agreement with you. * * *
>
> This is a matter of utmost urgency. I am leaving the country for five weeks later on this month, and Triton is looking to me to consummate the

12

> necessary agreements with you. I suggest the
> best solution may be to simply sit down on the
> earliest mutually available day and work
> through the necessary points to be covered so
> that a document can be signed, and both
> Reliance and Triton can be comfortable
> pursuing their joint objectives. Please contact
> me at your very earliest convenience. (Exh.
> #69, Sept. 1, 2000)

- What Ms. Brown ultimately did do is refer the matter to outside counsel. He initiated Travelers' first response to Triton's proposal but it came during the time that Triton's counsel was out of the country as Travelers had been advised that he would be (Exh. #70, Oct. 11, 2000).

- This first response from Travelers came 5-1/2 months after Triton had proposed terms for a completion agreement. This was at a point when the following events had transpired (Boyd Aff.):

    - The Corps had accepted Triton as completion contractor to Reliance, the takeover surety.

    - Triton had developed a plan for the rework that was presented to, and accepted by, the Corps.

    - Triton had demonstrated that it had the technical and financial capability to successfully complete the rework at no cost or risk to the surety.

    - Triton had invested over $900,000 in design and preparation costs dedicated to the rework task.

    - Triton was partially mobilized for commencement of the work, which by now was set to begin within three weeks after Travelers, through its outside counsel, first addressed the subject of a completion agreement.

27. The completion agreement Travelers' counsel proposed included multiple new provisions that were unacceptable to Triton, and that had never been discussed

between Triton and Reliance when the completing surety-completion contractor relationship was formed (Boyd Aff.). Counsel for Triton responded immediately upon his return to the country, taking exception to such provisions as an anticipatory full release of Travelers, the posting of performance and payment bonds with Travelers as obligee, re-designating Travelers as an additional insured on Triton's policies of insurance, stipulating the law of Connecticut, a state which had no relationship to the project, as the governing law, and numerous others. Triton counsel further emphasized that the proposed agreement failed to address a number of the items that had been proposed by Triton, including a commitment to ensure that Triton's claim rights were reserved (Exhs. #78, Nov. 1, 2000; #79, Nov. 6, 2000) ). Counsel's transmittal letter explained (Exh. #79, supra):

> While I appreciate that your proposed Completion Contract is based upon a form that may be typically used, I think we agree that this is not a usual situation. Triton is not a "broke contractor," and the surety is not funding the rework. This is not the typical instance of original work left to be done and contract revenues left to be drawn. It is rework. And Triton has vital interests in its claims for additional compensation from the Corps, and with its rework insurance carriers, that are critical to its continued existence as a successful contractor. In that respect Triton's interests do differ from those of Travelers, which is not out of pocket, and has no concern other than to watch over the completion work, whereas Triton must concurrently document and remain in readiness to pursue several millions of dollars in claims and subrogation interests. Triton has to be cautious that zealous pursuit of the completion objective as though it were the only

> consideration does not reach a point where the
> longer range concerns of claim recovery are
> prejudiced. .

28.     Counsel for Travelers responded that Triton had better fall into line or Travelers would terminate its right to proceed with the completion work (Ex. #81, Nov. 7, 2000). At that point, with the rework fully underway, such an act would have resulted in an additional year of delay and potentially, if not probably, the risk of millions of dollars in added costs (Boyd Aff.).

29.     The subsequent exchange between counsel for the parties are attached (Exhs. #80, Nov. 8, 2000; #82, Nov. 10, 2000; #83, Nov. 10, 2000; #84, Dec. 8, 2000; #85, Dec. 13, 2000). In mid-December, counsel for Travelers ended the negotiations by declaring "impasse" (Exh. #86, Dec. 14, 2000). At that juncture, the rework had progressed to a point where it was reasonably clear that the work was going to be successfully completed within the available construction window at no cost to the surety, which in fact is what did occur (Boyd Aff.).

**Travelers' Refusal to Submit Triton Extra Work Requests During Successful Completion of the Rework.**

30.     Triton began its prosecution of the rework activities on November 1, 2000, which was the first available date in the construction window. Travelers functioned on the project as completing surety. The surety representative on the project site was Arvin Daum, the outside consultant who originally had been retained by Reliance. Paperwork

and administrative matters were handled by Fred Bossard out of his office in Philadelphia, Pennsylvania (Boyd Aff.; Bossard Dep.).

31.  All of the remedial work was performed by Triton and its subcontractors, and was paid for entirely by Triton. Communications from Triton to the Corps were routed through Travelers. Communications from the Corps regarding the work were routed to Triton through Travelers. As the party in privity of contract, Travelers was the only direct interface with the Corps (McCollum Aff.; Boyd Aff.).

32.  The rework activities proceeded in accordance with plan and schedule. The river bypass (tunnel block) was successfully completed. The work commenced in one of the two tunnels, which allowed river flow to be maintained in the other tunnel. The emergency gates were disassembled, measured, field-machined, and then reinstalled. This same procedure then was followed in the second tunnel (Boyd Aff.).

33.  During the course of performing this rework, requirements arose which Triton believed, and Travelers representatives agreed, were beyond the scope of completing the original contract work. Once instance involved a Corps decision to perform work of its own in the tunnels upstream from the emergency gates to take advantage of the bypass. The Corps activity required that Triton cease its own operations, and stand by while the Corps crews finished their non-contract work. The Triton crews had to be paid even though they were not performing any productive work. The result was delay and extra labor cost that had nothing to do with the original contract scope or with the gate leakage remediation effort (Boyd Aff.).

34.    Triton duly prepared a proposal for extra compensation on account of the delay and idle labor costs. This request for extra payment was forwarded to Travelers so that it could be dispatched by Travelers on to the Corps and processed for payment (Exhs. #45, May 15, 2001; #62, Feb. 20, 2001). Travelers applied a surety overhead markup of 10% and a profit markup of 5% on top of the "Completion Contractor Cost" that Triton had submitted for pas through to the Corps (Exh. #24, April 10, 2001). Corps representatives have no recollection that Travelers asked the Corps to take action on this submittal (McCollum Aff.). It is undisputed that no payment ever was made to Triton (Bossard Dep., pp. 342-243; Boyd Aff.).

35.    Three other extra and additional work items were submitted by Triton to Travelers over the course of the work. (The corrosion, i.e., electrolysis issue; fish clog of the pass-through pipe; and removing and replacing the Belzona seal on the gates.) Travelers representatives have no recollection that these items were forwarded to the Corps for payment (Bossard Dep. p. 339). Corps representatives have no recollection that they ever were received. Travelers representatives were pressed to have them acted upon. It is undisputed that Triton received no payment on any of them (Boyd Aff.; McCollum Aff.; Bossard Dep., pp. 342-343) (Exhs. #17, #57, #58, #55, #56, #59).

36.    It is accepted practice that the party in privity of contract with the Government apply its own markup to an extra work item or claim being submitted by one of its sub-tiers. This practice applies to a prime contractor passing through the extra work

17

item or claim of a subcontractor. It applies equally to a completing surety passing through an extra or claim submitted by its completion contractor (McCollum Aff.).

37. Triton specifically requested that Travelers apply markups to the extras and claims that it submitted for pass through to the Corps (Exh. #44, March 15, 2001; Boyd Aff.). It was pointed out to Travelers that this markup would serve to defray the costs being incurred by Travelers, and thus mitigate or lessen the amount for which Travelers ultimately would seek indemnification from Triton under the GAI. Travelers did in fact apply such a markup to only one of the four items that were submitted to it by Triton for pass through to the Corps (Exh.# 24, April 11, 2000; Boyd Aff.). It did not apply any markup to the other three items. Corps representatives acknowledge that if the extra and additional work items had been allowed and paid, Travelers would have been entitled to payment for its markup (Boyd Aff.; McCollum Aff.).

38. As early as Triton's April 28, 2000 draft of its proposed Completion Agreement, the surety was requested by Triton, to include its own costs ("surety costs) as part of applications for payment and claims being submitted to Travelers by Triton for pass through to the Corps (Boyd Aff., Exh. #21, ¶8, April 28, 2000).

39. Both during and after the rework, Triton expressly requested that Travelers submit its own surety costs to the Corps for payment. The reason for this request was carefully explained: if Triton was correct in its contention that the Termination For Default was wrongful, or that the gate leakage problem was the fault and responsibility of the Corps, then the surety costs would be recoverable from the

18

Government; and since Travelers one day would look to recover its surety costs from Triton under the GAI, those surety costs should be part of the overall claim paid by the Government (Exhs. # 44, March 15, 2001; #37, March 26, 2002; Boyd Aff.)

40.    Travelers refused Triton's request to include its own surety costs as part of any claim or extra. It refused to apply any markups to extra and additional work submissions by Triton during the rework except for the one instance noted. It refused at all times to include its surety costs as part of the Triton claim (Boyd Aff.).

41.    Triton completed the rework ahead of schedule in February 2001, which was well in advance of the March 31st date on which the construction window closed and before the March 1st date to which Reliance had committed in the Takeover Agreement. By field-machining the gate seals, Triton had exceeded the specified tolerances, and had reduced the gate seepage to a point well below specified limits. Triton's consulting experts point to the success of this operation as a substantiation for their assessment that field-machining of the gate seals *after* the specified field welding had been performed should have been included as a feature of the original design (Boyd Aff.; Gerrard Rpt.). Even after the Contracting Officer had denied the claim, Triton continued in its attempt to convince Travelers that the markups and surety costs should be included in the claim for purposes of the appeal:

> "…(A copy of) pertinent correspondence shows that (i) even did Travelers did put a markup on Triton's change order request during the rework construction, it did not markup the claim; and (ii) despite Triton's request that it do so, Travelers did