> not include its own costs – the same costs you are now asking Triton and the indemnitors to pay Travelers – as part of the claim.
>
> If Triton's position in the litigation is substantiated, these are recoverable dollars. By not including Travelers' costs in the claim, Triton is put in a position where it cannot recover these amounts from the party at fault even though Travelers is demanding indemnity payment. It seems to me the right answer for both Travelers and Triton is to work through this situation so that neither of them is prejudiced. Setting everything else aside, there is no reason why, if the government is proved to be at fault, either Triton or Travelers should end up with a liability or loss. We are receptive to any and all realistic suggestions you may have (Exh. #37, March 26, 2002).

**Litigation Status of Triton's Pre-Rework Claims.**

42. At the point Triton's contract was terminated for default on February 28, 2000, the Corps records showed an unpaid contract balance of $239,860.20 (Exh. #47, May 7, 2002; and Exh. #49, May 22, 2002), the amount being imprecise because quantities had not been finalized (McCollum Aff.). Immediately following her termination action, the Contracting Officer issued a series of unilateral deductive change orders which reduced this amount to a negative contract balance. She also issued a DD Form 2626 Unsatisfactory Performance Evaluation (UNSAT); and, finally, she issued a Contracting Officer's Decision which denied all of the pending claims relating to the extra work Triton had performed on behalf of the Government, notably, the directed acceleration costs Triton had incurred as a consequence of the Government failure to

20

discharge its critical tunnel blockage and electrical power activities early in the job. See Cause #00-261C, Amended Complaint ¶7.a-d (Exh. #GG).

43.     On May 3, 2000, Triton filed an action in the United States Court of Federal Claims. The lawsuit challenged each and every one of these Corps Contracting Officer determinations including denial of the claims, issuance of the unilateral deductive change orders that consumed the contract balance, and issuance of the UNSAT. This Complaint also reserved the right to assert future claims that potentially might arise, which is standard practice in a government contract setting. Triton expressly reserved the right to recover surety costs, it being anticipated that Travelers would submit those costs and Triton would pursue recovery of them in connection with its efforts to secure a judgment on the other claims and issues (Exh. #FF ¶20.d; Boyd Aff.).

44.     This May 3, 2000 Complaint specifically challenged the Contracting Officer's termination of the Triton Abiquiu contract for default. This "wrongful termination" issue was pending at all times thereafter in Triton's litigation with the Government until all of these issues were settled nearly two and a half years later (Boyd Aff.).

45.     Travelers representatives were aware that this litigation had been filed and was ongoing. The Department of Justice counsel representing the Government visited the site in July of 2000 and talked with Mr. Bossard, among others (Bossard Dep., pp. 133-134). Mr. Bossard understood that the wrongful termination issue was part of the

existing lawsuit, and he testified regarding his knowledge of the other claims and issues that were pending in that lawsuit (Bossard Dep., pp. 289-290)).

46. This original Complaint was amended. The chief reason for the amendment had to do with jurisdictional questions regarding the UNSAT. Triton successfully demonstrated to the Contracting Officer that the UNSAT had been improperly issued, with the result that it was withdrawn and the Amended Complaint eliminated all allegations pertaining to the UNSAT (Boyd Aff.).

47. Consistent with usual practice, this Amended Complaint also reserved rights with respect to anticipated future claims. The Amended Complaint was filed after the rework had been successfully completed, but before any claim for recovery of rework costs had been submitted to the Contracting Officer for disposition. Department of Justice counsel for the Government at that point had agreed with Triton counsel that all claims arising from and relating to the Abiquiu project, upon leave of Court, ultimately should be dealt with in the same litigation. This seemed a logical and efficient disposition, since fault and responsibility for the gate leakage problem was a common thread running through the wrongful termination and related issues in the pending lawsuit, and would be a centerpiece of the lawsuit that would result from the Contracting Officer's anticipated denial of the rework claims. In an effort to shorten the whole process, Triton included an allegation that since the Corps was going to deny the rework claim anyway "...adherence to a disputes process is meaningless", and an allegation was

made that the Court could include the rework claim in that same lawsuit even though the contract disputes process had not been followed (Exh. #GG, Count II; Boyd Aff.).

**Travelers' and Triton's Review, Certification, and Submission of the Rework Claims.**

48.  Once it had become clear that there was no method for shortcutting the contractually mandated disputes process, Triton sought to have the rework claims expeditiously disposed of at contracting agency level. It was anticipated, and indeed Corps representatives had indicated, that these claims would be denied based upon the Corps' long-standing position that the gate leakage problem was due to contractor fault. Triton was aware of the agreement between counsel that they would seek to have all Abiquiu project claims combined into a single action. It was Triton's objective to get the rework claims rapidly submitted and denied by the Contracting Officer so that the litigation encompassing all issues could be moved forward (Boyd Aff.).

49.  After completion of the rework, Department of Justice counsel for the Government and Triton counsel agreed to attempt a negotiated resolution of the rework claims issues. A meeting took place on April 26, 2001. Consultants from both sides were in attendance. Each side was allocated one-half day for a presentation supportive of the merits of their respective position on the rework issues. Detailed narrative and powerpoint presentations were made. The proceedings were stipulated to be confidential and in aid of settlement (Boyd Aff.).

23

50. Travelers representatives were invited to attend these presentations. Triton's President was told that Travelers would "get back to him" in response to the invitation (Bossard Dep.; Exh. #105, March 16, 2001). Travelers was not heard from again on the subject, and no representative appeared on behalf of Travelers at the proceedings. Negotiations that followed the April 26, 2001 expert presentations proved unsuccessful (Boyd Aff.).

51. Triton's President took it upon himself to oversee the claim process and move it forward. Under his direction, detailed documentation for the dollars expended by Triton in connection with the rework were compiled. Since he was aware that the Government had been fully apprised regarding the basis for Triton's claim, he decided that the process would be expedited by not commissioning a lengthy claim narrative to be written. Representative correspondence reflecting Triton's position on the issues was included instead. On June 12, 2001, Triton certified and submitted a claim requesting recovery for the rework costs in the amount of $2,501,664. Mr. Boyd's transmittal letter particularly noted that this submission did not include Travelers' surety costs, which he anticipated would be forthcoming (Exh. #12, June 12, 2001; Boyd Aff.).

52. The Corps responded in a phone call from Mr. Bill McCollum, the Administrative Contracting Officer (ACO), to Mr. Boyd. He related that the Contracting Officer, along with her staff and advisors, had determined that the claim could not be accepted as submitted. Mr. Boyd was instructed that the claim would have to be split such that Triton would submit only the claim dollars that represented costs incurred while

24

it had a contract with the Government; and Travelers would submit the claim dollars that represented costs incurred while it was completing surety to the Government on the Abiquiu project. This decision was representative of standard Government practice regarding claims and disputes. The Government only will acknowledge and deal with "a single point of contact", which means it can accept and act only upon claims submitted by the party with whom it has a contract (McCollum Aff.; Lees Expert Report, Exh. #507).

53.    Mr. Boyd saw to it that the claim was broken out in accordance with the instructions he had been given by ACO McCollum. It was determined that $372,514 had been expended by Triton in connection with the gate leakage problem up to the February 28, 2000 date on which the Triton Abiquiu contract had been terminated for default. These dollars were spent on investigation, engineering, consulting, and design costs related to the leakage problem. Mr. Boyd certified the claim on behalf of Triton, and submitted this claim to the Corps of Engineers Contracting Officer for disposition (Boyd Aff.; Exh. #23, July 16, 2001).

54.    The remaining $2,129,022 represented the costs incurred by Triton as completion contractor to the completing surety. The backup for these costs was assembled separately. The claim package was submitted to Travelers along with a request that it certify the claim and pass it through to the Corps Contracting Officer for disposition. Mr. Boyd noted, once again, that Travelers surety costs were not in the costs Triton had included in the claim (Exh. #7, July 16, 2001; Boyd Aff.).

55. Mr. Bossard testified that he spent approximately three days reviewing the claim he had received from Triton. He eliminated several cost items which he believed, mistakenly from Triton's standpoint, were pre-Takeover Agreement expenditures (Bossard Dep., pp. 67-68, 71, 73-74).

56. Regarding his review of the claim, Mr. Bossard testified to the following: that he was familiar with the federal disputes process generally, and had experience with the requirements for claim certification on federal projects (Bossard Dep., pp. 46, 63, 153-157). Mr. Bossard was, for many years, a general contractor and was acquainted with the procedure by which the contractor passes through the claims of its sub-tiers to the project owner (Bossard Dep., pp. 106-107). He stated, and several times said that he understood, that it was not the role of the party passing the claim through to the Government to review the claim for purposes of determining its merits (Bossard Dep. pp. 79, 87, 174, 270). Deciding the merits of the claim was the business of the Contracting Officer in the first instance, and ultimately is the business of the Boards of Contract Appeals or Court of Federal Claims at the appellate level. Mr. Bossard was not questioned about this procedure by Ms. Monteiro, and he did not share his knowledge with her when, several months later, she took it upon herself to conduct an "investigation of the claim merits" (Bossard Dep pp, 148, 211-213, 176, 177, 201, 203-204, 190). Neither did he tell her that, nor did she ask whether, he held the same view regarding the claim when he certified and submitted it as he did when she asked him about it several months later (Bossard Dep. ,pp. 173-174); or that after he certified it, he had no new

26

information regarding the claim, and was not aware that anyone at Travelers did – his state of knowledge and his views on the claim were the same at the point of certification as they were at the time Ms. Monteiro inquired of him regarding the claim (Bossard Dep., p. 158). Mr. Bossard testified he was not aware of any Travelers' writing (apart from outside counsel's July 15, 2002 letter (Exh. #39), in which it was said that Triton's claim lacked merit, and he was specific he never told Ms. Monteiro that it lacked merit (Bossard Dep, p. 189).

57. According to Mr. Bossard's testimony, he secured permission from Ms. Brown, apparently in her capacity as a Claims Manager, to certify and sign the claim as Travelers' authorized representative (Bossard Dep., pp. 96; 124). Mr. Bossard then affixed certification language to the claim that was not in accordance with the contract requirements, and submitted it in Travelers' name to the Contracting Officer for disposition (Exh. #8, Aug. 30, 2001). Despite repeated requests by Triton, Travelers did not include its surety costs as part of the claim (Boyd Aff.).

58. ACO McCollum wrote back to Mr. Bossard that the claim could not be accepted because the language used in the certification was improper. He returned the claim submission to Mr. Bossard, referring him to "Contract Clause 70 'Certification of Claims and Requests for Adjustment or Relief (May 1994)' for proper claim certification procedures" (Exh. #9, Sept. 10, 2001).

59. Travelers took no action in response to ACO McCollum's rejection of the claim for nearly two months. Mr. Boyd urged Mr. Bossard to get the claim in, pointing

27

out that a delayed submission meant that interest was not accruing, and that it was holding the pending litigation (Exh. #25, Nov. 15, 2001). On November 15, 2001, Mr. Bossard resubmitted the identical claim document to the Contracting Officer for disposition, this time with the correct certification (Exh. #26, Nov. 15, 2001). Again, despite Triton requests, Travelers did not submit its surety costs as part of the claim. Mr. Boyd has no recollection that he provided a certification language to Mr. Bossard, but if he did it would have been in the form of transmitting the Clause 70 language that had been used by Triton in certifying its claim, which is the same provision to which Mr. Bossard was directed by ACO McCollum. The certification verbiage Mr. Bossard used is verbatim from that contract provision (Boyd Aff.). Mr. Bossard understood, when he recertified and resubmitted the claim, that Triton would appeal from a Contracting Officer's denial of the claim (Bossard Dep., pp. 136-137).

60. Mr. Bossard was well acquainted with the dispute between Triton and the Corps relative to cause and responsibility for the gate leakage problem (Bossard Dep., pp. 133-134, 289-290). Even though he felt the claim probably would be denied, he nonetheless felt "they (the Contracting Officer) might bite on it" (Bossard Dep. p. 78). Mr. Bossard believed this, even though by the end of the remediation work in March of 2001, he had formed a view that the cause of the leakage problem was not design related; a view he held at the time he certified the claim and sent it to the Contracting Officer (Bossard Dep., pp. 173-174) Agreeing that he possessed one view on that subject, and that Triton representatives held another view, Mr. Bossard acknowledged that this

difference was illustrative of one reason why it is not the place of a party passing through a claim to judge the claim merits, and why the merits are for someone else to decide (Bossard Dep., pp. 189; 276). This prospect did not result in him obliging Triton's request to include Travelers' surety costs. The surety costs were not submitted to Triton until the following year, thus preventing Triton from including those costs as part of its own claim (Boyd Aff.; Exh. #28, Jan. 18, 2002).

61.   On January 18, 2001, Triton received a Contracting Officer's Decision that denied its claim for a $372,514 equitable adjustment of the contract price to compensate it for pre-termination rework costs (see Exh. #91, ¶14).

62.   Travelers received a Contracting Officer's Decision dated December 18, 2001, denying the rework costs claim it had submitted. Travelers forwarded a copy of this Decision to Triton on January 18, 2002 (Exh. #28). At that point the Triton file was transferred to a Mr. Scarpellino within the Travelers' organization. Mr. Bossard testified that, excepting for a telephone conversation with Ms. Monteiro at some later date, he had nothing further to do with the Triton Abiquiu file (Bossard Dep.).

63.   On October 31, 2001, the Contracting Officer issued a Final Decision asserting that Triton was liable for costs incurred by the Government in connection with the rework. The amount was $498,461,36. This claim never was asserted against Travelers, against Reliance, or against the surety performance bond posted on the project (Exh. #27; Bossard Dep., pp. 141-142).

29

**Background Facts Regarding Travelers' Claim For Indemnity.**

64.    Triton has never denied that it and the individual indemnitors are signators to a General Agreement of Indemnity with Reliance. Triton repeatedly has acknowledged that the indemnity obligation is enforceable. This was specifically done in Triton's proposed completion agreement of April 28, 2000, that Reliance had requested (Exh. #28):

> a. Triton hereby confirms and ratifies the Indemnity Agreement, and acknowledges that the said Indemnity Agreement remains in full force and effect. The parties agree that the terms, covenants, conditions, and obligations created herein are in addition to and not in substitution for, the rights and remedies presently vested in them by law and by the terms of the Indemnity Agreement.
>
> * * *
>
> (6)    Nothing contained herein shall, in any way, waive, diminish or alter the rights afforded to Reliance and Triton under the Indemnity Agreement....

65.    The essence of this indemnity acknowledgment language was included in each draft of the completion agreement that Triton attempted to negotiate with Travelers during the unsuccessful exchange between counsel for the parties in the November-December 2001 time frame (Exhs. # 78, 80, 83, 85 and 85). They were repeated in the 2002 exchanges when Triton was attempting to secure Travelers' consent to allow an appeal from the Contracting Officer's Decision denying the claim:

> Neither Triton nor the individual indemnitors on the General Agreement of Indemnity with Reliance ever have equivocated on terms of that Agreement (February 28, 2002 letter, Exh. #33).

> I repeat what we have said from the very beginning of this matter: Triton and the indemnitors are cognizant of the mutual obligations owed under terms of the General Agreement of Indemnity. They intend to fully abide and discharge their obligations thereunder, and ask nothing more than that the surety do the same. (March 18, 2002 letter, Exh. #36).
>
> The proposal I made to you in the course of our phone conversation on Friday, April 26, 2002, included a reaffirmation of the commitment previously made by Triton and the indemnitors that they would and do acknowledge the indemnity obligation. (May 13, 2002 letter, Exh. #39).

66. Travelers made no claim or demand for indemnification throughout the period prior to and during the rework. No claim or demand was made during the months when Triton was requesting that surety costs be included with the pass-through claim that was being submitted to the Government in Travelers' name. The first demand for indemnification made by Travelers did not occur until January 18, 2002, which was after all the claims had been submitted and denied (Exh. #28). This also was the first occasion on which Travelers advised Triton as to the amount of the surety costs it would seek to recover from Triton under the GAI (Boyd Aff.).

67. Even though Triton never disavowed its indemnity obligation, it did raise question with the amount set forth in Travelers' demand (Exh. #503, Jan. 30, 2002). Triton asked for an opportunity to sit down and discuss certain of the invoiced items that were included in the Travelers' demand. Travelers' responded:

31

> ...Travelers will not engage in any dialogue or negotiation on particular entries or invoices. (Exh. #35, March 5, 2002)

68.     Travelers' posture did not change even though Triton pointed out specific items in the billing that it felt the parties ought to review and discuss (Exh. #39, May 13, 2002):

> (Your unwillingness to "engage in any dialogue or negotiation"... seemed to us an unreasonable stance for Travelers to take, particularly since Triton and the indemnitors always have acknowledged an indemnity obligation, and asked for nothing more than an open exchange to resolve the proper amount.)
>
> * * *
>
> Not for the purpose of avoiding an obligation, but rather to determine a fair and proper amount, we are suggesting to you that there are sums included in Travelers' billing to Triton and the indemnitors that are disputable [followed by exemplars of the disputable items].
> * * *
>
> May I also suggest to you that while Triton would argue that these costs and expenses are not recoverable under the Indemnity Agreement, they should be included in the Claim for Equitable Adjustment of the Contract Price.

69.     Triton believed it had and has further reason to question the Travelers' indemnity billing. Repeatedly throughout the rework and claim submission process, Triton requested that Travelers submit its surety costs to the Government. Travelers never did this, even though Triton spelled out the inequity of Travelers seeking to recover

32

the surety costs from Triton when, if Triton sustained its position in its litigation with the

Government, then it would be the Government that would have to reimburse these costs.

Triton's request to Travelers and its reasoning are supported by the documentary record:

> Exhibit #44 (illustrative of Triton's request that
> surety markups be applied by Travelers to the extra
> work proposals).
>
> (Travelers should) consider that at some point,
> Triton will be asked to reimburse Travelers' costs.
> If (Travelers) has legitimate costs tied to legitimate
> Triton extras, let's make sure the Corps pays, not
> Triton.
>
> * * *
>
> Any party that does extra work should be entitled to
> overhead and profit for the efforts....Please ask for
> (overhead and profit) and get it to help defray
> Triton's costs.

70.     From its April 28, 2000 proposed completion agreement onward, Triton

communicated to Reliance the request and need that Reliance should be reserving a right

to claim and recover all surety costs for which it intended to seek indemnification from

Triton.

> Reliance agrees that it will take reasonable
> necessary steps to preserve, and not to prejudice,
> these (above) claims; and that it will duly reserve
> with the Corps the right to recover all loss, cost and
> expense for which Reliance intends to assert an
> indemnity claim pursuant to the Indemnity
> Agreement. (Exh. #28, ¶8)

71.    Triton believed it had an understanding with Reliance that surety costs would be made part of the claim (Boyd Aff.). When the rework claim was transmitted to Travelers for pass through to the Corps' Contracting Officer, it expressly was pointed out that "There are certain items that are not included in this Request for Equitable Adjustment. The Surety's cost of administering the gate rework is not included." (Exh. #7, July 16, 2001) This belief that Travelers would submit its own costs was reaffirmed in a February 28, 2002 exchange between counsel:

> Triton submitted its part of the claim to Mr. Bossard, with the understanding that Travelers' costs incurred in connection with that takeover and rework effort would be added. (Exh. #33, Feb. 28, 2002)

72.    Triton's surety was Reliance, not Travelers. Triton had no knowledge regarding the arrangement between the two companies. Nothing ever was presented to Triton asking its consent to substituting in Travelers for Reliance. Triton had a successful relationship with Reliance for many years, and knew Travelers only by its reputation in the industry. There are no documents of which Triton is aware that obligate Triton to indemnify Travelers. Triton never has had any bonds written for it by Travelers, and has never paid any bond premiums to Travelers (Boyd Aff.).

**Triton's Second Amended Complaint, the Second Lawsuit, and Settlement of the Claims Comprehended By The Claims Court Actions.**

73.    Triton continued to investigate the possibility that there might be some way to expedite the disputes process. The fact that the rework had been completed

34

successfully and on time did nothing to alter the entrenched position of the parties regarding ultimate responsibility for the gate leakage problem and the consequent cost, notwithstanding the detailed presentation Triton consultants had made to Corps representatives on April 26, 2001 (Boyd Aff.).

74. Although the position of the parties was unchanged, it had become clear that any effort to avoid the disputes process and put the rework claim directly into the pending lawsuit was not going to work. Department of Justice counsel for the Government advised that even though this would have made sense and saved time from a practical standpoint, it nonetheless could not be done from a contractual and procedural standpoint. Triton felt it had no option except to follow the disputes procedure set forth in the contract. Once that process had run its course at contracting agency level, Triton still could seek to have all of the claims consolidated (Boyd Aff.).

75. Accordingly, a decision was made to drop Count II from the Cause #00-261C lawsuit. A Second Amended Complaint was filed on July 16, 2001, which sought relief relative to claims for pre-termination work under the original contract and a declaration that the Termination for Default was wrongful and should be converted to a Termination for Convenience of the Government. Triton deleted Count II of the January 12, 2001 Amended Complaint, in which it had asserted that the Court had jurisdiction over all existing and future claims related to the Abiquiu project on the basis that "(t)he Corps already has denied any liability for...costs incurred remediating the gate leakage problem, hence any adherence to a disputes procedure is meaningless." Triton would like

35

to have found a way to pursue the rework claim without Travelers' involvement, but there simply was no way that this could be done (Exh. #HH; Boyd Aff.).

76. Triton appealed the Contracting Officer's January 18, 2002 denial of its $372,514 rework claim on June 13, 2000, U.S. Court of Federal Claims Cause #02-702 (Exh. #91). (The original Complaint filed on May 7, 2000, and the successive amendments to that Complaint are Cause #00-261C.) This lawsuit also sought:

> A determination that the $498,461.36 alleged as an amount due to the Government by Triton (Contracting Officer's Decision dated October 31, 2001, Exh. #27) is to the Government account, and is not recoverable in full or in part from Triton.

and asked for:

> Consolidation of this lawsuit with the pending Case #00-261C, so that all issues arising from or relating to the Contract can be decided in a single action.

77. Department of Justice counsel for the Government and Triton counsel had agreed to consolidation. For reasons which it did not publish, the Claims Court declined to consolidate the cases. Instead, it assigned Cause #02-702 to the same judge that had been assigned Cause #00-261C, who ordered that these would be concurrent proceedings, including discovery, in the two cases, with no requirement for separate submissions to the Court, and said that the two were to be handled as "related cases".

78. Travelers had rejected all of Triton's requests and overtures regarding appeal of the Contracting Officer's denial of the $2,129,022 Travelers rework claim. Triton ultimately and conclusively was advised by counsel "…Travelers cannot presently

36

envision any scenario whereby it would participate with Triton in pursuing that claim" (July 15, 2002, Exh. 30). Triton management believed the only financially viable course of action available to it was to pursue settlement of the other claims with the Government, i.e., those claims that were pending before the Court in Causes #00-261C and #02-702 (Boyd Aff.).

79.    Department of Justice counsel and the Corps were agreeable to negotiations. It was made clear to Triton that negotiations could not include the $2,129,022 Travelers rework claim, and that nothing would be paid nor any consideration given to Triton on account of that Travelers' claim. The Corps understood that this claim belonged to Travelers, and had received indications from Travelers that no appeal was going to be taken from the Contracting Officer's denial of the claim Travelers had submitted (McCollum Aff.; Boyd Aff.).

80.    For the duration of these negotiations, this restriction on the scope of settlement negotiations remained in place. Corps and Triton representatives met and worked through the acceleration and extra work claims still pending from Triton pre-Termination work. It was agreed that Triton was entitled to a 28 day extension of time due to the early Government-caused delays on the project. A settlement amount was agreed, subject to DCAA audit (Boyd Aff.).

81.    Since it no longer had the potential upside of the $2.1 million rework claim, Triton recognized it could ill afford to pursue only the $372,514 claim for pre-Termination rework costs. In consequence, Triton essentially had to throw in this claim.

37

It did so by trading off Triton's pre-Termination rework claim for the Government's $498,461.36 claim against Triton. Triton was in a difficult position because it had to make this trade even though fully convinced that the Termination for Default would be set aside by the Court, which would have the resultant effect of negating any recovery on this claim by the Government against Triton (Boyd Aff.; McCollum Aff.).

82. Negotiations resumed on December 8-9, 2002, after completion of the DCAA audit. A settlement figure reflecting the audit results was agreed. There was no amount or consideration included for the $2.1 million Travelers claim, and the parties agreed that this would be made clear in their settlement agreement. Thus all claims encompassed by the two pending Claims Court lawsuits were settled (Boyd).

83. The final settlement agreement between Triton and the Government took the form of a Stipulation for Entry of Judgment (Exh. II, signed October 8 and October 20, 2003). This document includes specific language reflecting non-inclusion and non-release of Triton's rights with respect to Travelers on the $2,129,022 rework claim which Travelers had refused to allow Triton to appeal:

> 13. The releases provided by Triton in Paragraph 11 above, the subparagraphs thereunder, and/or any other paragraph and/or subparagraph of this stipulation for entry of judgment, release only, and only the Government....Nothing in this stipulation for entry of judgment is intended, nor should it be construed, as a release or waiver of any claim or recovery rights, whether known or unknown, that Triton, or the Government, have, or may have, against any third party including, but not limited to, Triton's performance bond surety, Reliance Insurance and/or its

38