successor, Travelers Insurance ("Reliance/Travelers"). These claims include, but are not limited to, any claim that Triton may have against Reliance/Travelers as a result of Reliance/Travelers not appealing a contracting officer's final decision denying a passthrough claim that Reliance/Travelers, pursuant to Reliance/Travelers takeover agreement that it entered into with the Government after the termination for default, submitted to the contracting officer for Triton, Reliance/Travelers subcontractor for the work to be performed pursuant to the takeover agreement.

\* \* \*

17. This stipulation for entry of judgment is for purposes of settling this case only....Nothing in this stipulation for entry of judgment shall

   a. confer, nor be construed as conferring, any rights and/or defenses upon any third party including, but not limited to, Reliance/Travelers; and
   b. be used by or on behalf of any third party including, but not limited to, Reliance/Travelers, to claim such rights or defenses.

**Saleback of Triton's Rework Insurance Coverages.**

84.   Unrelated specifically to the Triton Abiquiu project, but as a coverage applicable to all Triton company operations generally, Triton's insurance broker and the company management agreed that a recently available "Rework Protection" endorsement on its Commercial General Liability (CGL) insurance policy would constitute a prudent coverage to spread business risk. Triton purchased this coverage. Primary coverage was under a policy issued by St. Paul, with $1-million policy limits, and a $10,000 deductible

39

at each work site and a total deductible of $50,000. TIG coverage, designated "Contractors Rework Endorsement", was under its $10 Million "Coverage Plus Umbrella Liability Policy" which carried a $100,000 Self-Insured Retention (McClung Aff).

    85.    Coverage by these policies was detailed as follows:

> *St. Paul's Policy*: Contractors Rework. We'll pay for the repair, replacement, alteration or removal of your ongoing work that:
> - is done by or for you;
> - is structurally unsound; or
> - cannot be put to its intended use; even if the protected person is not legally required to do so.
>
> We will also pay for any resulting loss of use caused by such work.
>
> *TIG's Policy*: We will pay the cost of repair, replacement, alteration or removal of your product or your work which cannot be put to its intended use.

Both policies went on to list multiple exclusions.

Triton made a claim upon its CGL policy in connection with the gate leakage problem on the Abiquiu project. Coverage was disputed. There followed a lengthy communication between Triton, and agents and lawyers for the insurance carriers (McClung Aff.).

    86.    Triton had retained consultants to evaluate and advise regarding the gate leakage problem. It was on the basis of advice and reports from these consultants that Triton formulated its position regarding cause of the leakage problem. The consultants' view was that the Corps design was defective, and that the directive from the Corps

40

design team to tilt the gate so that the gate frame would conform to the as-found dimensions of the existing tunnel liner, which turned out to be skewed; and the on-site directives to fill gaps between the tunnel liner and the gate frame with weld, substantially exacerbated the design problem. The combination of these factors was deemed to be the substantial cause of the gate leakage problem (McClung Aff.).

87. Triton provided full details and documentation of the dispute with the Corps to St. Paul and to TIG, the carriers responded to Triton's claim under the policies by reciting policy exclusions that, according to the carriers, were applicable to the claim. Triton persisted in its claim (McClung Aff.).

88. There was a lengthy period of negotiations between Triton and its CGL carriers -- both the primary and the umbrella coverages. Both carriers persisted in their position. Both denied the obligation to pay for costs incurred in connection with remediating leakage on the gates. (St. Paul initially had indicated it might consider paying certain of the costs, but withdrew this overture when Triton sent invoices reflecting the costs actually being incurred performing the rework.) Neither St. Paul nor TIG ever directly reimbursed Triton for the as-incurred rework costs (McClung Aff.).

89. Triton continued to separately negotiate its claim with each of the two CGL carriers. It was TIG, the umbrella carrier, that first indicated a disposition to "buy back" its entire CGL coverage. This occurred in the October – November 2000, at a time when there was no certainty as to how much the rework would cost, or whether the Triton rework plan would successfully remediate the gate leakage problem (McClung Aff.).

90. Triton management evaluated the risk to all of its projects and the company operations generally that would result from losing the rework endorsement on its CGL insurance policy. This risk was weighed against the company's acute need for cash to fund the completion contract work on the Abiquiu project (McClung Aff.).

91. A decision was made that selling back the rework coverage was an expedient the company should pursue. Triton realized it was in an advantageous negotiating position with the carrier because the insurance companies were anxious to get out of the claims that had been materializing under these rework coverages. Further negotiations resulted in an offer from TIG to buy back its $10-million rework cover for a settlement amount of $1.6 million. Because it remained confident that it would prevail on its claim against the Corps, Triton agreed to accept that figure, on condition that TIG assign to Triton its subrogation rights. An agreement was reached on that basis (McClung Aff.).

92. No settlement was reached with St. Paul until several months after the rework had been completed. In part due to St. Paul having reneged on its initial commitments to partially fund Triton's completion contract work, Triton management adopted a more hard line position with St. Paul. Ultimately an agreement was reached whereby Triton sold back to St. Paul its rework coverage in exchange for $800,000 and an assignment of its subrogation rights (McClung Aff.).

93. Since the rework insurance covered the whole of Triton's operations, and was not project specific to Abiquiu, Triton lost this coverage on all company projects.

This encompassed Triton operations on a geographic scope extending from Hawaii to the East Coast, and from Washington state to Florida.

**Triton's Loss of Its $2.138-Million Rework Claim Against the Government Due to Travelers' Unreasonable and Arbitrary Decision Preventing an Appeal.**

***Triton's request to Travelers was nothing more than that it be permitted to appeal the Contracting Officer's Decision in Travelers' name.***

94.  It was never Triton's intention or request that Travelers be actively involved in the appeal. Travelers had certified the claim in its name. It had submitted the claim in its name. The Contracting Officer's Decision denying the claim was addressed to Travelers. It was Triton's understanding that the only available remaining remedy for the claim was an appeal taken in Travelers' name (Boyd Aff.).

95.  This was explained to Travelers in Triton's communications with representatives of that company in the March – July 2002 time frame. Travelers was never asked to bear any costs. It was never asked to assume any risk. It was not asked to take an active role in the appeal (Boyd Aff.).

> Triton has asked only that Travelers agree that Triton can proceed with the rework portion of the equitable adjustment claim in Travelers' name. Triton will bear all costs and expenses associated with that effort. The reason this is necessary, as we have discussed, is that Triton cannot pursue that claim in its own name. Triton's rights against the Government in respect to recovering costs of the rework...will otherwise be lost (May 13, 2002, Exh. #39).

***Triton repeatedly emphasized that it could not prosecute an appeal except in Travelers' name as plaintiff. Travelers never suggested there was some method by which Triton could pursue the claim in Triton's own name.***

96. Over the entire course of discussions between Triton and Travelers regarding appeal of the rework claim, Travelers never suggested or indicated in any way that Triton somehow could pursue the claim in its own name. The first time Triton ever heard such a contention was long after this lawsuit began. The first time Triton ever seen such a contention in written form is in Travelers' Motion for Summary Judgment.

97. Triton repeatedly emphasized to Travelers, in writing, that an appeal in Travelers' name was its only recourse. Every letter written to Travelers that made this point was responded to in some part by Travelers. No Travelers response ever took exception to Triton's position regarding the necessity for appealing in Travelers' name, and Travelers never even implied there was some other way the claim could be pursued.

> We are not asking for anything more than allowing the claim to be prosecuted in Travelers' name but at Triton's expense…( Exh. #39, May 13, 2002,).
>
> The clock is ticking on the time within which the appeal from adverse Contracting Officer's Decisions on the two rework claims must be taken. We intend to file the Pre-Default Termination portion of the claim submitted by Triton within the next couple of weeks. We are satisfied that the legal authority disabling Triton from appealing the Contracting Officer's denial of the Post-Default Termination in Triton's name is so clear that no purpose would be served by doing so. In any event, even if we were to file such a complaint, the

44

> Government lawyers have made it clear that a
> motion would be brought to dismiss it. By the time
> that motion could be heard and determined by (the)
> Court, the claim would be time-barred. At that
> time, even Travelers, as the proper party plaintiff,
> could not prosecute the claim. The result is that
> Triton simply will be unable to prosecute the post-
> Termination rework claim of over $2 million
> against the government (Exh. #41, May 20, 2002).

***Because there were no expert reports beyond those which already had been furnished, Triton offered to make its consultants available to explain Triton's litigation position. This offer was summarily rejected.***

98.　Over the course of the exchanges between Travelers and Triton regarding an appeal in Travelers' name, Travelers requested Triton furnish it with expert reports substantiating its claim entitlement position. Triton disagreed that Travelers, at that juncture in the claims process, should be reviewing the claim merits since Travelers already had reviewed the claim, certified it, and submitted it to the Contracting Officer for decision. Triton nonetheless made every effort to be cooperative. Travelers already had the only expert reports that had been generated (transmitted to Reliance March 7, 2000, Exh.#12). It was pointed out to Travelers that there were no current expert reports because the date established by the Claims Court for filing such reports in connection with the pending litigation still was several months off:

> Triton was reassured by your request that it provide
> you with the information we have offered regarding
> our litigation position with the government. As I
> explained, there are no "expert reports" in the
> lawyer's sense of that term because the litigation

45

> has not yet progressed to a point where such reports
> have been generated (May 13, 2002, Exh. #90).

99.    Travelers had been invited to attend the April 26, 2001 meeting between Triton and the Corps at which the Triton consultants were to spend half a day explaining their conclusion that the gate leakage problem was design related such that financial responsibility for the remedial work should rest with the Government. Travelers elected not to attend that meeting. When it was explained to Travelers that there were no written expert reports, Triton made what it thought was an even more sensible proposal – one that would appeal to Travelers if there was a real interest in reviewing the merits of the Triton claim:

> Triton's consultants...have spent hundreds of hours
> reviewing and analyzing the documents, the data,
> and the physical evidence pertinent to leakage of the
> emergency gates. We would welcome an
> opportunity to share their analysis with Fred
> Bossard and Arvin Daum. Dave Boyd will be
> contacting Arvin directly to discuss a suitable
> medium for doing this. A face-to-face session
> appears to be the best method of briefing Fred and
> Arvin, and answering any and all questions they
> may put to our consultants (Exh. #90, May 13,
> 2002).

This offer was flatly rejected by Travelers the following day:

> While Travelers appreciates your offer to meet with
> Fred Bossard and Arvin Daum, I do not believe
> such a meeting would be appropriate. In fact, it is
> requested that communications on this issue flow
> through this office (office of Travelers' outside
> counsel). Stated simply, please do not contact

46

> Messrs. Bossard or Daum directly (Exh. #40, May 14, 2002).

Triton responded, but never afterward heard from Travelers on the subject:

> I must tell you that one of the biggest disappointments was Travelers' refusal to allow a discussion between the Triton folks and your Arvin Daum and Fred Bossard. The reason that seems to extraordinary to us is because Fred and Arvin worked shoulder to shoulder and cooperatively with Triton for nearly two years while the emergency gate remedial work was being planned and executed. I believe I made it clear to you that we have no expert reports for them to review. The sensible thing, or so it seemed to us, was to simply arrange a face-to-face discussion between Arvin and Fred, and Triton's people and our technical consultants. They all know each other and have discussed matters openly in the past. We can see no possible reason why Travelers should ring down the curtain on what heretofore has been an open, cooperative, and constructive dialogue between our people on the one hand, and Fred Bossard and Arvin Daum on the other (Exh. #41, May 20, 2002,).

***Triton provided all of the documents that Travelers requested. It offered further documents, but Travelers never sought to review them.***

100.    During these exchanges in the Spring of 2002, Travelers requested that Triton provide it certain documents. Travelers asked for two categories of documents: those pertaining to the rework insurance coverage, and the paperwork relating to the gate leakage remediation. Triton was left with an impression that Travelers had a greater interest in the former category than in the latter category (Boyd Aff..

47

101. Documents pertaining to Triton's rework coverage were promptly provided to Travelers:

> ...I will compile for your review a package of the relevant insurance documents. As I described in our phone conversation Thursday, there were no "Proofs of Claim" submitted to the carriers. Coverage was disputed. We negotiated a settlement with carrier representatives and their lawyers. If you think it would be helpful, I can walk you and your client through the papers and the negotiation/ settlement process (Exh. #90, May 13, 2002).
>
> In accordance with your request, I am transmitting with this letter a packet of documents representative of the exchange between Triton and its rework carriers. * * *
>
> The total package of materials furnished by Triton to these carriers (is) ponderous. By way of illustration, after the claim with TIG was settled, Triton received back from Larry Beall (counsel for TIG) three bankers boxes full of the documents that Triton had provided to him.
>
> You may be assured that all three bankers boxes are available to you, or to some other Travelers representative, for review and copying. Please let me know your wishes in that regard (Exh. #52, May 29, 2002).

102. Regarding documents pertinent to the rework operations, the only limitation Triton ever placed on producing the entire array of such documentation including the results of its litigation discovery, was that the production be made in such a way that it would not jeopardize Triton's position in its ongoing Claims Court litigation with the Government:

48

> ...Triton is prepared to make available for Travelers' inspection and review all or designated parts of the documentation that has been accumulated in connection with the project and the pending litigation. You will appreciate that the paperwork is voluminous, consisting of several full file cabinets. I am satisfied that we can make an appropriate confidentiality arrangement to preserve any relevant privileges in connection with the pending litigation. If Travelers is interested in having access to these files and performing such a review, please let me know so we can work out the arrangements (Exh. #41, May 20, 2002).

Triton's willingness to produce these documents continued right through and including the point at which Travelers finally and unequivocally refused to permit the appeal:

> We have, as you would expect, conducted a thorough review of all files relevant to the Abiquiu Dam project in connection with the ongoing litigation, inclusive of three separate document productions by the Corps of Engineers. Our offer that these are available for review and copying by Travelers remains open (July 25, 2002, Exh. #54).

***Travelers refused to provide Triton any documents at all, and specifically refused to provide any support for its asserted position that the gate leakage problem was due to "faulty workmanship".***

103. Triton attempted to develop an "everything on the table" dialogue with Travelers. It was repeated rebuffed in these efforts. In connection with its ongoing litigation with the Government, Triton asked that Travelers provide access to the documents that it had generated in connection with the rework.

49

> It is unarguable that we are entitled to see (Reliance and Travelers' files)…and our preference would be to review the files on an agreed basis rather than in the context of an United States Court of Federal Claims subpoena. This is another area where we need to be allies, not adversaries (February 28, 2002, Exh. #33).

Travelers responded:

> Travelers strongly disagrees that Triton is in any way entitled to review Travelers' files concerning this matter. Stated simply, they will not voluntarily be made available for review (March 5 2002, Exh. #35).

To which Triton replied:

> Certainly you would not gainsay the relevance of all materials directly and indirectly related to the account Travelers is seeking to collect from Triton. Nor could it reasonably be asserted that, inasmuch as Travelers was the completing surety with respect to work which is entirely within the framework of pending litigation, that Travelers' files are immune from production. Requiring Triton to subpoena those records, as opposed to producing them cooperatively and willingly, appears outright belligerent (March 18, 2002, Exh. #36).

104. Much to the surprise of Triton, since it never previously had heard such a contention, Travelers suggested that:

> …(I)t is my understanding that Travelers concluded the cause of the gate leakage was defective construction by Triton (Exh. #29, April 16, 2002).

and later:

> ...(I)t has been the opinion of Travelers that the claim lacked merit (Exh. #30, July 15, 2002).

Triton requested that it be provided with any backup or documentation supportive of such a statement:

> ...(I)n light of the Triton - Travelers principal-surety relationship, and in the interest of good faith and fair dealing on both sides, I ask the following: if Travelers has any evidence beyond which you passed along to me from Fred Bossard that suggests faulty workmanship caused the gate leakage problem, would you please provide that to us. Quite obviously, if there is something we have overlooked or do not know about, it is only reasonable that we be apprised of it so that we can factor that information into our decision-making. I am certain you would not disagree that this is a matter of sufficient importance to warrant both Travelers and Triton placing all facts on the table, which we repeatedly have offered to do (Exh. 41, May 20, 2002).

Travelers never responded. Triton never received any documentation of any sort from Travelers prior to the discovery in this lawsuit.

***Facts concerning the Grand Jury Subpoena that was served on Travelers suggest that the object of the inquiry was unrelated to the rework claim.***

105.  Triton was aware that a Corps of Engineers' employee, at some point in 1999 when the disparate viewpoints on cause of the gate leakage problem were being trumpeted by each side, had filed a "whistleblower" complaint. Based upon Corps documents discovered in the course of the ongoing Claims Court litigation, it was evident that the allegations pertained to events that took place at the project in February of 1999

51

when the gates were being installed (McCollum Aff.). The only available documentation reveals that the investigators, upon interview of both lawyers for the Abiquiu District of the Corps of Engineers, filed a report stating as follows: "Neither REIKENBERG nor WALLACE (the Albuquerque District Corps lawyers) could pinpoint any false statements, false claims, or criminal activities possibly committed by Triton". This was pointed out to counsel for Travelers when he incorrectly stated that "Travelers understands that the major focus of the Department of the Army is the claim Triton has submitted for the rework costs with respect to the repair of the emergency gates". It also was pointed out to Travelers' counsel, when he asserted "based on a number of conversations with various representatives of the Department of the Army, Travelers understands that similar Grand Jury Subpoenas have been served upon Triton and one or more of Triton's subcontractors relating to the Project" (Exh. #30, July 15, 2002), that neither Triton nor any of its subcontractors on the Abiquiu project ever had received a subpoena (Exh. #54, July 25, 2002). That statement was accurate at the time and remains accurate today (Boyd Aff.). From the Corps' standpoint, they were never aware of any inquiry that related to an investigation of anything other than the February-March 1999 activities at the project site. Specifically, they had no direct or hearsay knowledge suggesting that the rework claim was being investigated (McCollum Aff.).

    106.    It is a certain fact that nothing ever came of the investigation. This has been affirmed by the U.S. attorney and by the individuals conducting the investigation. The file on this investigation was closed last year (Boyd Aff.)

### III. STANDARD FOR SUMMARY JUDGMENT.

At the summary judgment stage the Court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue of fact. See, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 Ed. 2d 202 (1986).

In conducting this determination "the court is mandated to resolve all ambiguities and draw all inferences in favor of the non-moving party in order to determine how a reasonable jury would decide." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir.), cert. denied, 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper. Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed. 2d 117 (1991).

### IV. TRAVELERS' REQUEST FOR SUMMARY JUDGMENT ON ITS INDEMNIFICATION CLAIM MUST BE DENIED.

**There are factual issues regarding the amount of Travelers' demand, and there are factually based legal bars to enforcement of the Travelers' indemnity claim.**

Triton never denied that it was signator to the General Agreement of Indemnity, and that the terms of that agreement concerning repayment of surety losses mean what they say. From the outset of surety involvement on this project, Triton consistently has acknowledged enforceability of the indemnity obligation. Reliance requested that Triton

53

suggest terms for a completion agreement, which Triton responded to with its April 28, 2000 proposed agreement (Defs.' §II ¶64).

> 1. Triton hereby confirms and ratifies the Indemnity Agreement, and acknowledges that the said Indemnity Agreement remains in full force and effect. The parties agree that the terms, covenants, conditions, and obligations created herein are in addition to and not in substitution for, the rights and remedies presently vested in them by law and by the terms of the Indemnity Agreement.
>
> * * *
>
> 6. Nothing contained herein shall, in any way, waive, diminish or alter the rights afforded to Reliance and Triton under the Indemnity Agreement....

**This acknowledgement of obligations owed under the General Agreement of Indemnity was repeatedly reaffirmed. Triton never equivocated on the subject.**

Travelers had made no claim or demand for indemnification during the rework. Nothing was ever said by Travelers regarding its intention to make a demand for payment upon Triton during the entire period when Triton was requesting that Travelers include its surety costs with the pass-through claim that was being submitted to the Government in Travelers' name.

Travelers did not demand indemnification until January 18, 2002 (Defs.' §II ¶66). This was after all the claims had been submitted and denied. This also was the first occasion on which Travelers advised Triton that it was asking to be reimbursed in the amount of $164,078.60 in "consulting fees and attorneys fees" (Exh. #28). Triton's President then learned that John Scarpolino, the Travelers' Claims Manager to whom the

54

file apparently had been referred, actually had nothing to do with the matter. It was now being handled by a Ms. Sherrie Monteiro, who was a Travelers' "Salvage" person, and who advised Triton's President that her only concern was "collecting the bill" (Defs.' §II ¶66).

Triton sought an opportunity to review and discuss with Travelers certain of the billed items. The request was flatly refused:

> Travelers will not engage in any dialogue or negotiation on particular entries of invoices (Defs.' §II ¶67).

Travelers persisted in this position, even though specific items in the billing were pointed out as being questionable obligations under an indemnity agreement (Defs.' §II ¶68).

In addition to legitimate concerns Triton expressed regarding billings from outside counsel that were included in the indemnity demand, there was no acknowledgment by Travelers of the $13,800 Triton had already paid (Boyd Aff.). Travelers maintained its stonewall position. There always has been a fact question as to the amount owed, even in the event Travelers does establish a right to enforce the Reliance indemnity agreement against Triton.

Travelers relies on language found in ¶28 of the GAI for the proposition which states "an itemized statement of Loss…shall be prima facie evidence of the fact and extent of the liability of the indemnitors to Reliance in any claim or suit…."(Plaintiff's Memorandum ¶9 fn. 3) This provision begs the issue. Triton took exception to the so-

called "itemized statement" immediately. It was specific in its objection to items such as the outside attorneys fees. "Prima facie" does not mean conclusive. The questions raised by Triton now are matters of disputed evidence in this case, leaving an issue of fact for the jury. There is nothing peculiar about a GAI that absolves Travelers from its burden of proving the amount, and justification for the amount, it alleges is owing.

Travelers has a further problem with its argument. There has been no proof advanced that Travelers, rather than Reliance, is entitled to enforce the indemnity agreement. When quoting provisions from the GAI in its moving documents, Travelers conveniently inserts its own name where the name "RELIANCE" appears in the indemnity agreement.

Triton's surety was Reliance, not Travelers. Whatever the arrangement may have been between the two companies for their own business purposes, nothing ever was presented to Triton asking that it consent to substituting Travelers for Reliance as its surety. Over a period of many years, Triton had enjoyed a successful business relationship with Reliance. Travelers was known to Triton only by its reputation in the industry. There are no documents of which Triton is aware that obligate Triton to indemnify Travelers. Triton never has had any bonds written for it by Travelers, and it never has paid any bond premiums to Travelers (Defs.' §II ¶72).

Even if one were to assume that some sort of assignment arrangement transpired between Travelers and Reliance, and this is only an assumption because there is no documentation demonstrating that the Reliance-Travelers GAI was assigned to Travelers

56

for any purpose, it is fundamental that the assignee must establish his standing to enforce a right that was possessed by the assignor. *Shoreline Communications, Inc. v. Norwich Tax, LLC*, 70 Conn. App. 60, 70 (Conn. App. 2002); *Elm Haven Const. Ltd. Partnership v. Neri Const.*, 281 F. Supp.2d 406, 415 (D. Conn. 2003). Travelers quotes freely from the Triton-Reliance GAI as though it was a party to that agreement, but has not pointed to any provision in the document that obligates Triton to accept, as a party to the GAI, any surety other than Reliance -- the surety with which it did business, to which it paid premiums, and the surety that issued the bonds for the Abiquiu Dam project.

Travelers' material breach of its obligations to Triton constitutes a defense to the indemnity obligation. Assuming for the sake of argument that Travelers somehow succeeded to the rights of Reliance under the GAI, then Travelers also succeeded to the obligations *owed* by Reliance to Triton under the GAI. Those obligations included a commitment to preserve and protect the Triton claim rights with the Government. This was material to Triton (Defs.' §II ¶16, ¶21-23). This is the essence of what Triton sought as a commitment from Reliance in the Completion Agreement. It is a promise that was made by Reliance, even though Travelers avoided entering into a written completion agreement. No breach could have been more fundamental to Triton than going out-of-pocket over $2-million in performing the rework, only to have its surety refuse the needed consent which would have allowed Triton to pursue its remedy with the Government as promised.

There is a second material breach. This does not take the form of an express promise, but rather an implied obligation. As is true with any contracting party, Travelers owed a duty to mitigate loss and expense to Triton. *Willametz v. Goldfeld*, 171 Conn. 622, 627 (Conn. 1976); *Pratt v. Dunlap*, 85 Conn. 180, 197 (Conn. 1912). This is an obligation it owed under the GAI. It is an obligation owed as well under the completion contract.

Travelers was entitled to place a surety markup on the claims submitted by Triton. It was entitled to submit its surety costs as part of the Triton rework claim. If Triton proved successful in establishing its entitlement, as Triton was confident it would be, then these costs would have been recoverable from the Government. This right to recovery has been specifically acknowledged by William McCollum, the Corps Administrative Contracting Officer for the project (McCollum Expert Report; McCollum Aff., Exh. #50).

Triton repeatedly requested that Travelers apply these markups and submit its surety costs. Except for one instance when it marked up an extra work item with 10% surety overhead and 5% profit during the remediation work on the gates, Travelers either neglected or refused to forward any markups or surety costs for payment (see Defs.' §II ¶33-41).

To the extent these costs were recoverable from the Government, Travelers could and should have been reimbursing itself for surety costs recovered from the Government rather than looking exclusively to Triton as it did. Travelers' markups on the claims