submitted by Triton would have been in an amount exceeding $300,000 (Boyd Aff.). The surety costs which it contends should be reimbursed are in the amount of $164,078.60, as Triton eventually learned on January 28, 2000. When the trier of fact rules upon the amount Triton is entitled to recover on its claim, it also will have an opportunity to rule on the amount which Travelers could have recovered from the Corps -- that is, if it had complied with Triton's simple request (and its duty to mitigate) that, for better or for worse, it merely add these costs to the Triton claims being passed through to the Government for payment. That constitutes a clear failure to mitigate, and is a defense to Travelers' claim for indemnity. Looked at through a different prism, Travelers now stands in the shoes of the Government, and the amount Travelers could have recovered from the Government offsets against such indemnity obligation, if any, as the jury may find is owed by Triton.

This issue of a further significance: Travelers' actions constitute one of the several grounds upon which the jury may find that the duty of good faith and fair dealing was breached, and that Travelers had an improper motive.

### V. A. **OPPOSITION TO TRAVELERS' MEMORANDUM OF LAW PARAGRAPH V.**

**There was no mechanism by which Triton could have pursued the post-Takeover Agreement claim in its own name, and there was no process by which Triton could have appealed from denial of the claim that Travelers had certified and submitted in Travelers' name (Travelers Memorandum of Law V.C).**

59

The excess water flow ("leakage") passing through the Abiquiu Dam emergency gates that Triton had installed under its contract with the Corps of Engineers ("Corps") was recognized as a serious problem in the February-March 2000 time frame. From that point onward, Triton was under direction by the Corps to fix the problem. Triton was steadfast that it had performed its contract work in accordance with Corps plans and specifications. It contended from the outset that the leakage was attributable to improper design, exacerbated by field directions that the Corps and its designers issued during installation, and by the irregular configuration of the existing tunnel liner to which the emergency gates had been affixed that had been inaccurately depicted by the Corps in its construction documents. The Corps disagreed, and said that the problem resulted from faulty workmanship (Defs' §II ¶11).

Thus, while the Corps and Triton hotly disputed what had caused the gate leakage problem, the Corps was in a position to enforce its directive that Triton had to fix the problem. That meant Triton was to fund and perform the corrective work from its own corporate resources, the Corps' position being that no more money was due or payable under the contract, and no payment would be made to Triton in respect to the "fix", i.e., the remedial work(Defs' §II ¶13). The Contracting Officer's "cure" letter of September 19, 1999 (Exh. #15), issued Triton specific requirements regarding how remedial work was to be performed.

The posture of the Corps and Triton on this issue never changed. Triton was required to perform the work as a condition of obtaining Corps acceptance on the project.

The only way for Triton to recover any money was to complete the remedial work such that the specified leakage tolerance had been met, and then submit and successfully prosecute a claim for recovery of these costs that it had thus expended. Triton made it plain to everyone involved that it would, in fact, pursue such a claim (Defs' §II ¶13).

That position of the parties did not change by reason of the Corps' termination of Triton's contract for default. It did not matter who performed the work, Triton would have to pay for it: initially, by funding the work itself, or, indirectly, by reimbursement if the surety funded the work; and Triton thereafter would seek recovery from the Corps. The only difference that the Termination For Default made was Triton's loss of contractual privity. This meant that instead of pursuing the claim for recovery of the rework costs directly in its own name, it would have to "pass-through" the claim -- meaning that the claim would have to be submitted by and in the name of the party having contractual privity with the Government. For purposes of the remedial work, the party having such privity for this work was Travelers (Lees Expert Report, Exh. #.506).

That background description of these parties' situation provides the underpinning for the salient point at issue: the costs Triton sought to recover in the claim submitted through Travelers were not caused by, and do not result from, the Termination For Default. They are costs that Triton was going to incur even if there had been no Termination For Default. And these are the same costs Triton in fact did incur as completion contractor to Travelers, the takeover surety, after the Termination For Default. They cannot be characterized as "wrongful termination damages". These costs

61

are not causally connected to the Termination For Default because Triton had to pay them under a reservation of rights to claim and recoup them, whether or not there had been a Termination For Default (Lees Expert Report, Exh. #506).

Contrast that factual scenario with the case law cited by Travelers in support of its argument that "Triton Had An Independent Right To Pursue The Rework Claim." Travelers has submitted this case authority to the Court as support for its argument that Triton could have pursued, in Triton's own name, a claim directly against the Government for recovery of the costs expended performing the remedial work – notwithstanding that these were costs incurred many months after Triton no longer had a contractual relationship with the Government. (There is a distinction to be kept in mind involving the difference between construction costs spent performing the work, and those costs incurred that are not directly related to the performance. The surety's own expenses, which do not contribute directly to the work being done, are an example of the latter category.)

In this respect, there are two categories of costs that were expended after the Corps terminated Triton's contract. The first is the actual costs Triton incurred performing the remedial work as completion contractor to the completing surety. These were $2,129,022 in amount, and were submitted by Travelers as the Rework Claim. The second cost category is "surety expenses". This comprises the $164,078.60 in consulting and attorneys' fees that Travelers spent. Such amounts are incurred as "surety expenses," but they ultimately are contractor costs because of the indemnity obligation owed by the

contractor as principal to its surety – the second of the two contractual relationships that are involved here.

*None* of the cases relied upon by Travelers to support its "Triton Had an Independent Right to Pursue the Claim" argument involved the first category of costs. The reason for this is fundamental. Post-termination, the contractor had no contractual relationship with the Government, and thus had no "independent right to pursue" recovery of these costs (Lees Expert Report, Exh. #.506; McCollum Expert Report, Exh. #508). Instead, the cases cited by Travelers involve the second category of costs. The reason for this also is fundamental. If the Termination For Default ultimately is determined to be wrongful, then the surety should never have been called upon to respond under its performance bond. The original contract should have remained in place, and the Government would have no reason to look to the surety for performance. Thus, the expenses incurred by the surety because it was called upon to respond on its performance bond are recoverable (McCollum Expert Report, Exh. #508). They are costs, or damages, directly attributable to the wrongful termination. To use the terminology from *William Green Constr. Co. v. United States*, 477 F.2d 930, 938 (Ct. Cl. 1973), cited by Travelers, they are "incurred...as a result of a wrongful termination."

Travelers cites *D.E.W., Inc. and D. E. Wurzbach, 1998 WL 212744, ASBCA No. 49735, 98-2 BCA ¶29, 738 (1998),* which instructs that, as an item of damages after the termination, a contractor seeking to have that termination declared wrongful and set aside can seek damages in the form of costs and expenses for which it became liable to the

63

surety– and recover them if it prevails. *Wolfe Const. Co., 1988 WL 100976, ENG BCA No. 5309, 88-3 BCA ¶21,122 (1988)*, is to the same effect. It has an added element because the decision says that the contractor/principal need not have actually paid its surety in order for it to include the surety expenses as part of the wrongful termination damages. These surety expenses, and the terminology of the *Dale Const.Co. v. United States*, 168 Ct. Cl. 692, 733 (1964), case cited in the *Wolfe* decision, are a "direct and foreseeable result" of the improper default termination.

By contrast, the $2,129,022 in rework costs expended by Triton are not a "direct and foreseeable result" of the Termination For Default. Instead, they are costs that were incurred by Triton when it was a sub-tier to the completing surety, even though they were expended in remediating a problem that had been discovered nearly a year previous to the Default. They are remediation costs that were going to be spent even if the Triton-Government contract had remained in place and the surety was never called upon following a Termination For Default. They are the same costs for the same work that in fact were spent after the Termination For Default. They do not result from, and indeed are not causally connected with, the Termination For Default. As noted, the Termination For Default adds to the situation only in the sense that if the Triton-Government contract had not been terminated, the claim to recover these costs could and would have been pursued by Triton in its own name. By contrast, after the Termination For Default and the Corps-Reliance Takeover Agreement was in place, the only party with privity of contract in whose name the claim could be pursued was the completing surety (Lees

Expert Report, Exh. #506; McCollum Expert Report, Exh. #508). The argument that Triton had an independent right to pursue its rework claim is wrong as a matter of law.

**Even if one were to assume, *arguendo*, that Travelers' argument was legally correct, there would remain waiver and estoppel issues for the trier of fact. Travelers' course of conduct waived the defense it now attempts to assert.**

By its course of conduct in dealing with Triton and the Rework Claim, Travelers clearly waived any right to now assert that Triton could have pursued the Rework Claim independently. This contention that "Triton had an independent right to pursue the Rework Claim" is a completely new argument being advanced by Travelers. Over the course of the parties' relationship prior to Triton's Answer and Counterclaim, Travelers at no time ever suggested that Triton could claim or appeal in its own name (Defs'. §II ¶¶96-97). In response to Corps direction that the claim for recovery of rework costs had to be split, based upon which party was in contractual privity with the Government when the costs being claimed were incurred, Triton submitted the $2,129,022 claim for recovery of the post-Takeover Agreement rework costs to Travelers for pass-through to the Government (Defs'. §II ¶53). Travelers certified and submitted the claim in Travelers' name (Defs'. §II ¶¶54-56). The Contracting Officer's Decision denying the claim was issued to Travelers (Defs'. §II ¶62).

Triton repeatedly requested that Travelers permit an appeal in Travelers' name, at all times making it clear to Travelers that such an appeal was Triton's only remedy

65

(Defs'. §II ¶¶96-97). Travelers never hinted that it disagreed with the Corps, or disagreed with Triton as to the proper procedure. Instead, it knowingly and unjustifiably refused to allow an appeal, with the result that the claim became time-barred and thus worthless. A trier of fact rightly could and well might conclude that Travelers waived any right it may have had to defend against the counterclaim by asserting that Triton could have pursued its own remedy for recovery of the rework costs.

**Travelers' should be estopped to assert this defense because of its certification and submittal of the rework costs as a claim.**

The chronology of these events can be traced through Triton's Factual Background. On June 12, 2001, after successful completion of the rework, Triton submitted a claim to the Corps seeking recovery of the entire $2,501,664 that had been expended performing the rework (Defs'. §II ¶51). The Corps rejected this submittal, indisputably on the proper basis, that from and after the date of the Corps-surety Takeover Agreement, Travelers was the completing surety (Defs'. §II ¶52). Accordingly, any claim for compensation based upon costs incurred after the date of that agreement would have to be pursued by Travelers (McCollum Expert Report, ¶Exh. #508)

Triton duly separated out that portion of the $2.5 million that fell within Administrative Contracting Officer (ACO) McCollum's definition. These were submitted by Triton to Travelers on July 16, 2001 (Defs'. §II ¶54).

On behalf of Travelers, and as its authorized representative, Fred Bossard reviewed the claim over a period of three days. He separated out certain of the costs that he did not feel were appropriate to the claim, then certified it and submitted it to the Corps of Engineers Contracting Officer in Travelers name (Bossard Dep., pp. 54-57). ACO McCollum responded that the claim could not be accepted as submitted because the certification was improper (Defs. §II ¶ 58). Using the certification language that was set forth as a requirement in Clause 70 of the Contract General Conditions, Mr. Bossard recertified and resubmitted the claim to the Corps (Defs'. §II ¶59).

At no point did Mr. Bossard, or anyone else on behalf of Travelers, raise any objection to submitting the claim in the surety's name (Boyd Aff.). There was never a suggestion that Triton could somehow submit the claim in its own name. It seems clear beyond argument that if Travelers had any notion it did not want to participate in the claim submission process, the issue should have been raised *before* Travelers certified the claim and sent to the Corps of Engineers for payment. Again for the sake of argument, if one were to assume somehow there was an alternative method by which Triton could have pursued these costs as its own claim, Travelers needed to raise the matter before it became the named participant in the contractually prescribed disputes resolution process.

At the least, if Travelers was of the mindset that Triton should be pursuing the claim in its own name, then Travelers should have withdrawn the claim before it was denied by the Contracting Officer. It is unarguably clear that once the Decision was

issued, this claim and these dollars could not be recast and submitted in some other form. The only remedy after the adverse COD was an appeal (McCollum Expert Report, Exh. #508). Indeed, a fair minded juror well might have misgivings, or even be outraged, that Travelers would raise such a contention as a defense in this lawsuit after it had allowed the claim against the Government to become time barred.

**Travelers' refusal to permit an appeal.**

It bears repeating that Triton never asked anything more of Travelers than that it permit an appeal to be taken from the adverse COD. Travelers was never asked to participate, or to take any active role, in the appeals process. All of Triton's communications on the subject were clear in stating that all costs would be paid by Triton, and there would be no expense whatever to Travelers. Triton's only request was that Travelers allow use of its name because there was no other remedy and no other way that an appeal could be taken (Defs'. §II ¶94-95). The record is clear and uncontroverted on those facts, even though Travelers apparently would have this Court believe that Triton somehow wanted Travelers "to appeal", and that an appeal would involve "risk and burden" to Travelers (Pltf.'s Memorandum, ¶12).

In accordance with the 1978 Contract Disputes Act and derivative contract provisions, the procedure for resolving a dispute between Triton and the Government over which party should bear responsibility and costs associated with the gate leakage problem was exclusive and preclusive: a claim had to be submitted to the Contracting

Officer at the agency under whose auspices the contract had been administered, which in this situation was the Corps of Engineers (Expert Reports of Lees and McCollum Exhs. #506 and #508).

Recognizing that the contracting agency well might have an entrenched position with respect to any particular contractor's claim, Congress also provided for an appeal in the event the contractor was dissatisfied with the Decision of the agency Contracting Officer. It was fairly predictable that in some situations, the Abiquiu Dam emergency gate contract being a notable example, the Contracting Officer's Decision would be based upon something short of an objective view because there always might be a chance that the Decision would mirror the position already taken by the Government employees that had designed and administered the project. Multiple Boards of Contract Appeals and the Court of Federal Claims are constituted to handle such appeals (Expert Reports of Lees and McCollum, Exhs. #506 and #508). The point seems inescapable: the contractor cannot truly be said to have the remedy contemplated by Congress unless it can both submit the claim to the agency Contracting Officer *and* appeal to an independent Court or Board of Contract Appeals in the event the Decision at agency level is deemed unsatisfactory.

Having certified and submitted the claim to the agency Contracting Officer, there was absolutely no reason for Travelers not to allow an appeal. There was no expense or financial risk involved. There was no jeopardy, penalty, liability, or other form of risk

involved (Expert Reports of Lees, Exh. #506). Triton repeatedly requested that it be allowed to pursue an appeal. And it was made clear to Travelers that Triton understood it had no recourse on the claim except through such an appeal (Defs'. §II ¶¶96-97). Ms. Monteiro's affidavit states that she knew this was what Triton understood the situation to be (see p. 23, infra).

In all of its many letters and conversations during the March-July 2000 time period the issue of an appeal was on the table, Travelers never even implied that a direct remedy was available to Triton (Boyd Aff.). If Travelers was aware of such a remedy, there was no good reason why this information should not have been shared with Triton. Since Travelers had willingly certified and submitted the claim, there doubtless would have been a duty on its part to provide that information, if it existed. Fred Bossard, who was Travelers' authorized representative for purposes of certifying and submitting the claim, testified that he saw no reason why Travelers should not have made such information available (Bossard Dep. VIII). Fair minded jurors well may conclude that Travelers is estopped, at this juncture, to raise such a contention. Those same jurors may call into question Travelers good faith and fair dealing for having led Triton down the primrose path, only to then attempt liability avoidance on such an ill-founded basis.

**Triton's Court of Federal Claims Pleadings Have No Bearing on the Issue.**

In its Memorandum, Travelers seems to suggest that Triton must have had a direct right to pursue the claim because of allegations it made in Court of Federal Claims

70

pleadings (Pltf's. Memorandum ¶64-67). It is a sufficient and conclusive response to that assertion to note that it is the law, and not the litigant that determines whether such a right exists. One either has a remedy, or one does not. A legal basis for a claim either exists, or it does not. It would be a curious legal system that permitted the litigant to create its own rights and remedies on the basis of what was alleged in the pleadings.

With those observations as a backdrop, the following discussions will recapitulate the claims and issues that were involved in Triton's Claims Court litigation, and the scope of the settlement that resolved that litigation. Triton had claims that arose from its performance of the original contract that were unrelated to leakage in the emergency gates. These claims were denied by the Contracting Officer. Triton appealed by filing a suit in the United States Court of Federal Claims (Claims Court). This lawsuit was filed on May 30, 2000 (Defs'. §II ¶42-44). That Complaint also challenged the propriety of the Termination For Default, and sought to have it set aside. Right was reserved in the pleadings to add additional claims. Specific mention was made of the claims Triton anticipated Travelers would make for recovery of the surety costs it incurred in connection with the rework. This was a claim which Travelers ultimately refused to make, and instead it now seeks to recover that same money from Triton in this lawsuit.

This original Complaint also sought to enjoin the Contracting Officer from issuing an Unsatisfactory Performance Evaluation ("UNSAT"). This issue was resolved ancillary to the litigation. The UNSAT was withdrawn, and Triton filed an amended

71

pleading eliminating allegations that pertained to issuance of the UNSAT (Ex. FF). Travelers was aware of the lawsuit, and had knowledge of the claims being therein asserted by Triton (Defs'. §II ¶45).

As a matter of trial strategy, it made sense to Triton that all claims and issues arising from and related to the Abiquiu Dam project should be part of, and should be resolved in, a single lawsuit or consolidated action (Defs'. §II ¶73). The efficiencies that would be realized if Triton was able to accomplish this require no explanation. The difficulty presented is that the disputes process in a federal contract, being a creature of statute, has its own structure and procedural requirements. As it turned out, Triton's own claim for costs associated with the gate leakage situation, which consisted of pre-Termination expenses incurred investigating, hiring consultants, and developing a remediation plan ("pre-Termination rework costs"), could not be incorporated by amendment. Initially, it was necessary to pursue the disputes process at contracting agency level. That is, submission of a claim to, and denial of the claim by, the agency Contracting Officer. And then, the claimant takes an appeal from the claim denial. Those are conditions precedent to Board of Contract Appeals or Claims Court jurisdiction (Lees and McCollum Expert Reports, Exhs. #506 and #508).

The court file will show that Triton did appeal from denial of its claim for pre-Termination rework costs (Defs'. §II ¶76). The Claims Court declined to accept the parties' stipulation that the appeal should be joined with the pending lawsuit. Instead, the

Court entertained two lawsuits arising from the same project separately, but indicated it would handle them substantially as though it was a single lawsuit (Defs'. §II ¶77), in other words a "related case". To recapitulate, Triton's claim for recovery of its own pre-Default Termination costs associated with the gate leakage was reserved in the original Complaint. The amount at that time had not been quantified. Triton's strategy at the time the original action was filed had been to amend the Complaint in order to incorporate the claimed amount of pre-Termination rework costs after the anticipated claim denial at contracting agency level. This same result was achieved by filing a second Complaint appealing from the claim denial, and pursuing that action with the earlier "related" case that was assigned to the same Claims Court Judge.

The original hope, indeed, the agreement reached with Department of Justice counsel for the Government, was to incorporate into the existing lawsuit. This was the reason for adding Count II to Triton's Amended Complaint. It was determined that this procedural mechanism, simple and expeditious though it would have been, would not work, so those allegations were dropped from the Complaint. (The process is described in more detail at Defs'. §II ¶¶74-75.) Travelers acknowledges that the operative Complaint, which is the Second Amended Complaint – does not contain the allegations pointed to by Travelers in its Memorandum.

The appeal that should have been taken from the adverse COD on the Travelers claim would have been a third lawsuit. Based upon its handling of the Triton rework

73

claim appeal, the Court likely would not have consolidated the appeal of the denied claim submitted by Travelers as part of the original Triton Complaint. As plaintiff in the first lawsuit and in the second "related" lawsuit appealing from denial of the pre-Termination rework costs, Triton would have been co-plaintiff with Travelers, the nominal plaintiff in the third lawsuit that took appeal from denial of the post-Takeover Agreement rework costs. The Court would have carried these as "related" cases as was done with the second Triton Complaint.

**Triton's Settlement Agreement With the Government.**

Travelers' off-the-mark arguments regarding the settlement agreement can be straightened out in short order. One has only to look at the agreement itself. The Government consistently adopted the position that, in its settlement negotiations with Triton on the claims that were in Triton's name, it would not pay any money or give any consideration for the claims submitted by Travelers (Defs'. §II ¶79). This position was steadfastly adhered to by the Government.

By the time settlement between Triton and Corps on the Triton claims had been finalized, the Travelers Rework Claim indeed had become time barred. That no consideration was paid by the Government, and no money was received by Triton on account of the Travelers Rework Claim is manifest from language in the Settlement Agreement. Full details are set forth in Defs'. §II ¶83.

**To recapitulate:**

74

There is no fair issue here. Triton had no remedy for recovery of its $2,129,022 expended in performing the rework except through Travelers. And once the Contracting Officer had denied the claim, the only remaining recourse was an appeal taken in Travelers' name. There is no legal principle or case authority to support a contrary view. But in any event, summary judgment must be denied on this issue because, even if there had been a separate remedy, there are waiver and estoppel issues for the jury owing to Travelers' certification and submission of the claim without any protest, or any suggestion that Triton should be pursuing it elsewhere. If Travelers did know of an alternative remedy, it should have shared, indeed may have been obliged to share, that information with Triton at the peril of being estopped from asserting such a defense at this late juncture.

## V. B. OPPOSITION TO TRAVELERS' MEMORANDUM OF LAW PARAGRAPHS V. A, B, E AND F.

**Travelers argues that it owed no duty and committed no breach. It is wrong on the facts and wrong on the law. There is an abundance of admissible evidence from which the trier of fact can conclude there are three agreements, and that Travelers breached both express and implied obligations owed to Triton.**

Travelers begins its argument seeking to dismiss Triton's counterclaim with a non-sequitur. It asserts that bad faith is the only bar to enforcing an indemnity agreement (Pltf.'s Memorandum, page 10, ¶V.A). The issue at hand is not enforcement of an