indemnity agreement. Rather, it is Triton's rights and Traveler's obligations under that agreement.

Travelers also errs by ignoring its completing surety-completing contractor relationship with Triton. It is not correct that the GAI is *the* operative agreement between Travelers and Triton (Pltf.'s Memorandum, page 11, ¶V.B). There are three operative agreements, of which the GAI is one. The other two are the completion agreement and the Takeover Agreement.

Even though Travelers avoided signing a completion agreement, there clearly was a contractual relationship. The evidence will demonstrate that the parties minds met, at least as between Reliance and Triton, on key terms of the completing surety-completion contractor arrangement: notably, that Triton would perform the work in accordance with Corps specifications and to the satisfaction of the Corps, and would pay all the costs of performance; and that Reliance, in its role as completing surety under the Takeover Agreement, would assure that Triton's claim rights were preserved and protected such that Triton would be afforded the opportunity to claim and recover the rework costs from the government (Boyd Aff.). Travelers' failure to allow an appeal of the claim was a breach of this completion contract.

It was the position of Reliance that it had lived up to its promise by reserving and protecting Triton claim rights in the Takeover Agreement. This was the intent of Mr. McLoughlin, the Reliance Claims Manager. Corps representatives acknowledged that they understood the Takeover Agreement secured such rights to Triton (McCollum Aff.).

76

And the Corps representatives knew also that Triton fully intended to pursue recovery of the rework costs; and that, after the Takeover Agreement, this only could be done through and in the name of the completing surety (Defs'. §II ¶58). This third agreement is germane because Triton is a third-party beneficiary of those promises and understandings.

Travelers Motion misses its mark in another critical respect: The "O.P.M." (Other People's Money) cases on which it relies simply are inapplicable to the Travelers/Triton situation. This is not a circumstance where Triton claimed that Travelers ought to be advancing money. Triton paid for all costs of the work! This is not a case where Travelers, over Triton's objection, stepped in and settled a third-party claim. The only third-party claims on the Abiquiu project were the demands by the Corps of Engineers, and Triton fully satisfied those from its own pocket! And this is not a case where Triton asked Travelers to assume, as Travelers asserts, "the risk and burden of an appeal" (Pltf.'s Memorandum, p. 12). All Triton did was ask that Travelers allow Triton, at its own cost, to appeal in Travelers' name – which is the only way in which an appeal could be taken; that is to say, the only way Travelers could fulfill its obligation to protect and preserve Triton's claim rights as had been promised.

Travelers' argument that it is entitled to Summary Judgment on Triton's breach of contract counts (Pltf.'s Memorandum, p. 10, ¶V.E.) makes the same erroneous assumption: Travelers labels the GAI as "the operative agreement between the parties" as though there were no other agreements under which Triton had rights. The basis for

Travelers' argument is that there is no provision in the GAI that *expressly* requires Travelers to pursue the rework claim, nor is there any "...change for modification to this agreement" which so requires.

The short answer to this argument, setting aside rights and obligations under the other two contractual arrangements, is that there are many rights and duties under a GAI, just as with any agreement, that do not appear in printed form within the four corners of the contract document. Under the law of Connecticut, it is clear that the duty of good faith and fair dealing exists under surety indemnity agreements. See, *PSE Consulting, Inc. v. Frank Mercede and Sons, Inc.*, 838 A.2d, 135(Conn. 2004), citing with approval holdings that "... the implied covenant of good faith is an overlay that applies to sureties;" and

> Every contract carries an implied covenant of good faith
> and fair dealing, requiring that neither party will do
> anything that will injure the rights of the other to receive
> the benefits of the agreement.

To Triton, there was one crucial benefit it looked to receive: it needed to have the chance to establish an entitlement to recoup the rework costs. Only the completing surety, because of its contractual privity with the government, was able to effect those rights. The surety would have to review Triton's claim when it was received, certify it in accordance with the contract, then submit it to the contracting officer; and when or if the contracting officer denied the claim – in this situation, it was "when" and not "if," because the Corps made it clear the claim would be denied – the completing surety would

78

need to allow Triton to take an appeal in its name (Lees Expert Report, Exh. #506). This is a duty Travelers could have discharged with virtually no time or cost being involved, and at no risk to Travelers (McCollum Expert Report, Exh. #508; Lees Expert Report, Exh. #506). Its refusal to allow the appeal to be taken is a breach. This unjustifiable conduct breaches the duty of good faith and fair dealings; it breaches the promissory duties owed under the completion agreement; and it breaches Triton's rights as third-party beneficiary.

It is worth noting that Travelers entire "no duty – no breach" argument (Pltf's. Memorandum, V.A, E & F) comes full circle. Section V.F. concludes as Section V.A. began: "Triton cannot establish that Travelers acted in bad faith." The entire argument is an exercise in attempting to apply the wrong body of case law (the O.P.M. cases) to the wrong issue (defenses to an indemnity claim rather than an examination of the contract rights being asserted by Triton in its counterclaim).

**The position taken by Travelers in its Motion for Summary Judgment assumes that the only relationship between Triton and Travelers derives from the General Agreement of Indemnity. The contentions made by Travelers regarding duties owed under the GAI are incorrect, but setting that point aside, the Travelers' argument entirely ignores the additional relationship between the parties: that of completing surety and completion contractor. Triton and Travelers were parties to this second form of relationship throughout the time they were involved together on the Abiquiu rework project. Triton's evidence will show**

79

**that the absence of a signed written agreement results from Travelers' mishandling of the file, and its refusal to fairly and reasonably negotiate such an agreement.**

By April 2000, it had been established that Triton was going to perform the work as completion contractor to Reliance. The evidence will show that Triton had conversations with Mr. Terry McLoughlin, the Reliance Claims Manager, regarding a written agreement defining this relationship (Boyd Aff.) Toward the end of April, Mr. McLoughlin asked that Triton forward a draft of its proposed terms. Triton complied with the request in a letter dated April 28, 2000 (Defs. §II ¶25)

Triton received no response to this letter for nearly six months. The evidence at trial will demonstrate how badly this matter was handled by Travelers. Unbeknownst to Triton, Mr. McLoughlin already had made his mind up that he would not stay onboard with Travelers after its buyout of Reliance. It thus was clear that the completing surety-completion contractor relationship, and the surety's "file" pertaining to the Abiquiu Dam project, would have to be handled by a successor Claims Manager. Mr. McLoughlin was not told who this would be. He was not asked to provide any sort of briefing. There was absolutely no "handover," even though key matters such as a completion agreement were pending.

On June 5, 2000, Dave Boyd inquired of Mr. Bossard as to the present status of Triton's proposed completion agreement. It was in response to this letter that Triton first learned that Travelers' takeover had been effective May 31, 2000, and that Mr. McLoughlin no longer was onboard. Neither were Messrs. Gary Judd, his immediate

80

supervisor, nor Mr. Vince Fasano, head of the Reliance Bond Claims Department, these two gentlemen also having elected not to stay on board with Travelers. (The above and succeeding references are at Defs.' §II ¶26.)

There is a clear inference that Reliance bond claim files fell into a virtual vacuum. After due inquiries, Triton learned that a Mr. Peters had the file. Triton was unsuccessful in its attempts to contact Mr. Peters. A letter was written to Mr. Peters in an effort to finalize the completion agreement. No response from Mr. Peters ever was received.

By July, 2000, plans for completion of the rework had been completed. In a presentation to the Corps of Engineers on August 15, 2000, the rework plan was approved. At this meeting, Fred Bossard presented a one page letter agreement to Dave Boyd for signature. This document dealt with none of the key issues that Triton had framed in its April 28, 2000 proposal. Reliance and Travelers witnesses have testified that drafting and negotiating completion agreements are the province of the Claims Manager. Mr. Bossard was from the construction support facility, and was operating well outside the bounds of his job description and authority – doubtless in the best of faith attempting to fill the Claims Manager vacuum that now existed at Travelers.

The following month Mr. Bossard advised that the file had moved from Philadelphia to Hartford, and there was a new Claims Manager assigned to it. By this time Triton had spent substantial sums in preparation for commencing work on November 1. Immediate contact was made with Ms. Alicia Brown at Hartford regarding

81

the urgency of a completion agreement. Since whatever file Ms. Brown had in her possession as the new Claims Manager apparently did not contain previous exchanges between the parties on the subject, counsel for Triton forwarded all of the key documents including the proposed agreement of April 28. Counsel also advised that he was leaving the country for five weeks in the middle of September. He asked that Ms. Brown respond expeditiously, and offered to meet and sit through to resolution of the agreement. Ms. Brown never responded.

What Triton ultimately did receive was a letter from outside counsel retained by Travelers. Given the history of non-response, it was predictable that this would come at a point when Triton's counsel was out of the country, as some two months before Travelers had been advised he would be. This was in October, 2000, on the eve of work commencing. Triton already had committed nearly a million dollars to the effort. It was clear to all concerned that Triton had both the financial and technical capability to do the work. Travelers was in a no-loss situation. Negotiations attempting to arrive at a completion agreement over the next months reflected the lack of incentive Travelers had for entering into an agreement with reasonable terms (Defs.' §II ¶27).

Travelers proposed terms that were bound to be unacceptable to any completion contractor, and they certainly were unsatisfactory to Triton. Far worse from Triton's standpoint, Travelers steadfastly refused to address or include the key provisions that had already been agreed to between the parties, notably clear language affirming that Travelers would preserve and protect Triton's claim rights (Defs.' §II ¶28).

82

After nearly two months of exchanges, Travelers declared an "impasse" to the negotiations. This terminal letter lectured Triton on its obligations under the GAI. At no point in these negotiations did Travelers ever recognize that Triton had rights and was owed obligations by Travelers as its completion contractor. A fair minded juror could conclude that this entire eight month stretch of non-negotiations was unfair, completely self-serving, and handled with lack of good faith by Travelers. It is not of minor significance that at the point in mid-December when Travelers declared "impasse" in these negotiations, rework at the Abiquiu project was proceeding rapidly and successfully. Fair-minded jurors might find it a matter of importance in their deliberations that part of the money for which Travelers is suing Triton under the GAI is for the attorneys fees expended in these abortive completion agreement negotiations – negotiations Travelers elected to end by declaring "impasse".

**From the very outset of their relationship immediately following the Termination For Default in February, 2000, the surety was fully and continually apprised of two central facts: first, that Triton intended to pursue a claim for recovery of the costs expended in connection with remediating the gate leakage problem; and, second, that Triton had developed substantial factual and technical backup in support of its position that defective design and the Corps of Engineers' mishandling of the differing site condition caused the gate leakage problem. These propositions are central to the dispute in this lawsuit. They are established by irrefutable evidence.**

At its very first meeting with Reliance after the Corps had issued its Termination For Default, Triton gave a detailed exposition of the events leading up to the Termination For Default. Reliance was told of the several bases upon which Triton and its counsel were convinced that the Termination For Default was wrongful (Defs.' §II ¶16; Boyd Affidavit). At that meeting, it was established that Triton stood ready, willing, and able to complete the necessary remediation work on the project, either as contractor if Reliance could convince the Corps to set aside the Default Termination; or as completion contractor to Reliance in the latter's role as completing surety under a Takeover Agreement (Boyd Aff.).

Equally in the forefront of Triton's dialogue with Reliance was its insistence that Triton would be entitled to recover the amounts it expended in accomplishing the remediation work. If Reliance could not arrange to have Triton reinstated as contractor, then Triton would have to look to its surety for reservation and preservation of that right. Reliance gave assurances that it would see to it that, upon successful completion of the rework, Triton would be in a position to pursue its claim (Boyd Aff.). When it became completing surety under its Takeover Agreement with the Corps, and Triton became the completion contractor, these assurances were reaffirmed (Boyd Aff.).

The second key proposition – that Triton provided substantial input that the leakage problem was attributable to Government fault to its surety – also is supported by irrefutable evidence. Travelers asserts in this litigation that it was uncertain as to the basis upon which Triton intended to establish its entitlement for recovery of the rework

84

costs. At best, this position is disingenuous. More likely, it is representative of the egregious mishandling of this matter by Travelers after it took the file over from Reliance, never really put in the charge of a "hands on" Claims Manager, and ultimately turned it over to its Collection person in the Salvage Department who had absolutely no knowledge of either the claims process, or the history of the relationship between these parties. See pp. \_\_\_\_, infra.

Triton also will offer evidence that, before, during, and even after the rework was performed in the November 1, 2000 – March 31, 2001 time frame, there were discussions regarding the way in which Triton was to authenticate the basis for its claim. From the outset, it was Triton's contention that the field welding feature of the design was the substantial cause of the gate distortion and resultant leakage problem. The distortion caused by welding was exacerbated by Corps of Engineers field directives given to Triton when it was found that the condition of the existing tunnel liner was different than represented in the contract documents. The instructions given to Triton were "fill the gaps with weld", which increased the amount of weld more than tenfold. These were topics of frequent discussion between Triton representatives and Messrs. Fred Bossard and Arvin Daum on behalf of Travelers (Boyd Aff.). The trier of fact also will hear evidence that Mr. Bossard, upon whom Ms. Montiero relied for the fleeting comment that he disagreed with the basis for Triton's claim, at no time during the rework, or ever, suggested that he believed the cause of the leakage was faulty workmanship. Neither did Mr. Daum. (Boyd Aff.)

At two meetings with Reliance in March, each of which lasted the better part of a day, Triton detailed the backup for its position that the Government was accountable for the gate leakage problem. On March 7, 2000, Triton transmitted seven consulting reports to Reliance dealing with the problem, and authenticating the technical soundness of Triton's position on this issue. These were the only "expert reports" that existed on the subject, and Travelers' contention that Triton failed to produce expert reports is flatly wrong. Triton carefully explained to Travelers in the Spring of 2002, when the request to allow an appeal from the Contracting Officer's denial of the claim was pending, that no new expert reports had been generated in connection with the ongoing Triton-Government litigation. Travelers had the only reports that did exist, and indeed had been in possession of them for two years at that point.

A trier of fact clearly has basis upon which to draw the conclusion that Travelers is accountable on both these issues. It assuredly did not live up to its commitment that Triton's right to claim and recover the rework costs incurred as completion contractor to the surety would be preserved and protected. And its position that Travelers did not understand the basis upon which Triton intended to establish its entitlement for recovery defies the evidence. Travelers assuredly did know, or if it did not the lack of knowledge was self-imposed and stands as but another example of the mishandling of this matter from the point at which Reliance stepped out of the picture until the Travelers' Salvage Manager made the incredible and baseless decision not to permit an appeal of the claim in Travelers' name.

**Travelers failed to discharge its obligations to its completion contractor during the rework. Extra work items that were submitted by Triton to Travelers to be passed through to the Corps of Engineers for payment were mishandled. None were ever pursued by Travelers, and none were paid.**

Travelers was in an enviable position for a surety. Because it was a completing surety, and thus stood in the shoes of a general contractor with respect to its privity of contract relationship with the Government, it had to maintain a presence at the project (McCollum Aff.). It also was the conduit for Triton, the completing contractor that was performing and paying for all the work. Travelers thus stood as that "single point of contact" with the Government that Congress insisted upon when it passed the 1978 Contract Disputes Act applicable to all federal public works (Lees Expert Report, Exh. #506; McCollum Aff.).

The trier of fact will hear evidence that Travelers had a single, self-interested objective. Reliance had inserted a provision in the Takeover Agreement that obligated the Corps to release its performance bond upon completion of the rework. (Def. §II ¶20). Travelers only had to await completion of the rework and its bond would be released. The motive was clear: get the job done at any cost to Triton, and don't ruffle any feathers on the Corps' side in the process! The trier of fact can infer that Travelers chose not to submit or pursue these extra work items because of this concern (doubtless unjustified, because extra work items, and fair payment for them, are a part of any substantial construction project). It just might get someone over at the Corps upset and jeopardize

87

the smooth flow of rework that was going on at the project site. The testimony from Travelers' witnesses at deposition offered no explanation or justification for not having executed this routine task – a task that only it could carry out on behalf of its completing contractor. Indeed, the individual whose job it was to attend to these matters couldn't even recall what happened to the extra work requests.

**So far as the rework claim seeking to recover costs expended by Triton remediating the gate leakage problem is concerned, Travelers cast the die when it certified and submitted the claim to the Corps of Engineers' Contracting Officer for Decision.**

For purposes of the issues in this lawsuit, this is the single occasion on which Travelers properly and adequately discharged the obligations it owed to Triton. There was no recourse for recovery on this claim except through Travelers; but even if there had been some other way known to Travelers by which Triton could have pursued this claim, once Travelers accepted the claim from Triton for pass through, reviewed the claim and certified it, and then submitted it to the Contracting Officer for Decision, any other route or remedy would have been foreclosed (McCollum Expert Report, Exh. #506; Lees Expert Report, Exh. #508).

**Travelers' purported justifications for denying Triton its appeal right are baseless, and in any event are not supported by competent, admissible evidence.**

Travelers' Motion is underpinned by an affidavit from Sherrie Monteiro. Ms. Monteiro does not become involved in this matter until February of 2002. She has not

88

demonstrated any working knowledge of the two year relationship that began with the Default Termination. She admits to no knowledge of contractor claims or the federal disputes process (Monteiro Dep., pp. 25, 44). Ms. Monteiro's entire contact with anyone who was involved with the Abiquiu project was a single phone call with Mr. Bossard that was about five or ten minutes in duration (Bossard Dep., pp. 177, 201). This was her "investigation" of the Triton claim. Mr. Bossard's entire recollection of what he told Ms. Monteiro is that he believed the cause of the gate leakage issue was the result of "...the contractor's failure to comply with the contract specifications and was not the result of a design issue" (Bossard Dep., pp. 204-205). This was the only input he provided to Ms. Monteiro (Bossard Dep., pp. 177, 201).

In a series of conclusory statements attributed to Ms. Monteiro, Travelers evidences a basic misunderstanding of what was involved in "sponsorship" of the appeal. At the threshold, it should be noted that her statements are incompetent. Ms. Monteiro has no direct knowledge of what went on at the point of certification. She was not even involved with the file. Federal Rules of Civil Procedure, Rule 56(e) is specific on the subject:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the Affiant is competent to testify to the matters stated therein.

That the evidence would be admissible at trial must be established:

89

> Since the burden is on the party moving for summary judgment to demonstrate that there is no genuine issue of material fact, the movant also must show that the content of his affidavits would be admissible at trial.
>
> The cases seem to indicate the judges will be quite demanding in their examination of the moving party's papers, but will treat the party opposing the motion indulgently. (citations)
>
> In addition to the admissibility requirements just discussed, Rule 56(e) further limits the matter to be properly included in an affidavit to facts, and the facts introduced must be alleged on personal knowledge. Thus, ultimate or conclusory facts and conclusions of law as well as statements made on belief or "on information and belief" cannot be utilized on a summary judgment motion.
>
> **Federal Practice and Procedure** (Wright and Miller, Federal Rules of Civil Procedure.

Accordingly, Triton objects to the defective affidavit of Ms. Monteiro, and moves that it be stricken.

Ms. Monteiro further evidences her lack of qualification in the claims and disputes area by a series of "Statements Of Material Facts" attributed to her. At Paragraph 34 (References are to Travelers' Statement of Material Facts), it is asserted that the certification language Travelers affixed to the claim before submitting it to the Corps of Engineers' Contracting Officer for disposition "...referred only to costs incurred, and not to any certification that the costs existed because of design defect." Such a statement indicates that the person making it is unacquainted with the federal contract disputes process. The individual doing the certifying is certifying a claim, not

90

costs. The certification asserts that the claim amount is believed to be owed by the Government. See, e.g., Exhibit #26. It is implicit that the certifier has reviewed the claim, which Fred Bossard did in this case. It is not expected or understood by the Government that the certifier of a pass-through claim is vouching for its merit (see Expert Reports of McCollum and Lees, Exhs. #508 and #506).

It is equally incompetent and misguided for Ms. Monteiro to assert that the "certification language was provided by Triton." This may be something that Ms. Monteiro read somewhere, but, in any event, it is hearsay as to her. The reality is that the certification language by Mr. Bossard is directly from Contract Clause 70, by way of the 1978 Contract Disputes Act. It is verbatim, no word having been changed. For Ms. Monteiro to attribute authorship of this statutory language to Triton is simply further evidence that Travelers was negligent in giving this file to Ms. Monteiro whose instructions were to collect from Triton and the indemnitors – a person who knew nothing about the claim history or the claims process.

In Paragraph 35, the statement that "Travelers was not sponsoring Triton's claim" again is attributed to Ms. Monteiro. This self-serving declaration is a further indication that she was uninformed about contract dispute procedure. Sponsorship does not mean vouching for the merits of a claim. It simply describes the act of a party in privity of contract with the Government passing through a claim of its sub-tier (McCollum and Lees Expert Reports, Exhs. #508 and #506). Travelers was sponsoring Triton's claim.

91

A statement is made at Paragraph 53, and repeated in Paragraph 57, that "Triton wanted Travelers to make the allegation in the appeal that the faulty gates were the result of a design defect". This is another example of Travelers' inaccurate assertion that Triton wanted the surety to take the appeal (Defs.' §II ¶94-95) It stands as a further demonstration of how badly the process was misunderstood. As has been noted, Triton never asked Travelers to file an appeal or even participate in the appeals process. Triton never said, and Travelers never asked, what the allegations in the appeal would be. All that is required procedurally is that an appeal be taken from the Contracting Officer's denial of the claim. It is noteworthy that this is but a watered down version of the flatly wrong understanding, apparently harbored by Travelers' counsel, that allowing Triton to take an appeal somehow would put him in jeopardy of a Rule 11 violation (Exh. #29, April 16, 2002).

While it is flatly inaccurate for Travelers to assert that "Triton...requested that Travelers appeal the Contracting Officer's Decision..." (another statement attributed to Ms. Monteiro), there is a significant admission, however, found in that same paragraph, where Ms. Monteiro says that she understood it was Triton's position (which it was and is) that, because of "contractual privity issues, Triton...needed Travelers to permit Triton to pursue the appeal in Travelers' name." This is highly pertinent to the waiver and estoppel arguments raised in opposition to Traveler's argument that Triton could have pursued the claim or appeal in Triton's own name. This "understanding" of Triton's need

to have Travelers sponsor the appeal also suggests that she may have known, and certainly ought to have known, that it was not her place to conduct an investigation of a claim Travelers already had sponsored. If she had spent a little more time talking to Fred Bossard during her perfunctory inquiry, she would have learned that Travelers investigation of the claim occurred before – not after – the claim was submitted to the Contracting Officer for a decision (Defs.' §II ¶55-56).

**There Was No Requirement for an Investigation to be Undertaken Prior to Allowing an Appeal in Travelers' Name.**

As noted, the investigation performed by Ms. Monteiro on behalf of Travelers, to the extent one is required by a sponsoring party in privity of contract with the Government (see Lees Expert Report, Exh. #506), falls woefully below any industry standard.

At Paragraph 41 it is asserted that Ms. Monteiro "conducted an investigation and evaluated Triton's request of Travelers to appeal the Decision". As discussed by the experts in their reports, there is absolutely no requirement for an investigation prior to appealing an adverse Contracting Officer's Decision to the Boards of Contract Appeals or Court of Federal Claims (Lees Expert Report, Exh. #506; Herman Expert Report, Exh. 507), Ms. Monteiro clearly would need to inform herself, but she was mistaken when she undertook this so-called "investigation".

Looked at through the prism of any applicable standard, the insufficiency of her investigation becomes apparent when examining Travelers' assertion at Paragraph 42 that "It was Travelers' position, based on the opinion of its experts, that the rework was necessitated by poor workmanship...". The record demonstrates what Ms. Monteiro did to conduct this investigation, and what she was told by the individual with whom she spoke. (There is only one such individual – Fred Bossard, except to the extent Ms. Monteiro, as asserted in Paragraph 41, "...relied upon the advice of counsel.") Mr. Bossard, who did perform the claim review for Travelers prior to certification, testified repeatedly that he understood it was not the province or task of the party reviewing a claim, prior to certifying and passing it through, to make an assessment or determination of the claim merits. That function belongs to the Contracting Officer and the appellate tribunals (Defs.' §II ¶56).

The fact of evidence is that there was one five or ten minute phone call between Ms. Monteiro and Mr. Bossard that apparently was followed up by a brief phone call or e-mail. Neither of them can remember. This is another instance of the same evidentiary problem. Mr. Bossard purportedly was relating to Ms. Monteiro what he was told by Mr. Daum (Bossard Dep, pp. 203-204). Mr. Bossard unhesitatingly acknowledges that he has no expertise in the area of high head slide gates, and it is not disputed that Mr. Daum, if indeed he would qualify as an expert, never talked with Ms. Monteiro. Thus, the only

evidence Travelers has offered to support the reason for refusing to allow the appeal is inadmissible.

Travelers' "facts" presented in support of its Motion are hopelessly at odds with the contemporaneous documentary record. It is asserted at Paragraph 45 that "...Travelers was willing to review whatever documents Triton choose (sic) to submit as part of Travelers' investigatory process"; and it is said, at Paragraph 52, repeated in Paragraphs 51, 54 and 57, that "[d]espite much communication...Triton never provided any new documentation or information to Travelers to suggest that Travelers' position on the cause of the gate leakage was inaccurate. These assertions are flatly refuted by written exchanges between the parties. Compare Defendants II ¶100-105.

At Paragraph 47, Travelers states that Triton's counsel "...admitted that Triton had no expert reports for Travelers' consultants to review in connection with their evaluation of the merits of Triton's Rework Claim." The facts, again documented by contemporaneous exchanges, show that this is not even a half truth; indeed, it is flatly misleading when compared to the dialogue that actually was going on between the parties. See Defendants II ¶98-99.

Thus, the assertion by Travelers in Paragraph 52, repeated in Paragraphs 55 and 58, that Travelers "would have been receptive" to any evidence Triton presented absolutely flies in the face of what was happening at the time. The evidence contemporaneous with events shows that Travelers had every opportunity to find out how

95