Triton proposed to support its claim entitlement. Indeed, Travelers had the gist of the technical backup in reports that Triton had provided nearly two years earlier (Defs.' §II ¶17). A fair and reasonable conclusion is that Travelers didn't really want to know the facts!

**The unreasonableness of Ms. Monteiro's reliance upon the conclusions of "Travelers' experts" presents a further credibility issue.**

Messrs. Bossard and Daum never, during design, planning and mobilization for the rework; or during after execution of the rework, ever said or implied that they believed the gate leakage problem resulted from faulty workmanship (Boyd Aff.). Mr. Daum was openly critical of the Corps design (Boyd Aff.). Fred Bossard unhesitatingly acknowledged that he did not have the expertise to independently develop an opinion as to cause of the gate leakage (Bossard Dep., V III).

The whole scenario of Ms. Monteiro's "investigation", even if she was justified in conducting one, presents credibility issues for the trier of fact (cf. Lees Expert Report and McCollum Expert Report: The only investigation conducted by a claim sponsor occurs *before* the claim is certified and submitted). Assuming, *arguendo*, that it was her role in the federal contract disputes process to make an assessment of the rework claim on its merits, the inadequacy of her investigation seems apparent. Ms. Monteiro did not take the steps that prudence and even minimum due diligence would require.

96

Triton's evidence will show, and the trier of fact well may conclude that it was unreasonable and imprudent of Ms. Monteiro not to secure some sort of written opinion or report documenting these so-called conclusions of "Travelers' experts" (Herman Expert Report, Exh. #507). It was unreasonable and imprudent of Ms. Monteiro not to seek some level of understanding as to the basis for the statement that Mr. Bossard believed the gate leakage problem was not attributable to design (Herman Expert Report, supra).

It was unreasonable and imprudent of Ms. Monteiro not to find out whether there was any sort of contemporaneous documentation supportive of the "faulty workmanship" assessment that was reported to her in the brief phone conversation with Mr. Bossard. The record shows, and Mr. Bossard in his testimony concedes, that there is not a single piece of paper within the massive record compiled during the surety's two year involvement with the Abiquiu project in which Mr. Daum, Mr. Bossard, or anyone else on behalf of Travelers suggests that faulty workmanship caused the gate leakage problem (Boyd Aff.; Bossard Dep.).

Travelers has failed to present admissible evidence, let alone believable evidence, in support of its Motion.

**Triton's evidence satisfied the most stringent applicable tests for demonstrating Travelers breach of the duty of good faith and fair dealing.**

The foregoing recitation of admissible evidence is illustrative of the reasons why Travelers is not entitled to summary judgment. We have styled Travelers' Memorandum

§§ V A, B & F as its "no breach – no duty" arguments. The facts heretofore set forth in this Opposition suggest the duties. The ensuing discussion is intended to illustrate the actionable breaches.

To demonstrate that duties unarguably are owed, Triton's evidence can cross the bar even if it is set on its highest rung. *PSE Consulting, Inc. v. Frank Mercede & Sons, Inc.*, 267 Conn. 279 (Conn. 2004), fairly can be described as a seminal case. The opinion is articulate and well-reasoned. It looks to Connecticut law to the extent there is applicable precedent, and then looks outside the jurisdiction "to seek guidance on how the covenant of good faith applies specifically in a surety context". A unanimous court decides the case, and articulates the law of Connecticut in this setting.

"Setting the bar to its highest rung" is meant to indicate that there are fact issues for the jury even if Triton could not meet the *PSE Consulting* standard. There are critical factual distinctions between this case and *PSE Consulting*. To begin with, *PSE Consulting* is an "O.P.M." case. The surety's payment of a bond claim was challenged by the bond principal who did not take care of his primary obligation to dispose of the third-party claims against him so that the surety would not be called upon to do so. Travelers did not pay *any* claims. Triton took care of all the third-party claims from its own pocket. As a second significant distinction, Travelers did not compromise or settle a claim. What it did was to effectively take ownership, or at least possession, of Triton's affirmative claim against the Government, which is significantly different than a surety

dealing with a claim made by a third party for which the surety may be liable on its bond. Having taken possession of the claim, and being possessed of the only means by which that claim could be appealed, Travelers caused the claim rights against the Government to expire and become worthless. There was no settlement! Triton received no value or consideration. None of Triton's obligations were reduced by so much as a penny.

Triton's rights against Travelers are much greater than those possessed by the prevailing *PSE Consulting* bond principal. Triton has rights under other agreements. And, unlike the *PSE Consulting* completing surety, Travelers could make no argument based upon an express entitlement, under the GAI, to compromise and settle a third-party claim. This was Triton's own claim. It was because of Travelers' unjustifiable acts that Triton received nothing from the Government for it.

Thus, Triton should not be required to meet the test of *PSE Consulting* to prevail in this lawsuit, let alone to successfully oppose summary judgment. Triton has shown evidence of other contracts, and breach of express contractual provisions. The facts Triton has demonstrated, we submit, nonetheless are sufficient to satisfy the "higher bar" set by *PSE Consulting* for trial purposes, and, *a fortiori*, for meeting requirements in a summary judgment setting. The Connecticut court indicates that:

> ...The failure to investigate, standing alone and not accompanied by other evidence of an improper motive, is not enough to constitute bad faith...

But that:

> ...A surety's failure to conduct an adequate
> investigation of the claim (upon a payment bond), when
> accompanied by other evidence, reflecting an improper
> motive, properly may be considered as evidence of the
> surety's bad faith.

The following seven points all carry a strong potential that the jury could find the

requisite "confluence of circumstances" from which it can conclude there was bad faith

under the *PSE Consulting* test. It may be worthwhile to introduce these seven items with

the testimony of Mr. Bossard, who was Travelers' point of contact with Triton up to the

time when Ms. Monteiro became involved: It was Mr. Bossard's view that the surety's

only obligation was to the Corps of Engineers (Bossard Dep., p. 258). His assessment

was that the surety had no obligation to preserve any claims of Triton; and it was not his

understanding that this surety (Travelers) owes any obligation to Triton (Bossard Dep., p.

259). This overview of the surety's complete non-responsibility to Triton was punctuated

by the following statement from Mr. Bossard: "We (Travelers) did not complete this

project in the best interest of Triton Marine" (Bossard Dep., p. 257).

1.  **The insufficient, ill-motivated "investigation" of Triton's claim by
Travelers' salvage person.** It is difficult to believe that a jury could draw any

conclusion except that the "investigation" of the claim made by Travelers' before

deciding not to permit an appeal was inadequate. While it may have been prudent for

Ms. Monteiro to look into the matter, she certainly had no business investigating the

claim in the sense of passing judgment on its merit. And to the extent she purported to

delve into the claim merits, her efforts were palpably insufficient by any common sense

measure, and fall well below the standards a surety is obliged to meet (Expert Report of

Charles "Bud" Herman, Exh. #507). Ms. Monteiro avowedly took over the file for the

purpose of collecting the indemnity, and she was not about to be diverted from that goal by having to look into a claim she had no business dealing with. The jury may Devine what her real motives were when she attempted to collect and pay herself from the $239,860.20 the government owes to Triton, at the same time she was about to commence suit against Triton for recovery of the same money (Exhibit #47 and #49, May 22, 2002).

      2. **Travelers' failure to mark-up claims submitted by Triton for pass-through to the Government, and its failure/refusal to add its surety costs to the Triton rework claim.** A trier of fact readily could find that this failure and refusal on Travelers' part was motivated selfishly, with utter disregard for Triton's interests. Reliance had successfully negotiated for a release of its performance bond upon completion of the rework. Mr. Bossard testified that a surety's objective in negotiating a Takeover Agreement with the bond obligee is to limit its liability (Bossard Dep., pp 207-208). Triton had a vital interest in recovering the $2.5 million in costs that were expended completing the remedial work. On the other hand, Travelers only was interested in getting the work done so that the performance bond would be released, after which it could collect its surety costs from Triton under the GAI. (Travelers was unsuccessful in two attempts to collect the balance that the Corps owed to Triton under the original contract (Boyd Aff.) – which also amounted to collecting money from Triton, instead of the Government, regardless of which party was responsible for rework costs.) Travelers simply wanted to lay low until Triton had spent all the money that was needed to ensure that the gate leakage was remediated, being careful not to ruffle feathers by asking the Corps for money. Nothing could have been more self-serving that this abject failure by Travelers to mitigate the loss and cost to Triton.

      3. **Travelers' failure to consummate a written Completion Agreement.** For five and a half months after Triton sent the requested draft Completion Agreement to Mr. McLoughlin, there was no surety response whatever. The details of the file

mismanagement (see Expert Report of Bud Herman, Exh. #507) are chronicled in

Defendants' §II ¶21-26.  When a response did come, it was at a point where Triton had

no incentive to negotiate an agreement on anything except its own terms.  Work was

about to begin, and Triton was in a virtual no-risk situation because of the way events had

unfolded since Triton had transmitted its proposed Completion Agreement:

- o    The Corps had accepted Triton as completion contractor to
       Reliance, the takeover surety.

- o    Triton had developed a plan for the rework that was
       presented to, and accepted by, the Corps.

- o    Triton had demonstrated that it had the technical and
       financial capability to successfully complete the rework at
       no cost or risk to the surety.

- o    Triton had invested over $500,000 in design and
       preparation costs dedicated to the rework task.

- o    Triton was partially mobilized for the commencement of
       the work, which by now was set to begin within three
       weeks after Travelers, through its outside counsel, first
       addressed the subject of a completion agreement.

Travelers insisted upon many terms that had not been part of any discussion or

commitment when Triton agreed to perform as completion contractor to Reliance.  A

number of these terms understandably were unacceptable to Triton, such as a release of

any future claims (which would have put Triton in a position where it had no way of

backing up the promise to reserve and preserve Triton claim rights with the Government);

and posting a performance and payment bond with Travelers as obligee, which would

serve no purpose except to add expense for Triton.

Traveler's refused to recognize Triton's status as completion contractor to Travelers as completing surety in these exchanges. It negotiated very much as though Travelers, rather than Triton, was paying all the costs. When Triton continued to press for language that affirmed the obligation to reserve and preserve its claim rights against the Government, such as it had proposed in the original draft, Travelers responded, "unfortunately, we are at an impasse" (Exh. #86, Dec. 14, 2000).

Then, as it currently does in its Motion, Travelers refused to acknowledge that Triton had status as a completion contractor in addition to its rights under the GAI, even though Travelers was responsible for the absence of a written, executed Completion Agreement. Travelers' conduct has an even sharper point to it because Travelers then had the temerity to bill and sue Triton for its attorneys fees, after having refused to discuss whether, under these circumstances, the fees incurred by outside counsel were a legitimate indemnity obligation.

4. **Travelers' refusal to meet and hear out Triton regarding merits of its claim; and its corresponding refusal to provide any documentation for its position that "quality workmanship" caused the gate leakage problem.** The *PSE Consulting* case quotes an earlier Connecticut decision for the following proposition:

> ...Although mere negligence or failure to make the inquiries which a
> reasonably prudent person would make does not of itself amount to bad faith,
> if a party fails to make inquiry for the purpose of remaining ignorant of facts
> which he believes or fears would disclose a defect in the transaction, he may
> be found to have acted in bad faith."

There absolutely cannot be any justification for Travelers refusing to allow its

consultants to meet with Triton's consultants in order that the basis for Triton's claim

could be explained. The exchanges in which this proposal was made by Triton, and

summarily rejected by Travelers, are detailed in Defendant's II Paragraphs 98-99.

Travelers had ample opportunity to become informed regarding the claim. It turned

down an invitation to attend a settlement meeting at which Triton and Corps consultants

gave detailed presentations in support of their respective positions (Defs. §II ¶99). This

course of conduct by Travelers virtually defines a failure "...to make inquiry for the

purpose of remaining ignorant of facts which (it) believed or feared would disclose a

defect in the transaction ..." A jury well may conclude that this abject refusal to meet,

certainly in concert with the other actions of Travelers during this period, support the

argument that Travelers had made up its mind, that it had absolutely no interest in

finding out anything more about the claim, and, as Ms. Monteiro might put it, that it

simply wanted to get on with collecting the indemnity.

Likewise, Travelers' refused to produce any documents to Triton. In the face of

all the evidence to the contrary (see Defs.'§ II, ¶100-102), Travelers refused to provide

Triton any documents from its Abiquiu project files, and specifically refused to provide

any support for its asserted position that the gate leakage problem was due to faulty

workmanship. (Defs' §II, ¶103-104). Travelers responded to Triton's request for

documentation of the position it had taken with respect to the gate leakage problem with

cryptic comments such as: "Travelers strongly disagrees that Triton is in any way

entitled to review Travelers' files concerning this matter. Stated simply, they will not

voluntarily be made for review" (Defs.' §II ¶103).

A jury is entitled to hear this evidence and decide upon Travelers' motive.

5. **Travelers' self-serving pre-judgment of Triton's guilt on the basis of
nothing more than a grand jury subpoena.** Although this is not the defining reason

Travelers elected not to allow an appeal of the claim, Ms. Monteiro made it clear that it

is one of the three reasons (faulty workmanship and Triton's refusal to provide

documents being the other two. See Pltf.'s Memorandum, pp. 10-11). Travelers offered

no admissible evidence to suggest that the object of the investigation was Triton's

rework claim. Her "understanding" as recited in the Travelers' memorandum is not

competent. Triton moves that it be stricken.

To the contrary, the admissible evidence shows that it was a Corps

representative who prompted the investigation; and that so far as the Corps'

Administrative Contracting Officer knew, the only thing investigators were looking into

were the circumstances surrounding the emergency gate installation in the February-

March, 1999, imeframe. Mr. McCollum states that he was specifically unaware of any

inquiry into the rework claim, and if the Corps had any questions or concerns about the

costs presented by Triton through Travelers in that claim, the Defense Contract Audit

Agency would have been called in to perform an audit (McCollum Aff.).

In a society that cherishes the principle of "innocent until proven guilty," Travelers' had absolutely no business being influenced by the mere fact it received a grand jury subpoena and its records were being reviewed. This is prejudgment in its most vicious form, at least in a civil setting, because Travelers says it was influenced by the subpoena to cause Triton's $2,129,022 claim to become time-barred. It is certainly plausible that a jury may decide that Travelers should be the one to suffer the financial consequences, and that if the way to do that is determining Travelers acted in bad faith, then the jury well might so conclude.

6. **Travelers' singular selfish motive to secure release of the bond.**  The *PSE Consulting* decision provides this further guideline for determining breach of the duty of good faith and fair dealing:

> A self-interested settlement that is 'unblemished by any other evidence of bad faith' would not constitute a *per se* violation of a covenant of good faith and fair dealing; but combined with a 'confluence of circumstances,' a self-interested settlement may have been made for 'improper motive' and, thus, would constitute bad faith.

The manner in which Reliance secured a release of its bond upon completion of the rework has been detailed. The result was a bond immunity from the Government claim for costs associated with the rework. As a result, the Corps' claim for nearly a half-million dollars was asserted against Triton but not against Travelers.

106

This meant that Travelers had no concern beyond successful completion of the rework. But for the release that had been negotiated in the Takeover Agreement, Travelers would have been involved in Triton's claim, because the Government's claim became part of the lawsuit in which Triton was pursuing its claims. Travelers had no such worry, and thus felt it could afford to turn its back on the appeal and let Triton's claim rights expire.

The result for Triton was that it had to negotiate away its own $372,514. rework claim in order to secure release of its potential liability from the Government's claim (Defs.' §II ¶81). The surety put Triton in this position both by negotiating the release and by refusing to permit an appeal of the claim. Nothing could have been more self-serving and, at the least, this is a "confluent circumstance" from which the jury can find bad faith.

7. **Travelers' course of action was motivated solely by its zeal to get on with the indemnity law suit.** Travelers' mishandling of the Triton/Abiquiu file throughout perhaps is epitomized by its assigning the file to a completely uninformed salvage person who knew nothing about the history of the parties' relationship; and who was unacquainted with the claim or the claims dispute process. Again looking to this as a "confluent circumstance," taken in the light of Travelers entire course of conduct, this was carelessness and callousness to and beyond the point of bad faith. Ms. Monteiro had a singular purpose. It was her job to collect the indemnity obligation. She cared nothing about Triton's claim. No one informed her regarding the claim. Because this is her job,

she treated Triton's claim as though it was hers, and made her decision as though it was

her money to chase or forget about.  Doubtless she never should have been put in this

position by Travelers; more significantly, it was a breach of the duty of good faith and

fair dealing to Triton for Travelers to have turned the file over to her.

Whether on the basis of "a surety's failure to conduct an adequate investigation of

a claim ... accompanied by other evidence; whether by applying the unreasonable

conduct of the *PSE Consulting* case:

> "Unreasonable conduct can be evidence of improper motive
> and is a proper consideration where parties are bound by a
> contract which is unmitigated discretion to one party."

or whether looked at through the prism of the court's "confluence of circumstances"

touchstone of factors that "...would constitute bad faith," Triton clearly has demonstrated

evidence which takes its breach of contract claims to the jury.

## V. C.   OPPOSITION TO TRAVELERS' MEMORANDUM OF LAW PARAGRAPHS V. D, G, H, I AND J.

a.   **Travelers request for Summary Judgment on the issue of damages must be denied.**

The determination of damages involves a question of fact.  Beckman v. Jalich

Homes, Inc., 190 Conn. 299, 309-10, 460 A.2d 488 (1983); Gerber & Hurley, Inc. v.

CCC Corp., 36 Conn.App. 539, 545, 651 A.2d 1302 (1995).  The damages theory is to be

determined by the trier of fact.  Westport Taxi Service, Inc. v. Westport Transit District,

235 Conn. 1, 18, 664 A.2d 719 (1995) *citing* General Leaseways, Inc. v. National Truck

Leasing Assn., 830 F.2d 716 (7th Cir. 1987). Triton is not seeking double recovery. It is

seeking the recovery it is entitled to because of Travelers' breaches of contract and

tortious conduct. Moreover, Travelers' characterization of the payments received by the

Rework Insurers is factually wrong. The payments were not made to compensate Triton

for its rework costs. Rather, the Rework Insurers, without regard to any actual rework

costs, agreed to make a settlement and buy back all of the rework policies it had issued to

Triton in order to eradicate any risk on all Triton projects, not just the Abiquiu Project.

(McClung Affidavit, pp. 4, 5 and 6.) Accordingly, there is absolutely no nexus between

the rework costs Triton is seeking to recover from Travelers and the payments made by

the Rework Insurers.

     Essentially, Travelers argues that Triton has already been made whole for its

rework costs because of payment.[1]  Putting aside the fact that the Insurers' payments had

no relation to the rework costs incurred on the Abiquiu Project, Travelers, regardless,

even if there was a nexus, cannot use the payments to shield itself from liability for its

various breaches of contract and tortious conduct. Triton has suffered damages because

---

[1]   F. R. Civ. Proc. 8(c) Affirmative Defenses requires that "in pleading to a preceding pleading, a party
shall set forth affirmatively ... payment ... and any other matter constituting an avoidance or affirmative
defense."  In its response to Triton's Counterclaims Travelers did not plead payment as an affirmative
defense.  Accordingly, Travelers' failure to plead the affirmative defense of payment as required by F. R.
Civ. Proc. 8(c) resulted in a waiver of that defense and its exclusion from the case.  5 Clarks A. Wright &
Arthur R. Miller, Federal Practice & Procedure, Federal Rules of Civil Procedure (2d Ed. 1990) Sec. 1278;
See, also, Travelers International v. Trans World Airlines, Inc., 41 F.3d 1570 (2d Cir. 1994); Sellers v.
M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988).

of Travelers and it is entitled to recover these damages from Travelers, without regard to the sums received from the Rework Insurers.[2]

It is well settled that contract damages are based upon the injured party's expectation interest, and are intended to give him the benefit of the bargain by awarding damages that will put the injured party in as good a position as if the contract had been performed. Vespoli v. Pagliarulo, 212 Conn. 1, 3, 560 A.2d 980 (1989); West Haven Sound Development Corporation v. West Haven, 207 Conn. 308, 317, 541 A.2d 858 (1988); Danpar Associates v. Somersville Mills Sales Room, Inc., 182 Conn. 444, 446, 438 A.2d 708 (1980); Johnson v. Healy, 176 Conn. 97, 105, 405 A.2d 54 (1978), Bachman v. Fortuna, 145 Conn. 191, 194, 141 A.2d 477 (1958).

Contract damages are to be determined as of the moment of breach. Kevin Roche-John Dinkelco & Associates v. New Haven, 205 Conn. 741, 749, 535 A.2d 1287 (1988); Gordon v. Indusco Management Corp., 164 Conn. 202, 264, 320 A.2d 811 (1973).

The fact that the injured party may have secured some benefit from the State before or after the moment of breach is irrelevant to the amount of recoverable damages. O'Hara v. State of Connecticut, 218. Conn. 628, 612, 590 A.2d 948 (1991); Rametta v. Stella, 214 Conn. 484, 493, 512 A.2d 978 (1990).

---

[2]    Triton also submits that Travelers can only assert those defenses to the matter that the federal government would have had if the claim had been appealed. Any determination as to whether the federal government would have been able to assert the payment by the Rework Insurers as a defense would be governed by Federal law. Triton asserts that such a defense would not have been available. See, e.g., North Slope Technical, Ltd. V. The United States, 27 Fed.Cl. 425 (1992).

The factual determination is whether the injured party was denied some expectant benefit as of the occurrence of breach.

As a benefit of the duty of good faith and fair dealing, the Completion Agreement and its status as a third party beneficiary of the Takeover Agreement, Triton expected that Travelers would reserve and preserve the rework claim so that the rework costs could be recouped from the Corps. Travelers breached its various contractual arrangements with Triton at the point in time it failed to allow the pursuit of an appeal of the denied claim. As of that breach, Triton was forever precluded from recovering the rework costs from the Corps. – it was denied the benefit of its bargain. But for the breach, Triton would have been able to recover its rework costs from the Corps. That Triton had already secured a separate benefit, the payments from the Rework Insurers – from a separate contractual arrangement – its Rework Insurance Policies – is of no consequence to the fact that Triton was denied the expected economic benefit that it had bargained for in its contractual arrangements with Travelers.

Even if there was a nexus between the payments made by the Rework Insurers and the rework costs, Travelers is likewise precluded from using the payments made by the Rework Insurers to shield itself from its alleged tortious conduct. Connecticut's well-established collateral source rule, applicable to any tort case, precludes a wrongdoer from benefiting from a windfall from an outside source. United Aircraft Corp. v. Int'l. Assn. of Machinists, 161 Conn. 79, 101-102, 285 A.2d 330 (1971), cert. denied, 404 U.S. 1016, 92 S.Ct. 685, 30 L.Ed. 2d 663 (1972).

The payments received by Triton from the Rework Insurers are completely independent of and collateral to Travelers' tortious conduct and resulting liability.

Accordingly, any attempt by Travelers to shield itself from damages to Triton must fail.

Under either a theory of breach of contract or tort, Travelers' argument that Triton has not been damaged fails. But for Travelers' breaches of contract and as a direct and proximate result of Travelers' tortious conduct, Triton could have recovered its rework costs from the Corps. At the very least, a genuine question of fact exists that should be put to the trier of fact.

**b.      Travelers request for Summary Judgment on Triton's Claim for Breach of the Uniform Commercial Code must be denied.**

The Indemnity Agreement operated as a Financing Statement. (McLaughlin Deposition, pp. 292, 295.) Connecticut recognizes the standard of commercial reasonableness under Article 9 of the Uniform Commercial Code. C.G.S. §42a-9-207. While Travelers asserts that only the standard of good faith applies, there is no support for the contention that the surety's handling of an affirmative claim cannot equally be measured by the standard of commercial reasonableness. See, General Ins. Co. of America v. Mezzacappa Bros., Inc., 2003 WL 22244964 (E.D.N.Y. 2003). Rather, courts have applied the commercial reasonableness standard to sureties. See, Associated Indemnity Corp. v. CAT Contracting, Inc., 964 S.W.2d 276, 282 (1998).

**c.** **A fiduciary relationship was created between Travelers and Triton and, thus, Summary Judgment must be denied as to Triton's Count for Breach of Fiduciary Duty.**

The existence of a fiduciary or other confidential relationship between two parties is a question for the trier of fact.

Where a fiduciary relationship might not otherwise exist it can be developed, however, from the contacts or transactions from which a relationship of trust and confidence could be established.

Rather than to precisely define a fiduciary relationship and exclude new situation the Connecticut courts have chosen to leave "the bars down for situations in which there is a justifiable trust confided on one side and a resulting influence on the other." Harper v. Adametz, 142 Conn. 218, 225, 113 A.2d 136 (1955); Alaimo v. Royer, 188 Conn. 36, 41, 448 A.2d 207 (1982).

The relevant inquiry is whether the relationship was "characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." Dunham v. Dunham, 204 Conn. 303, 322, 528 A.2d 1123 (1987). Any determination requires a consideration of the facts surrounding the relationship between the parties. See, Oak River Co. v. Ferreri, 2002 WL 31094978 at 2 (D.Conn. 2002) *(denying motion to dismiss because it was a question of fact as to whether a fiduciary relationship was created)*;

113

Johnson v. Schmitz, 119 F.Supp. 2d 90, 97-98 (D.Conn. 2000) *(denying summary judgment because question of fact as to whether there existed a fiduciary relationship).*

Triton was uniquely dependent upon Travelers to recoup its rework costs. By reason of the Takeover Agreement Travelers was the only party that could pursue a claim for the rework costs (Triton's Statement of Genuine Issues of Material Fact Para. 6). Moreover, a relationship of trust and confidence was further developed by reason of the fact that Travelers represented that it would reserve and preserve Triton's rework claim, and only it could, thereby inducing Triton to perform the rework (Triton's Statement of Genuine Issues of Material Fact Para. 2, 3, 4 and 6). Travelers acted in accordance with this relationship and certified and submitted the Rework Claim (Triton's Statement of Genuine Issues of Material Fact Para. 9). A justifiable trust was placed in Travelers by Triton with regard to the control, management and pursuit of the Rework Claim. Certainly, the factual predicates exist in order for a trier of fact to determine whether a fiduciary relationship existed and, thus, a corresponding duty was created. As such, Travelers request for summary judgment must fail on Triton's Count for Breach of Fiduciary Duty.

**d.    The facts support a cause of action for misrepresentation and, thus, Summary Judgment must be denied.**

A cause of action for misrepresentation requires (1) a misstatement of fact; (2) that the party making the statement knew or should have known it to be a misstatement;

114

(3) made to induce the other party to act; and (4) upon which the receiving party relied to its detriment. <u>Maturo v. Gerard</u>, 196 Conn. 584, 587, 494 A.2d 1199 (1985).

Misrepresentation presents an issue of fact. <u>Miller v. Appleby</u>, 183 Conn. 51, 55, 438 A.2d 811 (1981).

Travelers stated to Triton that it would reserve and preserve the Rework Claim (Triton's Statement of Genuine Issues of Material Fact Para. 3). Triton relied on this statement in deciding to perform the rework at its expense (Triton's Statement of Genuine Issues of Material Fact Para. 4). It completed the rework with the understanding and expectation that Travelers would reserve and preserve the Rework Claim. Contrary to its statements, however, Travelers did not reserve and preserve the Rework Claim to Triton's detriment.

The facts establish a cause of action for misrepresentation, present issues of fact to be decided by the trier of fact and, thus, Travelers' request for Summary Judgment must be denied.

e.     **Travelers' Request for Summary Judgment on Triton's Negligence Count must be denied.**

Connecticut courts have recognized a cause of action for the negligent performance of a duty that arises from a contractual relationship. <u>See</u>, <u>e.g.</u>, <u>Bonan v. Golding Home Inspections, Inc.</u> 68 Conn.App. 862, 869-70, 794 A.2d 997 (2002); <u>Neiditz v. Martin S. Fine & Assoc., Inc.</u>, 199 Conn. 683, 688, 508 A.2d 438 (1986); <u>Johnson v. Flammia</u>, 169 Conn. 491, 496, 363 A.2d 1048 (1975).

115

Travelers had the contractual duty to Triton under the Completion Agreement and as a third-party beneficiary of the Takeover Agreement to reserve and preserve Triton's claim. Moreover, it had a duty of good faith and fair dealing under the Indemnity Agreement. A duty having been established the trier of fact is entitled to determine whether the duty was breached and thus Travelers' negligent. Moreover, a trier of fact could reasonably determine that Triton was damaged by Travelers' negligence and that these damages offset any indemnity obligation. As such, Travelers' request for Summary Judgment on Triton's negligence count must be denied.

## VI.   CONCLUSION.

For all of the foregoing reasons Travelers' request for the entry of Summary Judgment on its Count for Indemnification and Counts I, II, III, IV, V, VI, VII and VIII of Triton's Counterclaim must be denied.

Respectfully submitted,

TRITON MARINE CONSTRUCTION CORP., ET AL

By _____

JOHN J. O'BRIEN, JR., ESQ. (CT04856)
PECK AND O'BRIEN, P.C.
433 Silas Deane Highway
Wethersfield, Connecticut 06109
Telephone:(860) 563-5500
Facsimile:  (860) 566-5520

116

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 4th day of January, 2005, the foregoing was mailed to

the following counsel of record:

Bradford R. Carver, Esq.
Eric Loeffler, Esq.
Cetrulo & Capone, LLP
Two Seaport Lane, 10th Floor
Boston, Massachusetts 02210

Dale R. Martin, Esq.
Barokas, Martin, Ahlers & Tomlinson
1422 Bellevue Avenue
Seattle, Washington 98122

JOHN J. O'BRIEN, JR., ESQ. (CT04856)
PECK & O'BRIEN, P.C.
433 Silas Deane Highway
Wethersfield, Connecticut 06109
Telephone:  (860) 563-5500
Facsimile:  (860) 566-5520

Triton Marine.Travelers P&C.Memo of Law in Opposition to Travelers' Motion for Summary Judgment

117