# EXHIBIT A



**Sherrie L. Monteiro, AFSB**

Senior Claim Executive - Salvage
Travelers
Bond and Financial Products
One Tower Square, 2S2
Hartford, CT  06183

(860) 954-4479
(888) 201-5608 (fax)
smonteir@travelers.com

August 14, 2007

| | |
|---|---|
| Triton Marine Construction Corp.<br>4510 Brittmore Road<br>Houston, TX  77041 | R. John Armstrong, Individually<br>10502 Daysailer Drive<br>Fairfax Station, VA  22039-1904 |
| Patricia B. Armstrong, Individually<br>10502 Daysailer Drive<br>Fairfax Station, VA  22039-1904 | Leola E. Daly, Individually<br>103 River Park Lane<br>Great Falls, VA  22066-3544 |
| N. Jean Searle, Individually<br>2121 Jamieson Ave., #1710<br>Alexandria, VA  22314 | William F. Searle, Individually<br>2121 Jamieson Ave., #1710<br>Alexandria, VA  22314 |
| Wendell E. Webber, Individually<br>2428 Normandy Ct.<br>Ponte Vedra Beach, FL  32082-2936 | Wendell E. Webber, Individually<br>905 Shipwatch Drive E.<br>Jacksonville, FL  32225-5417 |
| Janice K. Webber, Individually<br>2428 Normandy Ct<br>Ponte Vedra Beach, FL  32082-2936 | Janice K. Webber, Individually<br>905 Shipwatch Drive E.<br>Jacksonville, FL  32225-5417 |
| Sandra F. Prestridge, Individually<br>314 W. Olney Road<br>Norfolk, VA  23507-1821 | A. Burton Prestridge, Individually<br>314 Olney Road<br>Norfolk, VA  23507-1821 |
| Edward A. Wardell, Individually<br>6200 Winward Way, Apt. 16<br>St. Thomas, U.S. Virgin Islands  00802 | Carolyn S. Wardell, Individually<br>6200 Windward Way, Apt. 16<br>St. Thomas, U.S. Virgin Islands  00802 |
| Jerry W. McDonald, Individually<br>103 Riverpark Lane<br>Great Falls, VA  22066-3544 | Mary J. McDonald, Individually<br>c/o Gene Daly, Resident Agent<br>103 Riverpark Lane<br>Great Falls, VA  22066-3544 |
| Estate of Eugene F. Daly<br>c/o Gene Daly, Registered Agent<br>103 River park Lane<br>Great Falls, VA  22066-3544 | |

Re     Principal:      Triton Marine Construction Corp.
       Action:         Travelers Property and Casualty Insurance Co. v. Triton Marine
                       Construction Corp., C.A. No. 3:02cv1500, U.S.D.C. D. Conn.

Dear Indemnitors:

As you are aware from correspondence sent to you on April 4, 2002, the undersigned is an authorized representative of Reliance Insurance Company, the company that issued Bond No. B2617793 on behalf of Triton Marine Construction Corp., as principal.  In consideration of issuing the Bond, each of you, individually, executed an Indemnity Agreement, a copy of which was provided to you with my April 4, 2002 letter.  In that same letter, it was disclosed to you that Travelers is Administrator for and as successor in interest to Reliance Insurance Company.

As of April 4, 2002, each of you, personally, and jointly and severally, were liable to Travelers in the amount of $164,078.60.   Rather than recognizing your indemnification obligations to Travelers, the above-referenced litigation was commenced and has proceeded.  On February 9, 2007, United States District Court, District of Connecticut denied Triton's Motion for Summary Judgment.  A copy of that Ruling is enclosed for your convenience.

Please note that page 8 of the Ruling specifically discusses the appropriate procedure for Travelers, as surety, to make a claim against each of you, as indemnitors.  In accordance with the terms of the Indemnity Agreement, as well as the Court's Ruling, this letter constitutes a formal demand on each of you, to reimburse Travelers for the amount of its loss, which as of August 1, 2007, now totals $368,038.09.  This amount does not include legal fees and costs that have accrued since August 1, 2007, nor does it include prejudgment interest which is continuing to accrue at the applicable statutory rate.   Travelers, as surety, hereby demands that you immediately remit to it the amount of $368,038.09.   Attached to this letter is an itemized statement of the losses incurred by Travelers.

Travelers expects your prompt attention to this matter.  If you have any questions, please do not hesitate to contact me.  Otherwise, Travelers expects to receive payment forthwith.

Very truly yours,

I, Sherrie L. Monteiro, am Senior Salvage Executive for Travelers Casualty and Surety Company, which is the Administrator for and as Successor in Interest to Reliance Insurance Company. I am an authorized representative of Travelers.

Under the pains and penalties of perjury, I swear that the statements set forth in the foregoing letter as well as in the attached itemized statement of loss, which is incorporated herein by reference, is true and accurate.

_Sherrie L. Monteiro, AFSB
Senior Salvage Executive
Authorized Representative of Travelers,
as Administrator for and as Successor
in Interest to Reliance Insurance Company

cc:     Bradford R. Carver
        John J. O'Brien

Subscribed and sworn to before me, this 14th day of August 2007.

BARBARA A. CHECK
*Notary Public*
*My Commission Expires August 31, 2009*

# Itemized Statement of Loss

| Claim Num | Role Holder | Role | Trans Type | Payment Type | Check No | Check Date | Amount | Payee |
|---|---|---|---|---|---|---|---|---|
| 091-SC-E990221-1-RG | Mr. Arvin Daum | Other Vendor (non Atty) | CAPTIS Check | Engineering Consultants | 1041635 | 2000/07/20 | $2,412.43 | Mr. Arvin Daum |
| 091-SC-E990221-1-RG | Bossard, Fred | | Payroll Reimbursement | Employee Travel | 5000081 | 2000/08/04 | $1,809.31 | Bossard, Fred |
| 091-SC-E990221-1-RG | Mr. Arvin Daum | Other Vendor (non Atty) | CAPTIS Check | Atty Surety (non-salvage) | 1041879 | 2000/08/21 | $6,079.83 | Mr. Arvin Daum |
| 091-SC-E990221-1-RG | Mr. Arvin Daum | Other Vendor (non Atty) | CAPTIS Check | Engineering Consultants | 1000081 | 2000/09/22 | $3,342.77 | Mr. Arvin Daum |
| 091-SC-E990221-1-RG | Bossard, Fred | | Payroll Reimbursement | Employee Travel | 10001925 | 2000/10/10 | $1,656.08 | Brown, Alicia |
| 091-SC-E990221-1-RG | Bossard, Fred | | Payroll Reimbursement | Employee Travel | 1004031 | 2000/10/10 | $1,481.79 | Bossard, Fred |
| 091-SC-E990221-1-RG | Bossard, Fred | | Payroll Reimbursement | Employee Travel | 1004049 | 2000/10/23 | $956.53 | Bossard, Fred |
| 091-SC-E990221-1-RG | Bossard, Fred | | Payroll Reimbursement | Employee Travel | 1005308 | 2000/10/23 | $933.70 | Bossard, Fred |
| 091-SC-E990221-1-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | CAPTIS Check | Atty Coverage (No Suit) | 1005243 | 2000/11/01 | $8,930.18 | Cetrulo & Capone |
| 091-SC-E990221-1-RG | Bossard, Fred | | Payroll Reimbursement | Employee Travel | 1010151 | 2000/11/08 | $1,519.09 | Bossard, Fred |
| 091-SC-E990221-1-RG | Bossard, Fred | | Payroll Reimbursement | Employee Travel | 1010169 | 2000/11/08 | $1,797.07 | Bossard, Fred |
| 091-SC-E990221-1-RG | Brown, Alicia | | Payroll Reimbursement | Employee Travel | 1010178 | 2000/11/08 | $1,681.11 | Brown, Alicia |
| 091-SC-E990221-1-RG | Mr. Arvin Daum | Other Vendor (non Atty) | CAPTIS Check | Engineering Consultants | 1010799 | 2000/11/09 | $4,011.54 | Mr. Arvin Daum |
| 091-SC-E990221-1-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | CAPTIS Check | Atty Surety (non-salvage) | 1001117 | 2000/11/17 | $4,804.00 | Cetrulo & Capone |
| 091-SC-E990221-1-RG | Mr. Arvin Daum | Other Vendor (non Atty) | CAPTIS Check | Damages - Payment | 10014327 | 2000/12/04 | $8,474.80 | Mr. Arvin Daum |
| 091-SC-E990221-1-RG | Mr. Arvin Daum | Other Vendor (non Atty) | CAPTIS Check | Damages - Payment | 10014354 | 2000/12/04 | $12,942.44 | Mr. Arvin Daum |
| 091-SC-E990221-1-RG | Theodore Brown | Other Vendor (non Atty) | CAPTIS Check | Damages - Payment | 10014345 | 2000/11/09 | $7,899.47 | Theodore Brown |
| 091-SC-E990221-1-RG | Mr. Arvin Daum | Other Vendor (non Atty) | CAPTIS Check | Damages - Payment | 10019855 | 2001/01/09 | $24,971.98 | Mr. Arvin Daum |
| 091-SC-E990221-1-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | CAPTIS Check | Atty Surety (non-salvage) | 10023766 | 2001/01/24 | $5,793.93 | Cetrulo & Capone, LLP |
| 091-SC-E990221-1-RG | Mr. Arvin Daum | Other Vendor (non Atty) | CAPTIS Check | Damages - Payment | 10038982 | 2001/01/30 | $13,807.85 | Mr. Arvin Daum |
| 091-SC-E990221-1-RG | Mr. Arvin Daum | Other Vendor (non Atty) | CAPTIS Check | Damages - Payment | 10032021 | 2001/02/21 | $16,057.95 | Mr. Arvin Daum |
| 091-SC-E990221-1-RG | Mr. Arvin Daum | Other Vendor (non Atty) | CAPTIS Check | Damages - Payment | 10034226 | 2001/03/06 | $12,161.57 | Mr. Arvin Daum |
| 091-SC-E990221-1-RG | Mr. Arvin Daum | Other Vendor (non Atty) | CAPTIS Check | Damages - Payment | 10034227 | 2001/03/06 | ($16,057.95) | Mr. Arvin Daum |
| 091-SC-E990221-1-RG | Mr. Arvin Daum | Other Vendor (non Atty) | Void Check | Damages - Payment | 10034451 | 2001/03/07 | $13,454.35 | Mr. Arvin Daum |
| 091-SC-E990221-1-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | CAPTIS Check | Atty Surety (non-salvage) | 10037205 | 2001/03/19 | $730.66 | Cetrulo & Capone |
| 091-SC-E990221-1-RG | Mr. Arvin Daum | Other Vendor (non Atty) | CAPTIS Check | Damages - Payment | 10010319 | 2001/03/19 | $506.60 | Mr. Arvin Daum |
| 091-SC-E990221-1-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | CAPTIS Check | Damages - Payment | 10010605 | 2001/06/05 | $263.74 | Cetrulo & Capone |
| 091-SC-E990221-1-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | Captis Check - Clsd | Salvage - Attorney fees/costs | 10107766 | 2001/04/05 | $1,625.60 | Cetrulo & Capone |
| 091-SC-E990221-1-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | Captis Check - Clsd | Salvage - Attorney fees/costs | 10112292 | 2002/05/06 | $1,893.90 | Cetrulo & Capone |
| 091-SC-E990221-1-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | Captis Check - Clsd | Salvage - Attorney fees/costs | 10120851 | 2002/07/16 | $1,434.89 | Cetrulo & Capone, LLP |
| 091-SC-E990221-1-RG | AlphaGraphics (Hartford2) | Other Vendor (non Atty) | Captis Check - Clsd | Record Copies | 10120617 | 2002/07/16 | $768.22 | AlphaGraphics |
| 091-SC-E990221-1-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | Captis Check - Clsd | Salvage - Attorney fees/costs | 10124453 | 2001/07/25 | $3,389.36 | Cetrulo & Capone, LLP |
| 091-SC-E990221-1-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | Captis Check - Clsd | Salvage - Attorney fees/costs | 10125954 | 2002/08/27 | $2,638.67 | Cetrulo & Capone, LLP |
| 091-SC-E990221-1-RG | AlphaGraphics (Hartford2) | Other Vendor (non Atty) | Captis Check - Clsd | Record Copies | 10130202 | 2002/10/08 | $1,638.82 | AlphaGraphics |
| 091-SC-E990221-1-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | Captis Check - Clsd | Salvage - Attorney fees/costs | 10131166 | 2002/10/16 | $897.66 | Cetrulo & Capone, LLP |
| 091-SC-E990221-1-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | Captis Check - Clsd | Salvage - Attorney fees/costs | 10131185 | 2002/10/16 | $845.53 | Cetrulo & Capone, LLP |
| 091-SC-E990221-1-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | Captis Check - Clsd | Salvage - Attorney fees/costs | 10131174 | 2002/10/18 | $1,600.00 | Cetrulo & Capone, LLP |
| 091-SC-E990221-1-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | Captis Check - Clsd | Salvage - Attorney fees/costs | 10136376 | 2001/12/02 | $590.31 | Cetrulo & Capone, LLP |
| 091-SC-E990221-1-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | Captis Check - Clsd | Salvage - Attorney fees/costs | 10142064 | 2003/02/03 | $681.00 | Cetrulo & Capone, LLP |
| 091-SC-E990221-1-RG | Brown, Alicia | | Payroll Reimbursement | Employee Travel | 10149905 | 2003/09/21 | $322.79 | Brown, Alicia |
| 091-SC-E990221-1-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | Captis Check - Clsd | Salvage - Attorney fees/costs | 10148607 | 2013/04/07 | $1,400.78 | Cetrulo & Capone, LLP |

# Itemized Statement of Loss

| Case | Name | Role | Category | Subcategory | Ref. | Date | Amount | Name |
|---|---|---|---|---|---|---|---|---|
| 09-1-SC-E9902211-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | Caplis Check - Clsd | Salvage - Attorney fees/costs | 10163197 | 2003/05/27 | $6,037.66 | Cetrulo & Capone, LLP |
| 09-1-SC-E9902211-RG | Bossard, Fred | Payroll Reimbursement | Payroll Reimbursement | Employee Travel | 10153925 | 2003/06/02 | $1,515.74 | Bossard, Fred |
| 09-1-SC-E9902211-RG | Montaro, Sherrie | Payroll Reimbursement | Payroll Reimbursement | Employee Travel | 10156098 | 2003/06/25 | $88.35 | Montaro, Sherrie |
| 09-1-SC-E9902211-RG | Mr. Arvin Daum | Atty Representing Travelers | Caplis Check - Clsd | Salvage - Attorney fees/costs | 10162064 | 2003/07/22 | $16,353.26 | Cetrulo & Capone, LLP |
| 09-1-SC-E9902211-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | Caplis Check - Clsd | Expert Witness | 10159105 | 2003/07/29 | $4,382.63 | Mr. Arvin Daum |
| 09-1-SC-E9902211-RG | Mr. Arvin Daum | Atty Representing Travelers | Caplis Check - Clsd | Salvage - Attorney fees/costs | 10163935 | 2003/09/25 | $1,415.27 | Cetrulo & Capone, LLP |
| 09-1-SC-E9902211-RG | Montaro, Sherrie | Atty Representing Travelers | Caplis Check - Clsd | Employee Travel | 10165336 | 2003/10/07 | $1,378.59 | Montaro, Sherrie |
| 09-1-SC-E9902211-RG | Mr. Arvin Daum | Payroll Reimbursement | Payroll Reimbursement | Employee Travel | 10166997 | 2003/11/03 | $5,000.00 | Mr. Arvin Daum |
| 09-1-SC-E9902211-RG | Hennessey Corp. d/b/a Robert H. Lange Co. | Other Vendor (non Atty) | Caplis Check - Clsd | Salvage - Other | 10161012 | 2003/11/05 | $1,236.30 | Hennessey Corp. d/b/a Robe |
| 09-1-SC-E9902211-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | Caplis Check - Clsd | Salvage - Attorney fees/costs | 10167021 | 2003/11/05 | $5,122.50 | Cetrulo & Capone, LLP |
| 09-1-SC-E9902211-RG | Hennessey Corp. d/b/a Robert H. Lange Co. | Other Vendor (non Atty) | Caplis Check - Clsd | Salvage - Other | 10161039 | 2003/12/30 | $359.65 | Hennessey Corp. d/b/a Robe |
| 09-1-SC-E9902211-RG | Bossard, Fred | Payroll Reimbursement | Payroll Reimbursement | Employee Travel | 10171041 | 2004/02/09 | $54.41 | Bossard, Fred |
| 09-1-SC-E9902211-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | Caplis Check - Clsd | Salvage - Attorney fees/costs | 10161795 | 2004/02/25 | $18,535.94 | Cetrulo & Capone, LLP |
| 09-1-SC-E9902211-RG | Montaro, Sherrie | Payroll Reimbursement | Payroll Reimbursement | Employee Travel | 10171128 | 2004/03/09 | $301.03 | Montaro, Sherrie |
| 09-1-SC-E9902211-RG | EYAL Court Reporting, Inc. | Other Vendor (non Atty) | Caplis Check - Clsd | Salvage - Other | 10171155 | 2004/03/30 | $620.95 | Cetrulo & Capone, LLP |
| 09-1-SC-E9902211-RG | EYAL Court Reporting, Inc. | Other Vendor (non Atty) | Caplis Check - Clsd | Salvage - Other | 10171164 | 2004/03/30 | $425.96 | EYAL Court Reporting, Inc. |
| 09-1-SC-E9902211-RG | American Legal Copy, LLC | Other Vendor (non Atty) | Caplis Check - Clsd | Salvage - Other | 10177164 | 2004/04/02 | $2,381.59 | American Legal Copy, LLC |
| 09-1-SC-E9902211-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | Caplis Check - Clsd | Salvage - Attorney fees/costs | 10177479 | 2004/04/28 | $2,659.42 | Cetrulo & Capone, LLP |
| 09-1-SC-E9902211-RG | Mr. Arvin Daum | Other Vendor (non Atty) | Caplis Check - Clsd | Salvage - Other | 10178556 | 2004/04/30 | $3,169.52 | Mr. Arvin Daum |
| 09-1-SC-E9902211-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | Caplis Check - Clsd | Salvage - Attorney fees/costs | 10180742 | 2004/05/10 | $23,554.47 | Cetrulo & Capone, LLP |
| 09-1-SC-E9902211-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | Caplis Check - Clsd | Salvage - Attorney fees/costs | 10174477 | 2004/06/07 | $1,304.98 | Cetrulo & Capone, LLP |
| 09-1-SC-E9902211-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | Caplis Check - Clsd | Salvage - Attorney fees/costs | 10180402 | 2004/07/01 | $576.50 | Cetrulo & Capone, LLP |
| 09-1-SC-E9902211-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | Caplis Check - Clsd | Salvage - Attorney fees/costs | 10182671 | 2004/07/25 | $5,142.19 | Cetrulo & Capone, LLP |
| 09-1-SC-E9902211-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | Caplis Check - Clsd | Salvage - Attorney fees/costs | 10182239 | 2004/10/14 | $646.59 | Cetrulo & Capone, LLP |
| 09-1-SC-E9902211-RG | Melroy,Douglas | Payroll Reimbursement | Payroll Reimbursement | Employee Travel | 10180818 | 2004/10/28 | $482.27 | Melroy,Douglas |
| 09-1-SC-E9902211-RG | Bossard,Fredrick | Payroll Reimbursement | Payroll Reimbursement | Employee Travel | 10187792 | 2004/11/05 | $20,733.70 | Bossard,Fredrick |
| 09-1-SC-E9902211-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | Caplis Check - Clsd | Salvage - Attorney fees/costs | 10184100 | 2004/11/11 | $331.10 | Cetrulo & Capone, LLP |
| 09-1-SC-E9902211-RG | Michelle Kaczynski | Other Vendor (non Atty) | Caplis Check - Clsd | Salvage - Other | 10184107 | 2004/11/11 | $415.70 | Michelle Kaczynski |
| 09-1-SC-E9902211-RG | Michelle Kaczynski | Atty Representing Travelers | Caplis Check - Clsd | Salvage - Other | 10189953 | 2004/12/21 | $3,002.27 | Michelle Kaczynski |
| 09-1-SC-E9902211-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | Caplis Check - Clsd | Salvage - Attorney fees/costs | 10189594 | 2005/02/28 | $2,538.99 | Cetrulo & Capone, LLP |
| 09-1-SC-E9902211-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | Caplis Check - Clsd | Salvage - Attorney fees/costs | 10191861 | 2005/05/02 | $11,501.01 | Cetrulo & Capone, LLP |
| 09-1-SC-E9902211-RG | Cetrulo & Capone, LLP | Atty Representing Travelers | Caplis Check - Clsd | Salvage - Attorney fees/costs | 10197603 | 2005/06/02 | $209.90 | Cetrulo & Capone, LLP |
| 09-1-SC-E9902211-RG | Hinshaw & Culbertson (Chicago) | Atty Representing Travelers | Caplis Check - Clsd | Salvage - Attorney fees/costs | 10200946 | 2005/11/10 | $4,167.00 | Hinshaw & Culbertson |
| 09-1-SC-E9902211-RG | St. Paul Travelers,Claim Trave | Payroll Reimbursement | Payroll Reimbursement | Employee Travel | 10200954 | 2005/11/28 | $51.84 | St. Paul Travelers,Claim Trave |
| 09-1-SC-E9902211-RG | Hinshaw & Culbertson (Chicago) | Atty Representing Travelers | Caplis Check - Clsd | Salvage - Attorney fees/costs | 10207737 | 2006/04/03 | $3,706.48 | Hinshaw & Culbertson |
| 09-1-SC-E9902211-RG | Hinshaw & Culbertson (Chicago) | Atty Representing Travelers | Caplis Check - Clsd | Salvage - Attorney fees/costs | 10212453 | 2007/05/20 | $2,452.00 | Hinshaw & Culbertson |
| 09-1-SC-E9902211-RG | Hinshaw & Culbertson (Chicago) | Atty Representing Travelers | Caplis Check - Clsd | Salvage - Attorney fees/costs | 10223739 | 2007/06/25 | $1,002.50 | Hinshaw & Culbertson |
| 09-1-SC-E9902211-RG | Hinshaw & Culbertson (Chicago) | Atty Representing Travelers | Caplis Check - Clsd | Salvage - Attorney fees/costs | 10223928 | 2007/08/28 | $982.50 | Hinshaw & Culbertson |
| 09-1-SC-E9902211-RG | Hinshaw & Culbertson (Chicago) | Atty Representing Travelers | Caplis Check - Clsd | Salvage - Attorney fees/costs | 10224018 | 2007/07/05 | $384.00 | Hinshaw & Culbertson |
| | | | | | 10224189 | | Grand Total $345,861.55 | |

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| TRAVELERS PROPERTY & CASUALTY INSURANCE CO., Plaintiff, v. TRITON MARINE CONSTRUCTION CORP., *et al.*, Defendants. | Civil Action No. 3:02cv1500 (SRU) |

### RULING ON MOTION FOR SUMMARY JUDGMENT

Travelers Property & Casualty Insurance Co. ("Travelers") has sued Triton Marine

Construction Corp. and several individuals (collectively, "Triton"), principally seeking

indemnification under the parties' general indemnity agreement.[1] Triton has asserted a nine-

count counterclaim, principally alleging breach of contract. The lawsuit arises out of Triton's

construction and repair of the Abiquiu Dam Emergency Gate Bypass System, Triton's

relationship with Travelers as surety, and Travelers' refusal to pursue a claim on behalf of Triton

against the Army Corps of Engineers ("Corps").

Travelers has moved for summary judgment on its indemnity claim and each of Triton's

counterclaims.[2] I grant Travelers' motion in part and deny it in part.

---

[1] The individual indemnitors are: R. John Armstrong, Patricia B. Armstrong, Leola E. Daly, N. Jean Searle, William F. Searle, Wendell E. Webber, Janice K. Webber, Sandra F. Prestridge, A. Burton Prestridge, Edward A. Wardell, Carolyn S. Wardell, Jerry W. McDonald, Mary J. McDonald, and the Estate of Eugene F. Daly.

[2] Triton's counterclaims include: three counts of breach of contract, breach of the duty of good faith and fair dealing, violation of the Uniform Commercial Code, breach of fiduciary duty, misrepresentation, negligence, and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"). During oral arguments on the instant motion, Triton withdrew its CUTPA claim.

## I.     Standard of Review

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, I must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255. When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of its pleadings, but rather must present significant probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

If the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23; *accord Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim).

-2-

## II.    Factual Background

### A.    Triton's Indemnity Agreement with Reliance Insurance Co.

In September 1994, Triton executed an Underwriting and Continuing Indemnity Agreement in favor of Reliance Insurance Companies. Pl. Ex. 27.[3] Under the terms of the indemnity agreement, each indemnitor agreed to indemnify Reliance "against any and all LOSS that may in any way arise out of the exercise of the assignments contained in this Agreement." Monteiro Aff. (doc. # 46) at ¶ 10 & Pl. Ex. 27 at ¶ 17. "Loss" is defined to include "attorney and other professional fees" incurred by Reliance "by reason of executing or procuring the execution of the bond(s) . . . making any investigation on account thereof . . . [and] recovering or attempting to recover any salvage in connection therewith . . . ." Monteiro Aff. at ¶ 12 & Pl. Ex. 27 at ¶ 1, p.4.

Pursuant to the indemnity agreement, Reliance had the "exclusive right for itself and for INDEMITORS to decide and determine whether any claim, demand, suit or judgment on the bond(s) shall be paid, settled, defended or appealed." Pl. Ex. 27 at ¶ 28.

### B.    Travelers' Purchase of Reliance Group

Travelers purchased certain assets and liabilities of Reliance in May 2000, including the potential rights and obligations arising from the bond and indemnity agreement at issue here. Pl. Ex. 28.[4]

---

[3]  References to "Pl. Ex." refer to the exhibits attached to the affidavit of Bradford R. Carver (doc. # 47).

[4]  Although the contract assigning indemnity rights to Travelers does not specifically list the Reliance-Triton indemnity agreement, and Triton purports to dispute whether *Travelers* has any rights under the indemnity agreement, there is no genuine dispute that Reliance assigned the relevant rights to Travelers. There is no anti-assignment provision in the indemnity agreement,

C.    Abiquiu Dam Project

In May 1999, Triton contracted with the Army Corps of Engineers to construct the

Abiquiu Dam Emergency Gate Bypass System.  Monteiro Aff. ¶ 5; Def. Answer ¶ 22.  Relying

on the indemnity agreement, Reliance issued a performance bond with respect to that project,

naming the United States of America as obligee and Triton as principal.  Ex. B to Monteiro Aff.

In February 2000, the Corps notified Reliance that Triton was in default, issued a

Termination for Default of the Contract, and demanded that Reliance, as surety, complete the

contract pursuant to the bond.  Monteiro Aff. ¶ 7; Pl. Ex. 14.[5]  The Corps stated that it was

terminating Triton because the gates were not properly aligned and did not comply with the

contract specifications, causing a tremendous quantity of water leakage.  Pl. Ex. 30.  Triton

disputed the propriety of the termination and the Corps' claims that Triton was responsible for

the cost to re-work the gates.  Pl. Ex. 22.  At the time of the termination, Triton indicated that it

would bring an affirmative claim against the Corps because of the termination.  Def. Ex. C

(McLoughlin Depo.) at 193.[6]

In April 2000, Reliance entered into a takeover agreement with the Corps, agreeing to

complete the project.  Pl. Ex. 5 (Bossard Depo.) at 45; Monteiro Aff. ¶ 8; Pl. Ex. 15.  Triton

ultimately agreed to complete the repair work required under the takeover agreement, although

_____

and Triton is pursuing claims under the indemnity agreement against Travelers in the instant
action.

    [5] Monteiro's affidavit repeatedly refers to Travelers rather than Reliance.  *See* Monteiro
Aff. at ¶ 4.  It is undisputed, however, that Travelers was not involved as Triton's surety until the
assignment of Reliance's indemnity rights in May 2000.

    [6] References to "Def. Ex." refer to the exhibits attached to the affidavit of John J. O'Brien
(doc. # 58).

-4-

the parties dispute the reasons for that decision.

Triton challenged the Corps' termination of the original contract, arguing that the defects were due to design flaws rather than poor workmanship. Triton asserts that it agreed to complete the repairs after the takeover agreement was executed because it understood that the surety would sponsor its re-work claim against the Corps. Although all parties acknowledge that Triton planned to pursue its claims for wrongful termination and the re-work, they dispute whether Reliance or later Travelers agreed to sponsor the claim on behalf of Triton. There was never a written completion contract that formalized any agreement between Reliance or Travelers and Triton.

Triton completed the re-work of the gates in approximately February 2001, and Travelers completed its obligations under the performance bond. Pl. Ex. 5 (Bossard Depo.) at 65, 137.

D.    Re-work Claim

Following completion of the project, Triton assembled its costs (totaling $2,129,022) to perform the re-work and requested that Travelers submit its claim to the Corps on Triton's behalf. Pl. Ex. 9. Frederick Bossard, Travelers' Project Manger, reviewed Triton's claim, revised it – eliminating some costs that he considered inaccurate – and Travelers submitted the claim to the Corps on behalf of Triton. Pl. Ex. 5 (Bossard Depo. at 21, 67, 74, 76) & Pl. Ex. 10.

Ultimately, in December of 2001, the Corps denied the re-work claim. Pl. Ex. 13. According to the decision of the Contracting Officer:

> [T]he gate leakage problem was due to the misalignment of the gate frames, and the specification leakage requirement could be obtained with the original gate design and proper gate installation. Because proper installation of the emergency gates, including the gate frames, was the responsibility of Triton Marine, the costs submitted for the subject claim are not attributable to the

Government.

Pl. Ex. 13.

Travelers informed Triton of the Contracting Officer's decision in January 2002. Pl. Ex.

16. Triton requested that Triton appeal that decision. Pl. Ex. 1 (Monteiro Depo.) at 49.

Sherrie L. Monteiro, Salvage Manager for Travelers, became involved in the Triton

matter in approximately January 2002. Pl. Ex. 1 (Monteiro Depo.) at 21, 38. She considered the

request that Travelers appeal the Contracting Officer's decision.

Based on its experts' opinions, Travelers' position was that the re-work was necessitated

by poor workmanship, faulty installation, and/or poor manufacture of the gates and frames, not

by a defective design. Pl. Ex. 5 (Bossard Depo. at 167-68).

On approximately May 14, 2002, Travelers notified Triton, through counsel, that it was

willing to review documents submitted by Triton as part of its investigatory process. Pl. Ex. 20.

Triton had no expert reports for Travelers to consider in connection with their evaluation of the

re-work claim. Pl. Ex. 21; Pl. Ex. 1 (Monteiro Depo.) at 143-44. Triton sought to meet with

Travelers' consultants to discuss the merits of the re-work claim, but Triton did not provide any

new documentation or information to Travelers in support of its claim. Ex. 29; Pl. Ex. 1

(Monteiro Depo.) at 140-44, 150, 369-70.

On behalf of Travelers, Monteiro ultimately decided not to appeal the Contracting Offer's

decision regarding the re-work claim. Pl. Ex. (Monteiro Depo.) at 170. Monteiro relied on the

following considerations in making that decision: Travelers' experts concluded that the gate

leakage was not caused by a design defect as Triton claimed; Triton did not provide any new

documentation to contest Travelers' experts' conclusion; Travelers received a Grand Jury

Subpoena in connection with a criminal investigation of Triton that involved the re-work costs. Pl. Ex. 1 (Monteiro Depo.) at 173-74, 302.

### E.    Triton's Litigation against the Corps

Triton sued the government in May 2000. Pl. Ex. 34; Pl. Ex. 6 (Boyd Depo.) at 218-19. Among other relief, Triton sought to recover from the government the costs associated with its indemnity obligation to its surety in connection with the excess leakage remediation work under the takeover agreement. Ex. 34 at ¶ 20d.

In January 2001, Triton filed an Amended Complaint, restating its allegation that "the costs incurred remediating the gate leakage problem . . . are compensable, and are recoverable in this action." Pl. Ex. 35 at ¶ 27. In July 2001, Triton filed a Second Amended Complaint, withdrawing the count that demanded compensation for amounts expended remediating the gate leakage problem. *Compare* Pl. Ex. 35 *with* Pl. Ex. 36.

Triton settled with the Corps in approximately October 2003. Pl. Ex. 37. Pursuant to the Entry of Judgment in that case, Triton waived its right to recovery from the Corps of any costs that Triton may have incurred as a result of the re-work, whether incurred before or after the termination for default. Pl. Ex. 37 at ¶ 11(b).

### F.    Indemnification

Travelers demanded reimbursement from Triton for consulting and attorneys' fees and expenses in January 2002 and April 2002. Pl. Exs. 16 & 18.[7]

_____

[7] Pl. Ex. 18 is a demand letter dated April 4, 2002, and addressed to Willard F. Searle, one of the individual indemnitors. Triton does not dispute that on approximately April 4, 2002, Travelers made a demand upon the defendants in the amount of $164,078.60, as set forth in that letter. *See* Def. 56(a)2 Statement at ¶ 43.

## III.   Discussion

Travelers has moved for summary judgment on its indemnification claim and on all of

Triton's counterclaims.  Because a reasonable jury could find in favor of Triton on the

indemnification claim, summary judgment on that count is denied.  Triton has failed, however, to

raise a genuine issue of material fact with respect to its eight remaining counterclaims; summary

judgment is granted in favor of Travelers on each of those causes of action.

### A.   Travelers' Claim for Indemnification

The evidence in the record would permit a reasonable jury to conclude that Travelers has

not satisfied the necessary conditions to recover against Triton under the general indemnity

agreement.  That agreement sets forth the following terms in order for the surety to collect from

the indemnitors:

> In the event of payment, settlement, compromise, or investigation, an
> itemized statement of LOSS sworn to by an officer or authorized
> representative of RELIANCE or voucher(s) or other evidence of such LOSS
> shall be prima facie evidence of the fact and extent of the liability of
> INDEMNITORS to RELIANCE in any claim or suit and in any and all
> matters arising between INDEMNITORS and RELIANCE.

Pl. Ex. 27 (Underwriting and Continuing Indemnity Agreement) at ¶ 28.  The Connecticut

Supreme Court has noted that such a prima facie evidence provision "frequently is involved to

enable a surety to prevail on a motion for summary judgment."  *PCE Consulting, Inc. v.*

*Mercede,* 267 Conn. 279, 293 (2004).

David Boyd of Triton stated that in January 2002 when Travelers sought to recover under

the general indemnity agreement: "The demand was for the amount of $164,078.60, without any

detail or backup whatsoever."  Boyd Aff. (doc. # 58) at ¶ 72.  A fax dated January 30, 2002, from

-8-

Monteiro did itemize the amounts of the January 2002 demand. Def. Ex. 503. Monteiro appears

to be an "authorized representative," but she did not swear to the itemized statement, a

requirement under the indemnity agreement. Thus, summary judgment on Travelers' claim for

indemnification is denied.

### B.    Triton's Breach of Contract Claims

Triton has asserted three breach of contract claims against Travelers. Although Triton

points to three distinct contracts, its core allegation is the same: Travelers breached its duties

toward Triton when it failed to pursue an appeal of the Corps' denial of the contractor's re-work

claim.

### 1.    *General Indemnity Agreement*

First, Triton argues that Travelers breached the general indemnity agreement because it

failed to pursue the appeal of Triton's re-work claim. There is, however, no provision in the

indemnity agreement that imposes on the surety the duty to pursue any particular claim or appeal.

Rather, pursuant to the terms of the indemnity agreement, Triton assigns to the surety: "all rights,

actions, causes of action, claims and demands of [Triton] in, or arising out of, the [contract(s)] or

any extensions, modifications, changes or alterations thereof or additions thereto." Pl. Ex. 27 at

¶ 15(c). Accordingly, Triton's claim that Travelers breached the indemnity agreement fails as a

matter of law.

### 2.    *Takeover Agreement*

Second, Triton argues that it is an intended third-party beneficiary of the takeover

agreement between Reliance and the Corps. "The ultimate test to be applied in determining

whether a person has a right of action as a third party beneficiary is whether the mutual intent of

the parties to the contract was that the promisor should assume a direct obligation to the third party beneficiary." *Pelletier v. Sordoni/Skanska Const. Co.*, 264 Conn. 509, 531 (2003) (internal brackets omitted). "That intent is to be determined from the terms of the contract read in the light of the circumstances attending its making." *Id.*

The language of the takeover agreement does not suggest that the parties intended for Triton to be a third-party beneficiary under that contract. Rather, the takeover agreement provides that it does not affect the rights of the surety or Triton, its principal, with respect to any claims related to the termination of Abiquiu Dam contract. Pl. Ex. 15.

The relevant portions of the contract provide:

> 5. The Government acknowledges that the propriety of the Government's termination has not been decided. Notwithstanding any portion of this agreement the surety reserves all rights available to the surety or the principal, in regards to the propriety of the Government's termination, at law or in equity.
>
> ***
>
> 8. The Government understands that the Surety, by entering into this Agreement does not acknowledge the validity of the Government's termination of Principal's Contract, or acknowledge the validity of the assessment of any additional damages, or the validity of any other action taken by the Government against the Principal. This Agreement . . . is not intended to interfere with Principal's rights and remedies in any dispute with the government.

*Id.*

Triton's claim for breach of contract under the takeover agreement, a contract to which it was not a party or an intended beneficiary, fails as a matter of law.

3.    *Completion Agreement*

Third, Triton argues that Reliance and Triton entered into a completion agreement,

whereby Triton agreed to do the re-work on the Abiquiu Dam project in exchange for the surety's

"reservation and preservation" of Triton's claim rights against the government. According to

Triton, the "reservation and preservation" of rights necessarily meant – because of contractual

privity issues – that the surety would pursue Triton's re-work claim with the Corps. Triton

ultimately completed the re-work, but the parties dispute whether Triton did so in order to satisfy

its obligations under the indemnity agreement or whether it was acting pursuant to a separate

completion contract.

Triton has presented the following evidence in support of its argument concerning the

completion contract.

First, Triton points to the deposition of Reliance's Terry McLoughlin as evidence that

Triton and Reliance entered into a completion agreement. Def. Post-hearing Letter Brief (doc.

# 68) at 2. That testimony does not, however, support Triton's argument. When asked at his

deposition about a letter and "discussion draft" completion contract that Triton's counsel sent to

Reliance, def. ex. 21, McLoughlin responded that Reliance did not execute the contract because

he was "satisfied with the agreements entered into by the various parties." Def. Ex. C

(McLoughlin Depo.) at 268. He did refer to the "takeover agreement and the completion

agreement," but later corrected himself, stating:

> I am very vague on this because I didn't actually do it, we were contemplating
> a completion agreement to sign with Triton, and now I realize that didn't get
> done. That was something that was left on the table at the end.

*Id.* at 268-69.

-11-

Triton also points to the following deposition testimony of McLoughlin in support of its argument regarding the terms of a completion contract:

Q:    And did you understand that Triton was prepared [to perform the remedial work at its cost] because it understood that the parties' rights and remedies to recovery for the re-work costs at the end were preserved and protected?

A:    No. My understanding was that this was something that had been discussed and agreed upon by myself and one of the Daves.

*Id.* at 276-77.

McLoughlin clarified that they had agreed and discussed that Triton's obligation as indemnitor was to make the surety whole. *Id.* at 277. He did not testify that Reliance agreed to pursue or sponsor Triton's claim or any appeal, although he did acknowledge that he knew Triton expected to have its costs recovered by an affirmative claim against the Corps. *Id.* at 277. McLoughlin further testified regarding the draft contract proposed by Triton, def. ex. 21, and in particular paragraph eight, which concerned Triton's claim against the Corps:

Q.    So all of those claims that are set forth [in paragraph eight] you felt were covered by the reservations of rights set forth in the takeover agreement?

A:    All of those I wished them the best of luck with in processing.

*Id.* at 282. McLoughlin's testimony fails to support Triton's argument that the surety intended to sponsor the re-work claim when it sought to reserve and preserve Triton's rights under the takeover agreement with the Corps or when it negotiated Triton's completion of the remediation work.

Triton also points to a letter from McLoughlin to David McClung at Triton. Pl. Ex. 63. In that April 27, 2002 letter, McLoughlin confirms Reliance and Triton's "agreement and

-12-

understanding that Triton . . . will work with Reliance . . . in the investigation of the emergency

gate leaks and correction of the problems." *Id.* Although Triton relies on that letter to argue that

Triton and Reliance entered into a contract for Triton to complete the re-work in exchange for

Reliance pursuing Triton's claim with the Corps, the specifics of the letter, similar McLoughlin's

deposition testimony, do not support that argument.  In particular, McLoughlin wrote:

> Although Reliance in the Takeover Agreement expressly reserved all of
> Triton's and Reliance's own rights and defenses generally, and specifically
> concerning the validity of the termination, Triton has agreed with Reliance
> that Triton's interests will best be served by its continued participation as a
> competing contractor.

> Reliance will cooperate with Triton and its insurance carriers on the re-work
> investigation in a fair and reasonable manner, *but assumes no responsibility
> or obligation toward either*.

> The Continuing Agreement of Indemnity . . . remain[s] in full force and
> effect.

Def. Ex. 63 (McLoughlin letter, dated April 27, 2000) (emphasis added).

Moreover, Triton relies on the affidavit of its president, David Boyd.  Boyd describes

Triton's view of its "agreement and understanding" with Reliance with respect to the re-work:

"we understood that Triton, as completion contractor, would work with Reliance in the

correction of the gate leakage problems, and in return Reliance would reserve and preserve

Triton's claim on the project."  Boyd Aff. at ¶ 17.  Boyd also described Triton's desire to have a

more detailed completion agreement, *id.* at ¶¶ 17-18, but asserted that "Triton's efforts to get a

formal completion contract in place with Reliance were frustrated."  *Id.* at ¶ 22.

Finally, Triton relies on the deposition testimony of Travelers' Frederick Bossard, who

testified regarding the two-fold relationship between the surety and Triton.  He explained that

-13-

Travelers first had a relationship with Triton as a "terminated contractor," and, second, that Travelers had a relationship with Triton as a "completed contractor." Def. Ex. B (Bossard Depo.) at 263. He further testified that Travelers and Triton had "an understanding" that Triton would complete the re-work as Travelers' completion contractor. *Id.* at 264.

Despite Triton's general arguments, the record evidence indisputably demonstrates that, Triton's efforts notwithstanding, Triton and its surety did not enter into a completion contract that included Triton's key term, *i.e.*, that the surety would cooperate with it in prosecuting the re-work claim against the Corps. For example, in a letter dated April 28, 2000, Triton's counsel included a draft contract between Reliance and Triton regarding the re-work. Def. Ex. 21. In that draft, Triton proposed *inter alia* the following language: "It is acknowledged and agreed that Reliance, in cooperation with the claim prosecution effort, will make available as witnesses its consultants and key personnel associated with the Leakage Remediation Work and investigation." *Id.* at 9.

Moreover, in a letter to Reliance dated June 19, 2000, Triton's counsel wrote that he and McLoughlin had "discussed the advisability of a Triton–Reliance Workout Agreement. . . . My April 27th letter to Terry set forth the subject areas, and some of the substance, we felt should be dealt with in such an agreement. *There has been no response from Reliance.*" Def. Ex. 65 (emphasis added).

Finally, in a facsimile dated July 12, 2000, Travelers' Bossard provided Triton with a one-page Completion Agreement that was never executed. Def. Ex. 67.

The parties never executed a written contract, and there is no evidence whatsoever that Reliance agreed to the terms that Triton proposed regarding the surety's role in the prosecution of

-14-

Triton's claim with the Corps.  The only record evidence on that issue shows that the surety resisted executing a completion agreement that contained the disputed term.

In short, there is evidence from which a reasonable jury could infer that Triton and the surety entered into a separate, completion contract whereby Triton would complete the remediation work in exchange for Reliance, later Travelers, reserving and preserving Triton's claims regarding the termination before the Corps.  A reasonable jury could not, however, construe the contract to include as an "essential term," *see* Def. Post-hearing Letter Brief at 3, the requirement that Travelers to pursue, sponsor, or otherwise lend its name to Triton's re-work claim against the Corps.

C.      Triton's Claim for Breach of Implied Covenant of Good Faith and Fair Dealing

Triton argues that Travelers' conduct constituted a breach of the implied covenant of good faith and fair dealing.  Triton purports to base its claims on both the completion agreement and the indemnity agreement.

Under Connecticut law, an action for breach of the covenant of good faith and fair dealing requires proof of three elements: (1) that the plaintiff and defendants were parties to a contract under which the plaintiff expected to receive certain benefits; (2) that the defendant engaged in conduct that injured the plaintiff's right to receive some or all of those benefits; and (3) that defendant was acting in bad faith.  *See Franco v. Yale University*, 238 F. Supp. 2d 449, 455 (D. Conn. 2002).

With respect to the completion agreement, as discussed above, Travelers did not engage in conduct that injured Triton's right to receive any of the contractual benefits.  Triton was interested in securing Travelers' cooperation with its re-work claim, but a reasonable jury could

not find that any such right existed under a completion agreement.

Triton's rights under the indemnity agreement and Travelers' conduct under that contract require more analysis.

The implied covenant of good faith and fair dealing applies in the context of a surety indemnity agreement. *See PSE Consulting, Inc. v. Frank Mercede and Sons, Inc.*, 267 Conn. 279, 302 (2004). In *PSE Consulting*, the Connecticut Supreme Court described the scope of that duty in detail. The Supreme Court concluded that bad faith requires "an 'improper motive' or 'dishonest purpose' on the part of the surety." *Id.* at 304-05. Applying that standard, the Court concluded that a surety's failure to conduct a sufficient investigation into the validity of a claim upon a payment bond, when accompanied by other evidence that reflects improper motive, may be considered evidence of bad faith. *Id.* at 310.

Triton points to seven factors that it argues demonstrate Travelers' bad faith: Monteiro's insufficient investigation into the merits Triton's re-work claim; failure to mark-up Triton's claims for pass-through of its costs to the government; failure to consummate a written completion agreement; refusal to meet with Triton to discuss the merits of its claim and refusal to provide documents to support the conclusion that leakage was caused by poor workmanship; "pre-judgment" of Triton's guilt on the basis of a grand jury subpoena; selfish motive to secure the release of the bond; and zeal to pursue the indemnity lawsuit. Def. Opp. Memo. at 100-08.

To constitute a breach of the implied covenant of good faith and fair dealing, Travelers must have, in bad faith, impeded Triton's right to receive benefits that Triton reasonably expected to receive under the contract. *See De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 433 (2004). None of the factors that Triton relies upon represent either the

-16-

benefit of any bargain that Triton struck with Travelers or the reasonable expectation that Triton

had under the terms of any agreement with the surety. Accordingly, Triton's claims for breach of

the covenant of good faith and fair dealing necessarily fail as a matter of law.

D.     UCC

Triton has also alleged that Travelers' conduct did not conform to the Uniform

Commercial Code's standard of commercial reasonableness. Citing McLoughlin's deposition,

Triton asserts that the indemnity agreement operated as a financing statement under Article 9 of

the UCC, Conn. Gen. Stat. § 42a-9-207. Def. Opposition Memo. (doc. # 58) at 112. In the

portion of deposition testimony that was provided to the court, McLoughlin testified only that

paragraph 37 of the indemnity agreement "gives [the surety] the right to file the indemnity

agreement, UCC filing of the indemnity agreement." Def. Ex. C at 293.

Triton argues, in a cursory manner, that "courts have applied the commercial

reasonableness standard to sureties," citing one decision of the Texas Supreme Court in which

the court noted in dicta that "a surety may not dispose of collateral – including causes of action –

in a commercially unreasonable manner." *Associated Indemnity Corp. v. CAT Contracting, Inc.*,

964 S.W. 2d 276, 282 (Tex. 1998). Triton has not, however, pointed to any controlling case law

applying the commercial reasonableness standard to a surety's settlement of its principal's

claim,[8] nor has Triton produced evidence from which a reasonable jury could conclude that the

indemnity agreement was ever filed as a financing statement under Article 9.

---

[8] In at least one case, the Second Circuit has declined to address the argument that a surety's settlement must meet the UCC standard of commercial reasonableness. *Hutton Const. Co., Inc. v. County of Rockland*, 52 F.3d 1191, 1193 (2d Cir. 1995) (noting that argument was not raised before the lower court).

-17-

In 2003, the Eastern District of New York rejected an argument similar to Triton's. *See General Ins. Co. of America v. Mezzacappa Bros., Inc.*, 2003 WL 22244964 (E.D.N.Y. Oct. 1, 2003). In *Mezzacappa*, the defendant argued that the UCC's commercial reasonableness standard governed the settlement by a surety of its principal's affirmative claims because a provision in the parties' agreement provided that the surety could file the agreement as a valid UCC financing statement. *Id.* at *3. The court rejected that "specious" argument, after noting that courts have consistently applied the good faith standard to a surety's settlement of its principal's affirmative claims and concluding that the UCC has no application to a surety's indemnity agreement. *Id.* at *4-6.

There is no evidence from which a reasonable jury could conclude that the indemnity agreement operated as a financing statement under Article 9, nor does the standard of commercial reasonableness apply generally to a surety's indemnity agreement. *See National Shawmut Bank of Boston v. New Amsterdam Casualty Co.*, 411 F.2d 843, 849 (1st Cir. 1969) (holding that Article 9 did not displace surety's subrogation rights); *Amwest Surety Insur. Co. v. United States*, 870 F. Supp. 432, 434 (D. Conn. 1994) (rejecting attempt to apply the UCC to the surety's equitable subrogation claim, noting that "[t]here is no reference in the UCC to sureties," and that a "surety claim is [not] derived from . . . the ordinary financing contemplated by UCC Article 9"). Therefore, Triton's UCC claim fails as a matter of law.

E.    Breach of Fiduciary Duty

Triton asserts that Travelers was the contractor's fiduciary and that Travelers' conduct in refusing to sponsor or pass through the appeal of Triton's re-work claim was a breach of fiduciary duty.

-18-

"[I]n general, a surety does not owe a fiduciary duty to its principal." *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Woodhead*, 917 F.2d 752, 757 (2d Cir. 1990), *quoting National Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 207 (2d Cir. 1989).

Nevertheless, the Connecticut Supreme Court has purposefully left open the definition of a fiduciary, refusing to define "a fiduciary relationship in precise detail and in such a manner as to exclude new situations." *Konover Development Corp. v. Zeller*, 228 Conn. 206, 222-23, (1994), *quoting Harper v. Adametz*, 142 Conn. 218, 225 (1955). Rather, under Connecticut law, a fiduciary relationship may exist in "situations in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other." *Dunham v. Dunham*, 204 Conn. 303, 320 (1987), *overruled in part on other grounds, Santopietro v. New Haven*, 239 Conn. 207, 213 n.8 (1996), *quoting Harper*, 142 Conn. at 225. A fiduciary relationship is characterized "by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interest of the other." *Id.* at 322. "The superior position of the fiduciary or dominant party affords him great opportunity for abuse of the confidence reposed in him." *Id.*

There are no circumstances that would justify classifying Travelers' relationship with Triton as a fiduciary one. A reasonable jury could not find that Triton confided a "justifiable trust" in Travelers, resulting in the latter's "superiority and influence" over Triton. *Id.* at 320. Travelers and Triton operated as entities in a commercial relationship. Triton attempted to negotiate a contract that would require Travelers to pursue its re-work claim, including any appeal, and Triton may have proceeded with the "understanding" that the surety would lend its name to the re-work claim. Those facts, however, are wholly insufficient to create a fiduciary

-19-

relationship between the surety and its principal. Their relationship could not be described as one exhibiting "a unique degree of trust and confidence," and the surety – who under the indemnity agreement had the exclusive right to determine whether any claims on the bond should be paid, settled, defended or appealed – was not "under a duty to represent the interest" of Triton. *Id.* at 322.

    F.   <u>Misrepresentation</u>[9]

    Triton's claim of fraudulent misrepresentation fails as a matter of law. The essential elements of a claim for fraudulent misrepresentation are: "(1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury." *Maturo v. Gerard*, 196 Conn. 584, 587 (1985) (internal citations omitted).

    Triton argues that Travelers is liable for fraud because representatives from either Reliance or Travelers stated that the surety would reserve and preserve Triton's reclaim against the Corps. Even if a representative's statements concerning the "reservation and preservation" of Triton's rights implied that Travelers would pursue an appeal of the re-work claim, there is no evidence that any statement was known to be untrue by the party making it.

    G.   <u>Negligence</u>

    Under Connecticut law, "[a] party may be liable in negligence for the breach of a duty which arises out of a contractual relationship." *Johnson v. Flammia*, 169 Conn. 491, 496 (1975). Even absent a breach of contract, there may be tort liability because of negligence that occurs

---

[9] Triton's counterclaim does not specify whether the count of "misrepresentation" is based on a theory of fraudulent or negligent misrepresentation. In its opposition brief, however, Triton pursues a claim of fraudulent misrepresentation. Def. Opposition Memo. at 114-15.

during the course of performance under the contract. *Id.*

Triton does not, however, point to negligent conduct that caused it injury. Rather, Triton

merely repeats its allegation that Travelers had a contractual duty to reserve and preserve Triton's

re-work claim, which Triton understood to encompass the surety's sponsorship of the claim

before the Corps. Def. Opp. Memo. at 116.

Triton's brief details the involvement of certain Travelers employees, especially Sherrie

Monteiro, with respect to the re-work claim and Travelers' decision not to pursue the appeal.

Allegedly poor performance of particular Travelers' employees does not, however, give rise to a

negligence cause of action. Travelers did not have a duty to pursue the re-work claim under any

theory. Thus, Triton's claim of negligence fails as a matter of law.

**IV.    Conclusion**

Travelers' motion for summary judgment (doc. # 43) is denied with respect to its

indemnification claim and granted with respect to Triton's counterclaims.

It is so ordered.

Dated at Bridgeport, Connecticut, this 9th day of February 2007.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge

-21-